**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **Jane Doe I, Jane Doe II,** ) | | |
| **Jane Doe III, Jane Doe IV** ) | | |
| **Jane Doe V, Jane Doe VI** ) | | |
| ) | | |
| Plaintiffs, ) | No. _____ | |
| ) | | |
| **v.** ) | COMPLAINT | |
| ) | JURY DEMAND | |
| **The University of Tennessee,** ) | | |
| **The Director of** ) | | |
| **The Office of Student Conduct & Community** ) | | |
| **Standards (in his or her official capacity)** ) | | |
| ) | | |
| ) | | |
| ) | | |
| Defendants. ) | | |

_____

**COMPLAINT**
_____

**PRELIMINARY STATEMENT AND INTRODUCTION**

1.     This is a civil action for declaratory, injunctive and monetary relief for injuries Plaintiffs Jane Does I, II, III, IV, V, and VI sustained as a result of the acts and omissions of The University of Tennessee at Knoxville ("UT" or the "University") relating to sexual assaults involving UT football and basketball players (five rapes of female UT students)[1] and the University's deliberately indifferent actions before the rapes and afterwards in response in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX") and 42 U.S.C. § 1983. Plaintiffs also sue under the Supremacy Clause, Article VI, Clause 2, of the United States Constitution to bar UT from application and enforcement of a state statute and official policy (the

_____
[1] Three rapes were by UT football players, one rape by a UT basketball player and one rape by a non-athlete UT student where the underage victim became intoxicated with alcohol provided by football players at a party.

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 1 of 64 PageID #: 1

Tennessee Uniform Administrative Procedure Act, T.C.A. § 4-5-101 *et seq.*) in sexual assault cases on campus in derogation of Title IX and the Campus Save Act, 20 U.S.C. § 1092 (2012 (that *preempt* the TUAPA).[2]

2.      Plaintiffs assert two separate theories of liability for damages under Title IX:   1) deliberate indifference and clearly unreasonable acts and omissions that created a hostile sexual environment to female students *before* a sexual assault on a student by a fellow student by conduct and policies making a student more vulnerable to sexual assault itself; and 2) deliberate indifference and a clearly unreasonable response *after* a sexual assault that causes a student to endure additional harassment.

3.      UT intentionally acted by an official policy of deliberate indifference to known sexual assaults so as to create a hostile sexual environment. UT had actual notice (and itself created) a long-standing, severely hostile sexual environment of rape by male athletes (particularly football players) that was condoned and completely unaddressed by UT officials, including Chancellor Jimmy Cheek ("Cheek"), Athletic Department Director and Vice-Chancellor Dave Hart ("Hart"), and head football coach Butch Jones ("Jones").

4.      UT intentionally acted in a clearly unreasonable fashion in violation of Title IX by acts of custom and an official policy of: deliberate indifference to sexual assaults; direct interference with the disciplinary process in favor of male athletes who were charged with rape; directly supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape; and unlawfully discriminating against victims of sexual assault and fostering a hostile sexual environment by the misuse of a one-sided Tennessee Uniform Administrative Procedures Act ("TUAPA") procedure.

5.      UT's lack of promptness in investigating and remedying campus sexual assaults further constitutes deliberate indifference, because these investigative delays by UT helped to create the hostile sexual environment for discriminatory acts of these third parties by UT's repeated failure timely to remedy.

6.      The TUAPA procedure, was (and is, if not declared in violation of Title IX and preempted by the Campus Save Act (enacted as VAWA Section 304)) a deliberate rule and policy

---

[2] *Burgio and Campofelice, Incorporated v. New York State Department of Labor*, 107 F.3d 1000, 1006-07 (2d Cir. 1997); *Wright Electric, Incorporated v. Minnesota State Board of Electricity*, 322 F.3d 1025, 1028 (8th Cir. 2003).

decision by UT to allow perpetrators of sexual assaults, particularly varsity football and basketball players, to delay and altogether avoid sanctions and discipline for sexual assault by the use of a discriminatory TUAPA procedure that allows only accused perpetrators of sexual assaults (and not victims) to have the right of confrontation, cross-examination and a right to an evidentiary administrative hearing.

7. UT, in clear violation of Title IX and the constitutional right to equal protection, is unique among U.S. colleges and universities by virtue of its use of a one-sided TUAPA administrative hearing procedure ("contested case") that denies victims the rights to a hearing and to the same equal procedural, hearing, and process rights as given to perpetrators of rape and sexual assault. UT further acted (and acts) intentionally and in clear violation of Title IX by acts of custom and an official policy whereby Chancellor Cheek appoints administrative judges and hearing officers favorable to athletes and then *also decides any appeals* from TUAPA hearings in a clear conflict of interest. A hostile sexual environment was created by this procedure and policy as varsity athletes were condoned and encouraged to have parties with alcohol and drugs, entertain recruits, provide alcohol to underage female students and commit sexual assaults with no discipline or deterrence against committing sexual assaults as perpetrators of assaults faced no serious consequences.

8. Athletes knew in advance that UT would: support them even after a complaint of sexual assault; arrange for top quality legal representation; and then direct them to the TUAPA process, which was and continues to be a one-sided and unfair system of adjudication. Varsity athletes knew that they (not victims) would be fully supported by the UT athletic department and administration's process and that the perpetrators and athletic department could deter and discourage victims from pursuing complaints by: having their lawyers depose female victims; subjecting victims to extensive discovery; cross-examining sexual assault victims in a full blown hearing before an administrative law judge(appointed by Cheek); and delaying the investigation process until the athlete perpetrators transferred to another school or graduated without sanction or discipline. This is precisely what happened in the cases of Does I, II, IV, and VI and is the very reason that UT Vice-Chancellor Tim Rogers resigned from UT in March 2013 in protest over the violation of Title IX and the UT administration's and athletic department's deliberate indifference to the clear and present danger of sexual assaults by UT athletes.

9. UT administration (Chancellor Cheek), athletic department (Dave Hart) and football

coaches (including head coach Butch Jones) were personally aware (as "appropriate persons" under Title IX) and had actual notice of previous sexual assaults and rapes by football players, yet acted with deliberate indifference to the serious risks of sexual assaults and failed to take corrective actions despite express warnings and notice from UT Vice-Chancellor Tim Rogers and direct knowledge of numerous prior instances of sexual assaults. Under *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1171, 1173 (10th Cir. 2007) UT had "actual notice" under Title IX and acted clearly unreasonably because of UT's prior actual knowledge of sexual assaults by male athletes. The "before" theory of university liability for the rapes themselves recognized in *Simpson* has specifically been adopted by a Tennessee federal court in *Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 917-918 (M.D. Tenn. 2009). [3]

## Tolling Agreement with the University of Tennessee

10.     The University of Tennessee and Plaintiffs entered into a "Tolling Agreement," that tolled the applicable statute(s) of limitations such that this suit is timely filed.

---

[3] "Title IX liability can flow from two 'harassment' time periods: (a) when a school exhibits deliberate indifference, before a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack itself; or (b) when a school exhibits deliberate indifference after an attack, that causes a student to endure additional [*918] harassment." . . . *see, Simpson v. Univ. of Colorado*, 500 F.3d 1170, 1173 (10th Cir. 2007) (summary judgment in Title IX case inappropriate where claim was that coach failed to adequately supervise high school recruits because even before female students were sexually assaulted "there were a variety of sources of information suggesting the risks that sexual assault would occur if recruiting was inadequately supervised)."

*Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 917-918 (M.D. Tenn. 2009).

**COMPLAINT** ........................................................................................................................ 1

*PRELIMINARY STATEMENT AND INTRODUCTION* ........................................................ 1

    Tolling Agreement with the University of Tennessee ...................................................... 4

    Jurisdiction ...................................................................................................................... 6

*FACTUAL ALLEGATIONS* .................................................................................................. 7

    Notice of Ongoing Issues to the University's Administration and Athletic Department ...... 7

    Plaintiff Jane Doe I ........................................................................................................ 13

    April 2013: Another Allegation of Sexual Assault by Football Players at Vol Hall ......... 18

    February 2014: UT Football Player Arrests ................................................................... 20

    Plaintiff Jane Doe II ...................................................................................................... 21

    September 22, 2015: UT Football Player Allegedly Strikes Ex-girlfriend in the mouth ..... 23

    Plaintiff Jane Doe III ..................................................................................................... 23

    November 9, 2014: Enhancement of a Hostile Sexual Environment .............................. 25

    Plaintiff Jane Doe IV ..................................................................................................... 27

    Plaintiff Jane Doe V ...................................................................................................... 35

    December 2014: Another UT Football Player Arrested, Discipline Handled "Internally" ...... 36

    Plaintiff Jane Doe VI ..................................................................................................... 37

    March 2015: UT Football Player Arrested ..................................................................... 40

    July 2015: UT Football Player Arrested ......................................................................... 41

    November 28, 2015: Hostile Environment Remains Uncured ........................................ 41

*COUNT I :Violation of Title IX – 20 U.S.C. § 1681(a)* ...................................................... 43

*COUNT II: Violation of 42 U.S.C. § 1983:* .......................................................................... 46

    Declaratory Judgment and Injunctive Relief & Under Supremacy Clause, Article VI, Clause 2, of the United States Constitution. ........................................................................... 46

*Count III: Declaratory and Injunctive Relief for Violations of Title IX.* ........................... 48

    Plaintiff Doe I's Claims Under Title IX ........................................................................ 49

    Plaintiff Doe II's Claims Under Title IX ....................................................................... 51

    Plaintiff Doe III's Claims Under Title IX ...................................................................... 53

    Plaintiff Doe IV's Claims Under Title IX ...................................................................... 55

    Plaintiff Doe V's Claims Under Title IX ....................................................................... 57

    Plaintiff Doe VI's Claims Under Title IX ...................................................................... 60

*PRAYER FOR RELIEF* ...................................................................................................... 63

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 5 of 64 PageID #: 5

Plaintiff Jane Doe I is a resident of Knox County, Knoxville, Tennessee. Plaintiff Doe I was a student at UT from August 2012-May of 2014.

11.     Plaintiff Jane Doe II is a resident of Hamilton County, Chattanooga, Tennessee. Plaintiff Doe II was a student at UT from August 2014-January, 2015.

12.     Plaintiff Jane Doe III is a resident of Spring Hill, Tennessee. Plaintiff Doe III was a student at UT from August 2014-December 2014.

13.     Plaintiff Jane Doe IV is a resident of Orlando, Florida. Plaintiff Doe IV was a student-athlete at UT from August 2013-November 2014.

14.     Plaintiff Jane Doe V is a resident of Rhinebeck, New York. Plaintiff Doe V was a student-athlete at UT from August 2013-January 2015.

15.     Plaintiff Jane Doe VI is a resident of Knox County, Knoxville, Tennessee.  Plaintiff Doe VI was a student at UT before leaving in April 2015.

16.     Defendant University of Tennessee at Knoxville is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses throughout Tennessee.  The University is an instrumentality of the State of Tennessee, and is administered by the UT Board of Trustees. Further, the University receives state and federal funding under Title IV and therefore is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). The University can be served with legal process c/o Herbert H. Slatery III Attorney General, State of Tennessee, Office of the Attorney General and Reporter 425 5th Ave N #2,  Nashville, TN 37243.

## Jurisdiction

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and the Supremacy Clause, Article VI, Clause 2, of the United States Constitution.

18.     Venue is proper in the Nashville Division of the U.S. District Court in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(c)(2) because, *inter alia* , UT resides in the Nashville Division in the Middle District, is subject to this Court's personal jurisdiction, and Plaintiffs cannot receive a fair and an impartial trial by jury in accordance with the Seventh Amendment to the U.S. Constitution in any other judicial district in which venue would be proper. UT maintains several campuses in Nashville (College of Social Work, Pharmacy and Health Sciences) and UT's

Board of Trustees regularly hold its meetings in Nashville. http://trustees.tennessee.edu/ *last visited December 9, 2015). See also* T.C.A. 4-5-223 (*Davidson County, Tennessee is proper venue for TUAPA declaratory judgment suits*); *Jain v. University of Tennessee*, 670 F.Supp. 1388 (W.D. Tenn. 1987) (*aff'd* 843 F.2d 1391 (6th Cir. 1988)) (*UT is an arm of the State of Tennessee*).

## FACTUAL ALLEGATIONS

### Notice of Ongoing Issues to the University's Administration and Athletic Department

19.     Incidents involving athletes and misconduct, including specifically sexual violence, have been part of a hostile sexual environment and culture of the University of Tennessee Athletic Department for more than a decade. Plaintiffs aver that the University's actions affirmatively and deliberately created (and creates) a hostile discriminatory sexual environment for female students and acted with deliberate indifference in its response to incidents of sexual assault in a pattern, practice, practice, policy, and custom of grossly inadequate discipline and resolution in specific favor of male, "major sports" athletes. Plaintiffs further aver that said favoritism included interfering with and stopping the disciplinary process, concealing charges and investigations involving male athletes, arranging for specialized defense counsel for male athletes at UT facing criminal and sexual assault charges, encouraging parties with underage drinking to benefit recruiting, discouraged reporting by creating a culture of known tolerance for and protection of misconduct,  and misusing the Tennessee Uniform Procedures Act by Chancellor (Cheek) selecting judges to hear cases involving athletes in a delaying process not in compliance with Title IX.

20.     Under the "before" Title IX case, a prior known history of sexual misconduct by male athletes (football and basketball players) is relevant to notice and the creation of a hostile environment for sexual assaults and making female students vulnerable to assaults. *Simpson*, 500 F.3d 1170, 1179-1184. In 1995, UT football player Nilo Sylvan was arrested and charged with raping a 17-year-old youth in his West Knoxville apartment where he lived with other UT football players. See  http://dailybeacon.webfactional.com/sports/1995/sep/19/athlete-arrested-for-rape/ (*last visited December 9, 2015).  Sylvan was eventually dismissed from the team but remained under scholarship for the remainder of the semester. See http://dailybeacon.webfactional.com/sports/1995/sep/20/nilo-silvan-dismissed-from-team/ (*last visited* December 9, 2015). The arrest occurred less than one week after his teammate, Leslie Ratliffe, was arrested and charged for assaulting his girlfriend. See http://dailybeacon.webfactional.com/sports/1995/sep/19/athlete-arrested-for-rape/ (*last visited*

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 7 of 64 PageID #: 7

December 9, 2015).

21.    In 1996, (then) Jamie Whited, the first female associate trainer in UT's history, reported an incident to the Sexual Assault Crisis Center in Knoxville alleging that UT football player Peyton Manning had, in brief, "sat on her face" while she was assessing the extent of an injury. The incident was settled in 1997 for an undisclosed amount conditioned on the victim leaving her job at the University. See http://usatoday30.usatoday.com/sports/football/nfl/colts/2003-11-04-manning-suit_x.htm (*last visited* December 9, 2015).

22.    In May of 2003, UT football player Antwan Stewart was arrested and charged with raping a 16-year-old girl with a learning disorder in an on-campus dormitory. UT Athletic Department personnel (including head coach Phil Fulmer) were made aware of the incident within hours and met with the victim and her mother before the authorities were contacted. See http://dailybeacon.webfactional.com/news/2003/aug/1/da-will-not-charge-player-with-rape/    (*last visited* December 9, 2015). Charges were eventually dropped and Stewart played in all 13 games of the 2003 season.

23.    In January 2005, UT football player Tony McDaniel was arrested and charged with aggravated assault after hitting another student during a pickup basketball game on campus. McDaniel was represented by Knoxville attorney Don Bosch, a former UT Athlete and Member of the    Board    of    Athletics,    in    the    incident.    *See* http://usatoday30.usatoday.com/sports/college/football/sec/2005-05-18-tennessee-indictment_x.htm (*last visited* December 8, 2015).

24.    At that time, McDaniel was one of 13 UT football players who had been arrested or cited for crimes ranging from aggravated assault to underage drinking in less than a year (since February of 2004). *Id*.

25.    McDaniel was suspended from the team at the time (it was the offseason) and he remained enrolled at UT for the duration of the Spring, 2005 semester. The victim was another UT student whose face was broken in four places, requiring a metal plate. McDaniel was indicted on a felony charge of aggravated assault in May of 2005 but the University's discipline was limited to a suspension for the summer school sessions and "indefinite probation," and McDaniel was not allowed    to    use    the    student    recreational    center.    See http://usatoday30.usatoday.com/sports/college/football/2005-07-28-notes_x.htm    (*last visited*

December 8, 2015).

26.     In July 2005, McDaniel pleaded guilty but, in a deal obtained by his attorney, the charges were reduced to misdemeanor assault and he was allowed to return to the team following the first two games of the season. *Id*.

27.     In November of 2009, UT football players Nu'Keese Richardson, Janzen Jackson and Mike Edwards were arrested and charged with attempted armed robbery. http://thegrio.com/2009/11/12/3-university-of-tennessee-football-players-arrested-for-robbery/ (*last visited* December 8, 2015).

28.     Former UT Athlete and Member of the Board of Athletics, Knoxville attorney Don Bosch, represented UT football player Janzen Jackson in the incident. *See* http://espn.go.com/ncf/news/story?id=4647094 (*last visited* December 8, 2015). Jackson was reinstated to the team that season and continued to play for the Volunteers throughout the 2010 season before withdrawing from school during the Spring 2011 semester (he was reinstated in July of that year) and ultimately being kicked off the team for issues relating to substance abuse in August 2011. *See* http://www.utsports.com/sports/m-footbl/mtt/jackson_janzen00.html (*last visited* December 8, 2015), see also (http://www.teamspeedkills.com/2011/8/24/2381418/janzen-jackson-dismissed-tennessee-volunteers-football?_ga=1.110006467.735610754.1426605234 (*last visited* December 9, 2015). Jackson has since been arrested for murder and, as of 2014, was being held on a $1-million-dollar bond. *See* http://theadvocate.com/sports/9579990-128/rabalais-for-janzen-jackson-football (*last visited* December 8, 2015).

29.     In July of 2010, UT football players Da'Rick Rogers and Darren Myles, Jr. were arrested following a brawl at a bar where multiple (reports ranging from 6-12) football players were partying on an evening that left an off-duty police officer seriously injured. *See* http://www.myfoxmemphis.com/story/18526635/da-no-more-charges-in-bar-brawl-with-vols (*last visited* December 8, 2015). Myles was arrested on charges of assault, evading and resisting arrest and Rogers was arrested on charges of disorderly conduct and resisting arrest. http://www.wrcbtv.com/story/12778928/updated-calhouns-darick-rogers-arrested-in-knoxville-bar-fight (*last visited* December 8, 2015).

30.     Myles was dismissed from the football team; however, in a deal arranged by his attorney, Don Bosch, Rogers agreed to perform 16 hours of community service and the charges were

dropped in September, without Rogers missing a single game of the 2010 season. See http://www.myfoxmemphis.com/story/18526635/da-no-more-charges-in-bar-brawl-with-vols (*last visited* December 8, 2015).

31.     In February of 2011, UT football player Brent Brewer was arrested and charged with domestic assault. See http://www.rockytoptalk.com/2011/2/14/1992611/tennessee-safety-brent-brewer-suspended-indefinitely-after-domestic?_ga=1.104791110.735610754.1426605234 (*last visited* December 7, 2015).

32.     Brewer was represented by attorney Don Bosch in the incident and although initially given an "indefinite suspension" from the football team, Brewer was reinstated to the team five weeks later after reaching a plea agreement that reduced the charges to "offensive touching." See http://usatoday30.usatoday.com/sports/college/football/2011-03-21-2474544407_x.htm (*last visited* December 8, 2015), http://www.sbnation.com/2011/3/21/2063625/brent-brewer-reinstated-at-tennessee (*last visited* December 8, 2015).

33.     In 2011 and 2012, multiple separate allegations were made to the University relating to sexual assaults by UT athletes. (Then) University of Tennessee Vice-Chancellor, Tim Rogers ("Rogers"), made repeated efforts to bring concerns over serious ongoing problems involving sexual assaults by football and basketball players and with the University's response as it relates to sexual assault cases to the attention of school administrators.

34.     In June of 2011, UT Athletic Director, Mike Hamilton, resigned amidst significant criticism by Tennessee fans for setbacks on and off the field in three major sports (men's basketball, baseball and football). See http://espn.go.com/ncaa/news/story?id=6634194 (*last visited* December 10, 2015).

35.     Hamilton was succeeded by Dave Hart[4], the athletic director for Florida State University. During his tenure at FSU, the University (and, specifically, the athletic department) came under serious scrutiny after attempting to cover up an alleged rape of a female FSU student athlete by a football player in 2003. The incident resulted in the commission of multiple reports to study the

---

[4] During a January, 2013 interview, Hart commented on his plan to cure the ongoing financial woes of Tennessee's athletic department left in the wake of repeated unsuccessful seasons in major sports, stating: "We've got to get football healthy," "That's our economic engine. When that program is successful, everybody wins." *See* http://www.sportsbusinessdaily.com/Journal/Issues/2013/01/28/Colleges/Tennessee.aspx (*last visited* December 10, 2015).

athletic department's operations, one by the Inspector General. The Inspector General report found that Hart's department maintained a policy that ""all athletic department personnel should go to their supervisor before contacting officers in the university and state administration." "The 'tone at the top' typically indicates the culture of most business units or organizations," the inspector general report went on to state. "Within the Athletics Department, we believe the culture of isolation has been established by the tone of the Athletics Director (Dave Hart), who is ultimately responsible for all facets of the Department's operations." The report also found that the athletics department did not seek counsel from FSU police or other university departments on potential criminal matters. And in the MGT report, Hart was criticized for "not holding head coaches accountable for the enforcement of rules for players, including classroom attendance and student conduct." http://www.tennessean.com/story/news/local/2015/02/16/dave-hart-helm-florida-state-athletics-mishandled-rape-claim/23458011/ (*last visited* December 10, 2015). In a later interview, former FSU general counsel, Betty Steffens, who headed the task force implemented to review the athletic department's dealings, said the way Hart's athletics department handled the sexual assault claim made by a student-athlete "was totally not the right way to do business." *Id*.

36. Upon information and belief, after Hart's hiring during the 2011 football season, the University received a report of an alleged sexual assault against UT football player Da'Rick Rogers. The University never disclosed the allegation.

37. The athletic department exercised improper and undue influence on the disciplinary process and Director of Student Judicial Affairs, Jenny Wright. The athletic department criticized Ms. Wright's investigations and their outcomes in incidents involving athletes that included in a verbal berating by Athletic Director and Vice Chancellor Dave Hart.

38. No action was taken against Da'Rick Rogers by the University or football team as a result of the alleged rape and he continued to play in every game of 2011, earning all-conference accolades before eventually being kicked off the team in 2012.

39. In 2012, accusations were made against Hart and the University by athletics department staffers and associate athletic director Debby Jennings for discrimination and two separate lawsuits were filed alleging, in-part, that Hart and the athletic department's actions in removing female staff and administrators and replacing them with male counterparts were intended to facilitate the running of the department as a "good ol' boys club," consistent with the specific

findings and criticisms of the Inspector General reports from FSU. *See Deborah Jennings v. The University of Tennessee and Dave Hart*, Case No. 3:12-cv-00507, USDC EDTN, Second Amended Complaint Doc. 35 at 24, ¶ 105. *See also*, http://www.tennessean.com/story/opinion/editorials/2015/02/16/university-tennessee-operate-impunity/23521043/ (*last visited* December 10, 2015).

40.   In May 2013, (then) University of Tennessee Vice-Chancellor, Tim Rogers again voiced his concerns relating to serious ongoing problems involving sexual assaults by football and basketball players and with the University's response as it relates to sexual assault cases.  Rogers met with Chancellor Cheek, provided direct notice to Cheek of the hostile sexual environment, rape culture and increased risk of placing athletes with freshman woman at Vol Hall. Rogers provided written memos to Cheek detailing these concerns. The University has stated to Plaintiffs' counsel that these memos are no longer available.

41.   These issues raised by Rogers were memorialized in a document specifically addressing a pattern of undue influence and involvement by the Athletic Department and Administration.

42.   Mr. Rogers again attempted to discuss these concerns in May 2013, directly to Cheek before he communicated them directly to University of Tennessee President Joe DiPietro ("President DiPietro").

43.   Specifically, in a written memorandum, Rogers raised the following "examples" of interference by the Athletic Department:

5.   **Examples**
  a.   **Vol Hall residential parameters modification (freshmen now eligible)**
  b.   **Refusal to address inordinate # of disciplinary cases involving athletes**
  c.   **Refusal to discuss inordinate number of sexual assault allegations in Vol Hall, some alleging athletes were involved**
  d.   **Refusal to allow me to discuss a proposal to launch a campus–wide program to address the issue of sexual assault**
  e.   **Constant criticism of disciplinary penalties assigned to athletes**
  f.   **Consideration of a new residence hall on the Stokely site when there exists no logical reason for that siting other than to benefit Athletics at the detriment of University Housing and the residential student body at-large**

44.     Rogers presented the memorandum to Chancellor Cheek, who refused to read Mr. Rogers' written memorandum.

45.     Rogers subsequently met with President DiPietro, but no substantive action was taken to address the problems raised by Rogers.  Rogers resigned from UT on March 6, 2013 due to "the intolerable situation" created by the UT administration and athletic department of interfering with the disciplinary process for athletes and being deliberately indifferent to the risks of sexual assaults and rapes by football players and basketball players, particularly at Vol Hall. This was specific notice of the risk of sexual assault and the existence of a University created atmosphere of a hostile sexual assault environment created and condoned by the UT administration and athletic department.

46.     Jenny Wright, then Director of Student Judicial Affairs, voiced concerns relating to a pattern and practice of active interference by the Athletic Dept. that included "coaching witnesses to get their stories straight."

47.     Upon information and belief, Jenny Wright was specifically instructed by Chancellor Cheek to "stop" and not pursue an investigation or disciplinary action in an incident relating to allegations of sexual assault against UT football player Marlin Lane in April, 2013 (discussed *infra*).

48.     Plaintiffs herein each allege injuries occurring after the University was on notice of a hostile sexual environment created by University policies as proven by issues raised by Ms. Wright and Mr. Rogers (and later memorialized in Mr. Rogers' Memorandum).

**Plaintiff Jane Doe I**

49.     In February, 2013, Plaintiff Jane Doe I met Yemi Makanjuola, a 6' 9" (then) UTK student and basketball player from Nigeria. Makanjuola initially asked Plaintiff Doe I out for Valentine's day (February 14, 2013) but when she informed him she had dinner plans, Makanjuola proposed instead that they order lunch and eat at his on campus apartment in Vol Hall.

50.      While at his apartment on February 14, 2013, Makanjuola made sexual advances towards Plaintiff Doe I that were expressly and clearly rejected. Plaintiff Doe I left the apartment and later that evening exchanged text messages with Makanjuola.

51.    During the exchange, Plaintiff Doe I again explained that she was only interested in friendship and did not want to have a physical relationship with someone she had just met. Makanjuola replied, indicating that he both understood and respected her position and additionally invited Plaintiff Doe I to come over the next day.

52.    Based on Makanjuola's expressed understanding of her intentions, Plaintiff Doe I accepted the invitation and arrived at Vol Hall the following day on February 15, 2013, around noon. Initially, Makanjuola's conduct was acceptable and the two made small talk while watching TV.

53.    Both Makanjuola and Plaintiff Doe I were sitting on his bed. Approximately an hour and a half later, Makanjuola lay down on his bed and pulled his pants down. He forcefully grabbed Plaintiff Doe I's head, pushing it towards his penis. Plaintiff Doe I resisted and verbally said "no" repeatedly. Makanjuola ignored Plaintiff Doe I's objections and got on top of her, forcefully removing her clothes.

54.    Using her hands, Plaintiff Doe I attempted to block Makanjuola from vaginally penetrating her with his penis until Makanjuola grabbed both of her hands and held them above her head. Plaintiff yelled for him to stop repeatedly and continued struggling but was unable to stop the 6'9' athlete, who stared at Plaintiff throughout the ordeal without speaking other than repeatedly "shhh-ing" her.

55.    When Plaintiff attempted to leave and began putting on her clothes Makanjuola told Plaintiff to let him dress her. Makanjuola attempted to take a photograph of Plaintiff Doe I while she was naked but Plaintiff refused. After her clothes were on, Makanjuola again attempted to take a picture of the two of them together but Plaintiff Doe I refused.

56.    Plaintiff Doe I was scared to leave and sat in the room until Makanjuola informed her that it was time to leave because he had pre-game. Makanjuola followed Plaintiff out of the dorm and instructed her to get into a vehicle he flagged down that was being driven by another basketball player, Jarnell Stokes. Makanjuola instructed Stokes to stop the car and let Plaintiff out at the bottom of Peyton Manning Pass. As she exited the vehicle Makanjuola instructed her to text him when she got back to the dorm.

57.    Plaintiff Doe I was in shock at the events and did not know what to do. Makanjuola later contacted her but when she refused to meet him at his apartment he became angry and asked why she was being difficult.

58. The following morning on February 16, 2013, Plaintiff went to the hospital where she underwent a sexual assault exam. The assault was reported by the nurses to the police, who interviewed Plaintiff while at the hospital. That same afternoon, on February 16, 2013, Makanjuola played in Tennessee's win at home over the University of Kentucky.

59. A police report detailing the incident was filed with UT's police department ("UTPD").

60. Upon information and belief action was taken by the University through its media relations department to limit public access to UTPD's records of the investigation. *See* Kuykendall, Blair, Open access laws ignored by UT, The Daily Beacon at p 4, April 23, 2013.

61. On February 17, 2013, a No-Contact Directive was sent to Plaintiff and Makanjuola by UT via email.

62. UT sent notification to faculty over Plaintiff's Spring, 2013 classes that Plaintiff had suffered a "traumatic personal experience," would "likely miss some of her classes" and that "the Dean of Students Office is working with her, and would appreciate any support you can provide."

63. Plaintiff Doe I subsequently sought a protective order against Makanjuola where she was represented by a court appointed attorney. Although Makanjuola obtained representation by Don Bosch, a well known Knoxville attorney, a former UT athlete and member of the UT Board of Athletics, Makanjuola did not appear for the initial hearing and arrived several hours late for the rescheduled hearing because of conflicts with his UT basketball schedule.

64. UT's investigation concluded that Makanjuola had violated the University's General Standard of Conduct 5 and 6 and provided notification of same in early March, 2013.

65. The process was then delayed by an openly disingenuous request by Makanjuola's attorney for an administrative hearing to contest the charges.

66. Upon information and belief, this practice of requesting a disciplinary hearing was routinely utilized by UT athletes who had been accused of sexual assault for the sole purpose of delaying implementation of disciplinary action without any intent of actually participating in the hearing.

67. Upon information and belief, the purpose of requesting a disciplinary hearing was to allow Makanjuola to continue to play basketball throughout the remainder of the season and to allow

UT to effectuate his transfer to another school, the University of North Carolina at Wilmington, where UT's Head of Basketball Operations, Houston Fancher, had accepted a coaching job (announced April 23, 2013).

68. On March 7, 2013, Plaintiff received a copy of correspondence from UT Chancellor, Jimmy Cheek, sent to Makanjuola's attorney, Don Bosch, notifying Makanjuola that, per his request for a hearing the matter had been assigned to an administrative law judge.

69. On March 17, 2013 ("Selection Sunday"), the NCAA Selection Committee announced the participants and tournament brackets for the 2013 NCAA Men's Division I Basketball Tournament. UT did not make the tournament.

70. On March 18, 2013, counsel for UT wrote the administrative law judge to request a hearing date, indicating that the parties would need until May 2013, to complete depositions.

71. The administrative law judge appointed to preside over the hearing sent a request to counsel for dates to schedule the hearing on March 18, 2013, and requested a response from counsel for UT and Makanjuola by March 21, 2013.

72. Makanjuola's attorneys did not initially respond to the administrative law judge's request and on April 1, 2013, the hearing date was set for May 22, 2013. Only after the May 22 hearing date was selected did Makanjuola's attorney contact the judge to instead request a later hearing date of May 30, 2013.

73. Upon information and belief, Makanjuola requested the later hearing date in order to ensure that any disciplinary action would be imposed after he was able to complete academic courses at UT so that his eligibility for transfer would not be adversely affected.

74. Upon information and belief, UT routinely delayed matters relating to disciplinary proceedings and announcements until time periods when school was not in regular session so as to mitigate the negative impact of related media.

75. No depositions were taken in the case as initially represented when scheduling the disciplinary hearing.

76. On April 20, 2013, UT announced that Makanjuola had been granted a release in a statement from Tom Satkowiak, Associate Director of Media Relations for the University of Tennessee Athletics. There was no mention of the pending disciplinary charges, protective order or

the allegations by Plaintiff. In announcing the release, the (then) UT head basketball coach Cuonzo Martin stated "Yemi is leaving the team on good terms. He's respected by his teammates and coaches, we all appreciate the work he's put in during his time here and I'm confident that he'll be successful." *See* http://www.timesfreepress.com/news/sports/college/story/2013/apr/21/vols-makanjuola-transferring-out-ndiaye-signs/105926/ (*last visited* December 3, 2015).

77.     On April 23, 2013, the University of North Carolina at Wilmington ("UNCW") announced the hiring of Houston Fancher (UT's Head of Basketball Operations) as its newest assistant basketball coach.

78.     Makanjuola subsequently announced his intent to transfer to UNCW to play basketball.

79.     Makanjuola continued to take classes at UT through the spring semester.

80.     On May 1, 2013, the administrative law judge contacted counsel for UT and Makanjuola to confirm the May 30, 2013, hearing date. That same day, counsel for UT replied, confirming the May 30, 2013, hearing date but noting that Makanjuola did not plan on participating.

81.     On May 30, 2013, counsel for UT received an email from counsel for Makanjuola confirming that Makanjuola would not be participating in the hearing and that no one would be appearing on his behalf.

82.     Neither Makanjuola nor his attorneys appeared for the hearing and, at the onset, counsel for UT indicated to the administrative law judge that a motion for default would be forthcoming.

83.     Plaintiff appeared for the hearing and testified via Skype despite the fact that Makanjuola did not appear and despite the fact that counsel for UT had already moved orally for default and announced a forthcoming motion for default judgment. Plaintiff was subjected to direct examination by counsel for UT, forcing her to relive the incident in detail. Plaintiff was further subjected to subsequent examination by the administrative law judge, that included questions inappropriately classifying Mr. Makanjuola's actions as "a little friendlier than you would have him be?" and further inquiry of whether Plaintiff's response to the encounters with Makanjuola (in reporting the incident) were related to his statements that he "didn't like you [Plaintiff]" and whether Plaintiff was "being vindictive in any way." May 30, 2013, Transcript of Proceedings.

84.     Although the administrative law judge indicated at the onset of the hearing that retroactive disciplinary action dating back to the assault was an available remedy, the only disciplinary action sought by UT was an indefinite suspension.

85.     The administrative law judge issued her decision on July 24, 2013, finding that Makanjuola had violated the General Standards of Conduct set forth in the initial charges and, as a "penalty," issued an "indefinite suspension," effective July 24, 2013.

86.     Following the "indefinite suspension," Plaintiff continued her enrollment at UTK in the nursing program, an academic track to which she had already committed three years of work.

87.     In December of 2013, less than five months after the date the decision was issued, Plaintiff was contacted via text message by Makanjuola, resulting in recurrence of significant PTSD symptoms directly attributable to the February assaults.

88.     The contact directly impacted Plaintiff's academic performance and class attendance; however, the measures initially taken to notify her teachers and provide academic assistance and support (required under Title IX), were not continued and as a result Plaintiff's grades suffered.

89.     Plaintiff was not notified by UT until May of 2014, when it was too late to transfer to another program, that her GPA (3.12) was .08 points below the nursing program requirement (3.2) and therefore insufficient to remain in the UT nursing program. Upon being informed that her GPA did not meet the requirements, Plaintiff even provided medical evidence (in the form of a letter from her therapist at UT) establishing that the drop in academic performance was largely attributable to the assault, the subsequent contact by her assailant and resulting recurrence of PTSD.

90.     Despite the medical evidence (and UT's duties under Title IX), on May 21, 2014, Jane Doe I was informed that the school would offer no leniency and she was precluded from continuing in the nursing program for failing to meet the 3.2 GPA requirement.

### April 2013: Another Allegation of Sexual Assault by Football Players at Vol Hall

91.     In April 2013, yet another report was made alleging sexual assault at Vol Hall, this time involving UT football players, Geraldo Orta and Marlin Lane (who the victim alleged raped her). (Then) ineligible UT football player Izauea Lanier[5] (Lanier played for UT during the 2011

---

[5] Lanier, a 2008 high school graduate, originally committed to Auburn but was ruled ineligible and subsequently transferred to East Mississippi Community College for two seasons. He played for the University of Tennessee

football season before being ruled ineligible by the NCAA for the 2012 season) was also involved in the incident.

92.    The assault occurred on April 7, 2013, in the suite shared by these and other football players, including roommate A.J. Johnson.

93.    During the investigation, UT football players were interviewed but only after they had already been made aware of the allegations by UT and had conversations with their teammates.

94.    Upon information and belief, these conversations and prior actions by UT allowed the players to "get their stories straight."

95.    The victim's account of the incident described nearly identical circumstances to those found by UT in its investigation of the assault on Plaintiff Jane Doe IV (see *infra*), including but not limited to a sexual encounter with one player (Orta) that was initially consensual before another player (Lane) joined in without consent; the provision of alcohol by UT football players to minors; and, a claim by one of the accused that communications with the victim included a "pinky promise." *See* April 2013 UTPD Police Report.

96.    No disciplinary action was ever taken against the football players involved in the incident by the University.

97.    No disciplinary action was taken at all against the football players except a nominal "suspension" on April 13, 2013, when UT football player Marlin Lane was suspended from the football team for what was stated by Head Coach Butch Jones as "disciplinary reasons." *See* http://www.tennessean.com/story/news/local/2014/10/31/ut-never-disclosed-rape-allegations-athletes/18267043/ (*last visited* December 4, 2015).

98.    The purely facial "suspension" only consisted of Lane missing four practices and a scrimmage before he was fully reinstated to the team less than two months later at which time Head Coach Butch Jones described him as a "success story," and Lane has since been promoted to a member of the Vols' 13-man player staff of team leaders. *Id*.

99.    The April, 2013 incident marked the third such allegation of sexual assault (including

---

during the 2011 football season but was ruled ineligible by the NCAA for the entire 2012 season. He then transferred (again) to West Alabama, where he played in 2014. See http://www.tuscaloosanews.com/article/20140912/NEWS/140919838?p=1&tc=pg (*last visited* December 7, 2015).

the assault against Plaintiff Doe I) in the Vol Hall student apartments in a two-month period; however, the University's disclosure of these incidents was limited to Head Coach Jones's announcement of Lane's suspension for "disciplinary reasons" and (then) Head Basketball Coach Cuonzo Martin's statements relating to Makanjuola's release, supra —without any reference to the allegations of sexual assault.

<u>**February 2014: UT Football Player Arrests**</u>

100.   On February 2014, later in the week of "National Signing Day" police responded to a party at an apartment in Knoxville where former UT football player Dontavis Sapp and (then) current UT football players AJ Johnson, Curt Maggitt, Jalen Reeves-Maybin and Jakob Johnson lived. *See* http://knoxblogs.com/evanseleven/2014/02/10/butch-jones-faces-1st-field-incident-tenure-9-vols-arrested-cited-sunday/ (*last visited* 12/1/15).

101.   No fewer than 9 UT football players were arrested or cited in connection to the incident and fourteen partygoers (including at least four UT football players, Dontavius Blair, Dimarya Mixon, Justin Coleman and Malik Brown) were cited for underage drinking. *See* http://knoxblogs.com/evanseleven/2014/02/10/butch-jones-faces-1st-field-incident-tenure-9-vols-arrested-cited-sunday/ (*last visited* 12/1/15). Upon information and belief, drugs were in use at the party.

102.   (Then) current football players Curtis Maggitt, Jalen Reeves-Maybin and Jakob Johnson were cited for providing alcohol to underage persons. *Id*.

103.   Two former UT football players were arrested and another former UT football player was cited during the incident. *Id.*

104.   UT football player Danny O'Brien was arrested and charged with criminal impersonation with a false identification, underage consumption and resisting arrest.[6] *Id.*

105.   UT football player AJ Johnson was arrested and charged with providing alcohol to a minor and for resisting arrest. *Id.*

---

[6] Since the events complained of herein, Danny O'Brien has again been the subject of "internal" team discipline (but not University discipline) after reportedly failing a drug test in 2015. He was suspended from playing for one game and subsequently reinstated without further disciplinary action by the University. *See* http://allfortennessee.com/2015/09/10/why-danny-obrien-was-suspended-by-vols/ (*last visited* December 2, 2015).

106.   In addition, a member of the UT football coaching staff was present during the police response and attempted to dissuade police from arresting football players and recruits, efforts that were captured on police video of the incident.

107.   Police video also shows two other individuals identified on the scene as an assistant strength coach and a defensive line coach who were not detained. *See* https://www.questia.com/newspaper/1P2-36371392/camera-footage-reveals-ut-football-staff-member-was (*last visited* December 3, 2015).

108.   The UT football coach was initially placed in handcuffs and in the back of a squad car. *Id*.

109.   Despite the charges, media coverage and the fact that a coach witnessed the incident, all charges were dropped in lieu of community service and no school discipline was imposed as Head Football Coach Butch Jones publicly announced his decision that "I'll handle all punishment inside." *See* http://www.timesfreepress.com/news/sports/college/story/2014/feb/27/ut-players-punishments-to-be-team-issue/132907/ (*last visited* December 3, 2015).

110.   Upon information and belief, the above-described "party" included (then) non-UT football players or UT student attendees considered "recruits."

111.   Upon information and belief, the party was organized in relation to "National Signing Day" that occurred the previous week.

112.   Upon information and belief, at all times relevant UT football staff was aware of the above described "party" and, specifically, that recruits would be in attendance.

**Plaintiff Jane Doe II**

113.   Plaintiff Jane Doe II, a freshman UT student, suffered a forcible rape at Vol Hall, with attendant emotional suffering, and further suffered when she was subjected to a clearly unreasonable investigatory response by the University.

114.   The assault occurred on September 6, 2014, in Vol Hall by Mr. John Doe I, a UTK football player.

115.   The assault occurred after Plaintiff attended a party at a fraternity, where alcohol was

provided.

116.  Initially, the investigation was headed by (then) Director of Student Conduct and Community Standards, Tim Burkhalter ("Mr. Burkhalter").

117.  During the investigation, Plaintiff informed UTK investigators that, prior to the assault, she had never had sexual intercourse and that, at the time it occurred, she was on her period. Plaintiff also informed UTK investigators that when she woke up the morning after the assault, she found a strap had been ripped off her top and the button ripped off her shorts and photographs were taken of the torn clothes.

118.  On October 1, 2014, at 12:34 PM (EST), based on Mr. Burkhalter's findings, the University provided (via email) notice of intent to move forward with disciplinary action against Mr. Doe I for violations of General Standards of Conduct and that a hearing was scheduled for October 6, 2014. Notice of Charges and Hearing.

119.  On October 1, 2014, at approximately 4:30 PM (EST), John Doe filed two baseless complaints against Plaintiff in retaliation to her reporting of the sexual assault. The first complaint Mr. Doe I filed alleged theft of a sweater against the victim of a sexual assault. The second was for filing a false complaint.

120.  The completely baseless and retaliatory reports filed by Mr. Doe I were premised in-part on Plaintiff's actions in leaving the dorm the following morning wearing a sweatshirt, actions she were forced to take because her clothes had been torn off during the sexual assault.

121.  On October 3, 2014, Mr. Doe I rescinded an earlier waiver and requested an administrative hearing under the Tennessee Uniform Administrative Procedures Act, pushing back the previously noticed hearing date of October 6, 2014.

122.  Without explanation, the University then reassigned the case to the Office of Equity and Diversity (ultimately to the Interim Director, Jenny Richter) and, in an email from Vice Chancellor Vince Carelli (Notice of Withdrawal of Charges) notified Plaintiff Doe II that the pending disciplinary charges against Mr. Doe I were rescinded, initiating a "fresh" investigation. As with other UT investigations, Plaintiff's account was completely discounted and, based on the "collective" (and virtually identical) accounts of Mr. Doe I's teammates and a time-lapsed video from an unspecified time after the assault (that arguably shows Ms. Doe II tripping while trying to walk

barefoot in a dorm stairwell), UT determined that, by a preponderance of the evidence, she could not have been incapacitated and, further, that the sexual encounter was consensual. Doe II Investigative Report.

123. This illusory basis flatly contradicted the statements made to UT on multiple occasions by a witness who knew both Ms. Doe II and Mr. Doe I (indeed, the witness was a member of the same fraternity and played baseball on the same team as Mr. Doe I prior to enrolling at UT). Further, it is consistent with the ongoing theme of victim blaming, which ultimately led to public humiliation and Plaintiff's departure from school in January 2015.

124. Even more contradictory are the University's findings relating to the retaliatory reports by Mr. Doe I (dated November 14, 2014), that denied the imposition of discipline against Plaintiff for allegedly filing a false report finding that they were brought in good faith. Mr. Doe I Investigative Reports.

**September 22, 2015: UT Football Player Allegedly Strikes Ex-girlfriend in the mouth**

125. Early Sunday morning on September 22, 2014, police responded to an incident involving UT football player, Treyvon Paulk, after he reportedly punched his ex-girlfriend in the mouth. *See* http://www.knoxnews.com/govolsxtra/football/tennessee-freshman-tailback-treyvon-paulk-dismissed-from-team ( last accessed November 18, 2015).

126. No discipline was issued by the University excepting yet another facial suspension from the football team without explanation or reference to the assault.

127. The practical effect of the "suspension" as the sole form of discipline was virtually nil given that, at the time, Paulk was taking a medical red-shirt for the season while rehabbing from an injury the previous year and, in any event, he continued to participate in team activities and disclosed as much to other students, including Plaintiff Jane Doe III.

**Plaintiff Jane Doe III**

128. Plaintiff Jane Doe III was sexually assaulted on October 12, 2014 by UT student Mr. John Doe II and two students attending Tennessee State University.

129. The details of the assault are contained in the University's Investigative Report (Doe

III Investigative Report) and include Ms. Doe III's incapacitation due to alcohol and resulting inability to consent.

130.   Although the assault took place off campus, the events leading to the assault began on campus in Vol Hall (the dorm that Vice-Chancellor Rogers warned UT Chancellor Cheek presented a clear and present danger of sexual assaults) where she, a minor, was provided alcohol by several members of the UTK football team.

131.   The football players that provided the alcohol included Traevon Paulk, who, despite UT's press release, was still attending practice and participating in team events following an allegation of battery by Mr. Paulk's former girlfriend just weeks before.

132.   The University was made aware of Plaintiff's assault shortly after it occurred and a no-contact order was issued October 24, 2014.

133.   Although a no-contact order was issued, Plaintiff Doe III observed her assailant (who lives off campus where the assault occurred) at her dorm on multiple occasions.

134.   Plaintiff Doe III subsequently withdrew from UT and although the grades for those classes are not reflected negatively on her transcript, the withdrawal mid-semester has impacted her eligibility for scholarships and financial aid.

135.   In addition, Plaintiff Doe III has been unable to fully begin her recovery, as UT's investigation has not yet concluded as of the date of this Complaint.

136.   As in other cases, Mr. Doe II requested an administrative hearing although counsel for UT has expressed that it is unlikely Mr. Doe II will actually participate in the hearing.

137.   The timeframe for the investigation under Title IX, following the promptness mandate established in *Davis v. Monroe County Board of Education* (526 U.S. 629, 1999), would have expired on or around December 11, 2014, which potentially would have allowed Plaintiff Doe III to return to school the following semester in January, 2015; however, even though the family had expressed dissatisfaction with UTK's response (particularly with the timeframe), as of December, 2015, a date has not even been set for the hearing.

138.   Her alleged assailant seemingly continues to be enrolled at UT and it is unclear when and what notification, required by Title IX, was given to the school of the investigative findings as they relate to the other two alleged assailants.

139.	Further, as to Mr. Doe II, the University has only sought potential retroactive application of disciplinary measures to a seemingly arbitrary date in February 2015, essentially allowing the alleged sexual assailant to remain in school and earn college credit while the victim has endured precisely the opposite, a withdrawal from school negatively impacting her eligibility for financial aid and scholarship.

140.	The University's explanation for the delay is Mr. Doe II's choice for a hearing even though counsel for the University has also communicated that it is unlikely he will even participate.

**November 9, 2014: Enhancement of a Hostile Sexual Environment**

141.	On November 9, 2014, the University's Athletic Department made arrangements to surprise the football team with a visit from popular rap artist, Lil' Jon.

142.	Prior to this visit and at the specific insistence of the football coaching staff, UT had adopted the rapper's song "Turn Down for What"[7] as its official 3rd down football anthem, playing the song in Neyland stadium during games each third down when the opposing team was on offense and using a play on the lyrics (as "Third Down for What") for printing on official team merchandise.

143.	For more than a decade, the rapper Lil' Jon has been associated with sexual violence and rape culture.[8]

144.	Most recently, his song "Literally I Can't," (released just weeks before his visit with the UT football team and the hit single central to his tour at that time) came under fire and was debated as possibly the most sexist song promoting sexual assault, battery and rape—ever. The theme of the song is "don't take "no" for an answer from women." *See* http://www.knoxnews.com/govolsxtra/columnists/john-adams-bad-rap-lil-jon-has-worn-out-his-welcome_53366907 ( *last visited* December 7, 2015). The verses include the phrase "Girl I know that you can. I don't wanna hear no." In the music video, conservatively dressed sorority sisters arrive at a raucous house party and rebuff the advances of the drunken male party attenders with the refrain "Literally, I can't." After responding "Literally, I can't" to each of the offers, the girls are rushed and

---

[7] The official music video for Lil' Jon's "Turn Down for What" features frantic and continuous "humping" of inanimate objects and unwilling bystanders. https://www.youtube.com/watch?v=HMUDVMiITOU (*last visited* December 7, 2015).

[8] At the 2005 MTV Spring Break concert, one of the most publicized instances of his career, Lil' Jon, performing as Lil Jon & the East Side Boyz infamously demanded that the young women in his concert audience expose their breasts or he would not continue to perform. See http://www.crowdsafe.com/new.asp?ID=1486 (*last visited* December 7, 2015).

tackled by boozed-up jocks, while Lil' Jon aggressively shouts the song's chorus for the women to "Shut the f**k up." *See* http://www.news.com.au/entertainment/music/music-videos/women-should-shut-the-fk-up-is-this-the-most-offensive-song-of-2014/news-story/375a201bf2afa250e96c601adadd355c ( *last visited* December 12, 2015).

145.    The rapper's visit was publicly celebrated by the University's Athletic Department, who produced and published a video showing the football team and specifically football players A.J. Johnson's and Curt Maggitt's (Johnson and Maggit standing in orange) reactions to the rapper's presence. *See* https://www.youtube.com/watch?v=3PUtD_a8QrI (*last visited* December 7, 2015).



146.    Further, the rapper's presence at practice was praised by UT football coaches in social media repeatedly over the following days and weeks without any disclaimer to the sexual

violence central to the rapper's public persona and music.




**Plaintiff Jane Doe IV**

147.   Plaintiff Jane Doe IV was a sophomore student-athlete (member of a varsity athletic team) at the University of Tennessee when she was forcibly raped by University of Tennessee football players A.J. Johnson and Mike Williams on November 16, 2014.

148.   The rape occurred at a condominium/apartment owned by a UT Athletic booster, Dr. William Powell. Plaintiffs allege on information and belief that the UT Athletic Department both controlled these premises and arranged for this housing that was paid for with football scholarship funds.

149.   The details of Plaintiff Doe IV's assault as found by the University's investigation are contained in the University's Investigative Report.

150.   The assault occurred on or around November 15-16, 2014, following Tennessee's win in the football game against the University of Kentucky during a party (where marijuana and alcohol were in use) at an apartment where University of Tennessee football players including A.J. Johnson, Curt Maggitt and Geraldo Orta lived.

151.   Orta and Lane had been previously criminally investigated for rape in their suite

shared by A.J. Johnson.  Chancellor Cheek had directed Jenny Wright to "stop" disciplinary action in connection with this prior incident. http://www.tennessean.com/story/sports/college/vols/2015/03/06/ut-athletics-accused-influencing-student-discipline/24505399/ (*last visited* December 9, 2015).

152.  Upon information and belief, the party was thrown and hosted by football players because of the presence of football recruits who were visiting and had attended the football game.

153.  Upon information and belief, the party was attended by UT football players, UT students and football recruits and, at times, included in excess of 70 attendees.

154.  Alcohol was purchased by UT football players including Mike Williams and Curt Maggitt for the specific purpose of providing said alcohol to recruits and underage minor women.

155.  The University was made aware of the incident on November 16, 2014.

156.  Knoxville police were contacted and attempted to interview Williams and Johnson. Initially Johnson indicated he would meet for an interview; however, neither player showed up for the interview and, consistent with previous incidents, instead delayed giving statements until specialized defense counsel had been retained including Johnson's current attorney, Tom Dillard.

157.  The head coach of Plaintiff Jane Doe IV's varsity team had already been notified of the assault and contacted Plaintiff Doe IV by text in the early morning of November 16, 2014, before coming to her dorm room.

158.  Even though the athletic department was clearly aware of the situation, calls and texts were made by A.J. Johnson and his roommate and teammate, Curt Maggitt, to Plaintiff Doe IV and her teammates, including her roommate, Plaintiff Doe V, in an effort to convince Plaintiff Doe IV not to pursue any investigation or disciplinary action.[9]

---

[9] In an interview with the Tennessean, vice chancellor Margie Nichols indicated that school officials were well aware of the situation as early as 9:00 AM the day of the assault:

> "Knoxville Police Chief David Rausch contacted University of Tennessee Police Chief Troy Lane on Sunday morning, hours after the women reported the alleged assaults. By 9:07 a.m. Sunday, University Chancellor Jimmy Cheek and Athletics Director Dave Hart had been alerted about the allegations, along with nearly a dozen of the university's top academic and athletic officials.

> The alert system prompted the University Division of Student Life to reach out to the alleged victim and is offering her services and support, Nichols said."

159. On November 17, Plaintiff Doe IV met with several University representatives including Jon Gilbert (Executive Senior Associate Athletics Director), Mike Ward (Senior Associate Athletics Director) and her varsity team's head coach. Gilbert, Ward and the head coach began the meeting by informing Plaintiff that the football team had just announced the immediate suspension of the two football players who had assaulted her, A.J. Johnson and Mike Williams, from all team activities.

160. When Plaintiff Doe IV asked whether the suspension was limited to football, she was assured that both Johnson and Williams would not be allowed to "step foot on the athletic footprint of the campus."

161. During the meeting, Plaintiff Doe IV also voiced concerns of how the incident would be handled by the university as she had only recently (after she had been assaulted) become aware of the Marlin Lane incident from 2013, that also involved allegations of sexual assault against football players and reports of subsequent harassment by their supporters against the victim.

162. While the aforementioned was being discussed, Plaintiff Doe IV received a message from Plaintiff Doe V who was witnessing (at that moment) several football players "jumping" Drae Bowles, a member of the football team that had actually taken Plaintiff Doe IV to the hospital the night of her assault and who had supported her decision to report the incident to the authorities.

163. Plaintiff Doe IV informed Gilbert, Ward and the head coach at that time and even provided the identities of the players, but was told only "we'll look into it."

164. Plaintiff Doe IV later understood that athletic coaches were present during that altercation but has never been informed of any action was ever taken against the players in reference to that incident.

165. Days later, Plaintiff Doe IV became aware of a second assault on Drae Bowles in the team facility by the same football players.

---

http://www.wbir.com/story/sports/2014/11/20/police-continue-to-conduct-interviews-in-rape-investigation/70039904/ (*last visited* December 12, 2015).

Even though the Chancellor, Athletics Director and "nearly a dozen top academic and athletic officials" had been alerted early that morning, phone records show repeated calls continuing well into the afternoon from Johnson and his roommate/teammate Curt Maggitt.

166.  Plaintiff Doe IV brought the second assault to the attention of school administrators but again, has never received information of any action taken by UT against these players although she has since been made aware that Drae Bowles transferred to another school.

167.  The actions and intent of UT football players against Drae Bowles were disclosed by Williams in his November 26, 2014, interview with the police, when he stated that his teammate, Geraldo Orta, had told Williams that the football team had "a hit" out on Drae Bowles.

168.  In his interviews with police, UT football player Geraldo Orta stated that he felt Bowles had betrayed the team and that where he (Orta) came from, people got shot for doing what Bowles did. These facts are set forth in the Knoxville Police Department Incident Report.

169.  During the interview Orta also admitted having approached Drae Bowles in Smokey's Cafe (the athletic dining facility), getting "in his face" and saying "some threatening things." *Id*.

170.  Orta further acknowledged that UT football player Curt Maggitt had also, in a separate incident, confronted Drae Bowles in the team locker room before the team was instructed by Head Coach Butch Jones not to talk to him and before Bowles was "given time away from the team." *Id*.

171.  The second assault on Bowles was admitted by Curt Maggit in his own interviews with police as well as the fact that he had purchased alcohol for the party. *Id*.

172.  No discipline was administered to either player.

173.  In the days following the meeting, Plaintiff Doe IV became aware that Williams and Johnson were and would continue to be allowed to remain on campus and, contrary to the "official statements," would be allowed access to the academic support centers (shared by women's and men's athletics).

174.  Plaintiff Doe IV made the decision to stay at home with family until exams out of the fear of a possible encounter simply by following her own class and tutoring schedule.

175.  Knowledge of how the University had handled allegations against football players in recent situations during Plaintiff Doe IV's time at UT caused her to leave campus. Plaintiff was aware of the situation earlier that year (in February of 2014), when multiple football players including Johnson were arrested at a party at Johnson's apartment.

176.  Plaintiff Doe IV became aware that all charges, including drug and alcohol and

charges for resisting arrest/assaulting an officer, had been dropped and that the players only received community service without any team or University discipline.

177.    Plaintiff Doe IV also became aware that a football coach was present at that party but, as multiple football players (including Johnson) had later explained to Plaintiff and others, "Coach took care of it so it's no big deal."

178.    Despite the assurances offered during the meeting, within days, statements were made by the UTK football coaching staff publicly supporting A.J. Johnson. In a post-practice interview on November 19, 2014, Linebackers Coach Tommy Thigpen even went so far as to say (in reference to Johnson) "He's a great player, great kid, great ambassador," and  "I look forward to him getting back."[10]

179.    The school and athletic department, that Plaintiff Doe IV once considered herself proud to be a part of, made it clear "whose side they were on" and abandoned Plaintiff Doe IV in silence while simultaneously affirming the character of the football players who raped her.

180.    The student body and UTK fan base adopted and mirrored the sentiment expressed by the athletic department and coaching staff and Plaintiff Doe IV was ridiculed, shamed and vilified in virtually every public forum.

181.    A few weeks later in December 2014, A.J. Johnson was allowed to graduate in a special ceremony from which photos were posted of him posing with Chancellor Jimmy Cheek and Athletic Director Dave Hart (in the very athletic facility Plaintiff had been told Johnson would not be allowed to "step foot on").

182.    The ceremony itself was significant as it was held and offered exclusively to members

---

[10] http://www.tennessean.com/story/news/2014/11/19/ut-student-leaders-decry-victim-blaming-amid-rape-allegations/19301797/

of the athletic department and, moreover, some of the photos were published by the official UT Twitter (vol_football) account.[11]

 

183. Photos of A.J. Johnson and Curt Maggitt from the 2014 Student-Athlete Winter

---

[11] Plaintiffs have since learned that the University had access and authority to control A.J. Johnson's (and other "major sports" athletes') social media accounts.

Graduation remain on the official UT sports website ([utsports.com](utsports.com)) as recently as December, 2015.



184. Even though the media had already highlighted the lack of empathy or support for the victims of sexual assault at UT (*see* fn. 1, *supra*), the athletic department through its football coaches and players continued to publicly support the men who raped Plaintiff Doe IV-as shown in the photographs published after the bowl game[12].

---

[12] The photographs below were taken following Tennessee's Bowl Game victory with both players and coaches using their hands to show number "45" in support of A.J. Johnson, who reposted the photos and acknowledged the support with the caption "My squad showing Much Love*** Great Win*** Thats how you #LightEmUp#LB's #VFL". These photographs (and numerous similar photos) were widely published on social media including direct postings by UT coaches, including Coach Larry Knight.







185. During a telephone conversation with her varsity team's head coach in February of 2015, Plaintiff Doe IV specifically requested a conference with the University's Title IX coordinator. Despite the coach's assurances, no such conference was ever scheduled and Plaintiff Doe IV has not

received further communication from the Title IX coordinator.

186.  The University's investigation took nearly six months (the report was provided to Plaintiff on May 4, 2015) but no actual disciplinary action has been taken despite the findings of student misconduct.

187.  Plaintiff Doe IV was subjected to numerous character attacks and threats on social media and sports blogs that caused her severe emotional distress, and created and deepened a hostile environment for her on the basis of her sex.

188.  Because of the actions by the University, its coaches, administration and athletics program, Plaintiff could not continue her education at the University of Tennessee at Knoxville and was forced to sit out the Spring, 2015 semester while trying to find another place to continue her education and collegiate athletics (which had afforded Plaintiff the financial opportunity to attend school in the first place).

### Plaintiff Jane Doe V

189.  Plaintiff Jane Doe V was a Title IX investigation witness subjected to retaliation and the collective "victim blaming" that occurred in the wake of the assault of her teammate, roommate and friend, Plaintiff Jane Doe IV.

190.  Directly after the assault on Plaintiff Doe IV, Plaintiff Doe V was the recipient of multiple communications from football players, including one of the alleged rapists. These were reported by Plaintiff Doe V on November 16 and 17 to the varsity coach and Mike Ward, who were already aware of the players' actions but made no assurances that they would be addressed by the University.

191.  The effects on Plaintiff Doe V were traumatic and worsened by UT's repeated failures to cure the environment and effectively implement interim or remedial measures.

192.  In addition to being contacted after UT had notice of the assault and in addition to seeing one of the attackers (Mike Williams) in the academic center for athletes (after being expressly assured neither Williams or Johnson would be allowed in the athletic facilities), Plaintiff Doe V witnessed the intimidation and physical retaliation by other UT football players against another witness in the investigation, Drae Bowles when he was attacked by UT football players Orta and Maggitt at the Smokey's dining hall.

193.    Plaintiff Doe V reported this directly to UT administrators and, further, reported that the attack on Bowles had been witnessed by members of the coaching staff.

194.    No assurances were made and no action was taken by UT in response to Plaintiff Doe V's reports, even after she notified administrators of accounts of a second physical assault on Bowles by the same players in the team facility (locker room).

195.    Plaintiff Doe V was forced to move dorm rooms and her grades suffered.

196.    Eventually, Plaintiff Doe V was forced to leave school because of UT's failure to protect her from a hostile sexually discriminatory environment and the resulting trauma. As a direct result of the incident, Plaintiff Doe V has been diagnosed with PTSD with severe anxiety and was medically restricted from attending school for the entire Spring 2015, semester.

197.    Plaintiff Doe V attempted to maintain communications with her coach, in an effort to return to UT when she was medically cleared. However, because of UT's continued failure to cure the hostile environment and because during the conversations (on or around March/April 2015), the coach made statements to the effect that Plaintiff's return would be conditioned on requirements that she (Plaintiff Doe V) could not associate or socialize with the same group of people—insinuating that the rape and events that had followed were somehow the result of the girls' (members of the row team, including Plaintiff Doe IV's) actions, Plaintiff Doe V was forced to look to other schools.

**December 2014: Another UT Football Player Arrested, Discipline Handled "Internally"**

198.    On December 3, 2014, UT football player Jalen Hurd (the team's starting running back and leading rusher) was arrested by citation for underage drinking. *See* http://www.tennessean.com/story/vols/2014/12/18/butch-jones-jalen-hurd-discipline/20595979/ ( last accessed 11/18/15).

199.    The incident was not initially publicized until after an article was published by the Tennesseean the following week. *Id.*

200.    In a subsequent press conference, Head Football Coach Butch Jones said the running back was disciplined internally and that the incident would not affect Hurd's status with the team— specifically as to the upcoming bowl game on January 2, 2015. *See* http://www.tennessean.com/story/vols/2014/12/18/butch-jones-jalen-hurd-discipline/20595979/ ( last accessed 11/18/15).

**Plaintiff Jane Doe VI**

201. Plaintiff Jane Doe VI was allegedly sexually assaulted on February 5, 2015, by UT student and football player Riyahd Jones. The details of Plaintiff Doe VI's assault are documented in the University's Investigative Report.

202. At the time of the assault, Plaintiff Doe VI was a sophomore (2014/15 academic year) attending UT with full tuition provided through academic scholarship/financial aid, living in an off-campus apartment complex called the "Gateways of Knoxville," with one other roommate who dated Riyahd Jones.

203. Prior to the assault on February 5, 2015, there were two previous incidents where Riyahd Jones "made a pass" at Plaintiff Doe VI while he was dating her roommate. The first time took place in Plaintiff Doe VI's apartment around October 2014 and the second in December 2014. Plaintiff Doe VI clearly communicated to Mr. Jones that his advances were unwanted and informed her roommate of the incidents on both occasions.[13]

204. After the assault was reported to the police and while KPD was searching for Riyahd Jones, Plaintiff's roommate was repeatedly called by Riyahd Jones's roommates (also football players) who were threatening/pleading (through roommate) for Plaintiff to drop the allegations.

205. One of the football players who contacted Plaintiff's roommate in an effort to mitigate the damage was Deanthonie Summerhill (a UT running back who was living with Riyahd Jones).

206. Given the preceding events at UT, these players should have been educated extensively (and on multiple occasions) regarding the impropriety of attempts to contact a victim of an alleged sexual assault.

207. Plaintiff is unaware of any effort by UTK to notify her teachers of the situation, in complete abrogation of UTK's duties under Title IX, to afford academic remedies to a victim.

208. UT Football players should have received training (apart from standard instruction) following each of the preceding incidents involving athletes. The actions by UT football players in

---

[13] It is important to note that, under its obligations under Title IX, Jones would have been subjected to education materials covering sexual assaults and consent on multiple occasions due to other reported incidents that occurred during the academic year leading to the alleged February 5, 2015, assault on Ms. Doe VI. Questions and Answers on Title IX and Sexual Violence at 38.

wake of the assault in attempting to contact Plaintiff Doe VI (directly and through her friends), follow same. The "advice" communicated by UT football player Todd Kelly to Plaintiff's current boyfriend (and his parents) should have been treated as a violation of the no-contact directive, is retaliatory, and is further evidence of a lack of training/instruction-especially considering the nature of the instructions required under Title IX and the repeated preceding incidents involving football players.

209. The University's investigative findings of the incident are completely void of any reference to the post-assault communications by the other UT football players.

210. As in previous investigations, the victim's statement and credibility were completely discounted.

211. Further, the findings represent a fundamental misunderstanding and misapplication of the very definitions of "consent" as set forth by UT in the report.

202. In deciding that Jones's account was more likely than Plaintiff's, UT investigators relied heavily on the fact that certain witnesses to the investigation did not participate or respond to requests for interviews despite Plaintiff's reports to the investigators that Jones and other football players were contacting those witnesses (and their families) and despite other witnesses' statements confirming similar repeated communications by the football players. *Id*. at 15.

203. No discipline resulted from the communications and contact to witnesses by the football players.

204. The UT investigators also relied heavily on a statement offered by Riyahd Jones that provided that Plaintiff "told him to leave" and that he, without obtaining consent, ignored the request and instead kissed her. The statement further provides that Plaintiff then turned her back to Jones before he proceeded, again without obtaining consent, to perform oral sex and vaginally penetrate her. *Id.* at 9.

205. Still, UT determined that, because Plaintiff did not resist and appeared sexually aroused, she consented to the sexual encounter, evidencing an extreme bias for the athlete's statement or, alternatively, a lack of competency and training. *See* June 3, 2015, Investigative Report at 2-3, 14-15.

206. As a result of the assault, Plaintiff was forced to move out of the apartment and return

home with her parents. She did not have any run-ins with Jones on campus following the incident; however, her current boyfriend was told by other UT football players to "stay away" from her. One of these football players was Todd Kelly ("TK"), who had gone to high school with the current boyfriend. TK and TK's parents both communicated same to current boyfriend and current boyfriend's parents-again, in staunch violation of the no contact order and contrary to the required education from the prior instances.

207. As a direct result of the incident, Plaintiff Doe VI was forced to miss class on multiple occasions for court and other appointments relating to the alleged assault.

208. Plaintiff informed her teachers whenever she had documentation to support the absence but did not discuss specifics.

209. Eventually, the number of absences necessitated her withdrawal from school for the semester with no credits earned though Title IX assured her academic remedies for such absences.

210. Because of the requirements (to remain a student for duration of scholarship/aid), she was initially determined not to qualify for continuation of her financial aid/scholarships. Plaintiff Doe VI was forced to appeal these decisions-some of which are still pending as of the December 2015.

211. Riyahd Jones was allowed to remain in school, graduate at the end of the spring 2015 semester, granted a release and has since transferred to Georgia Southern where he continues playing football.

212. Jones' graduation occurred on May 7, 2015, nearly a month before the University of Tennessee (in violation of the timing guidelines for investigations under Title IX and UT's own policies) concluded its investigation. Both Jones and the University celebrated his graduation, publishing photos through the school's official website (identifying Jones as an athlete) and on social

media.





**March 2015: UT Football Player Arrested**

213.  In March 2015, UT football player Coleman Thomas was arrested and charged with felony theft. *See* http://www.tennessean.com/story/news/crime/2015/03/26/ut-football-player-coleman-thomas-arrested-felony-theft/70504536/ ( last accessed 11/18/15). The property had been stolen from a fellow student's dorm room in Reese Hall and was reported stolen to the University of Tennessee Department on March 13, 2015. *Id.*

214.  Thomas was represented by Knoxville attorney Don Bosch in the incident. *See* http://www.local8now.com/home/headlines/Felony-charges-dropped-against-UT-offensive-lineman-299844811.html (*last visited* December 8, 2015). The charges were later dropped against Thomas, who claimed he did not realize the property was stolen when he sold it, and an arrest warrant (related to the same charges) was then issued for Michael Sawyers, who had been dismissed from the team (without official University discipline) in a statement earlier that year on February 4,

for "violation of team rules." *See* http://www.knoxnews.com/govolsxtra/football/jenkins-wharton-granted-releases-sawyers-dismissed_42943570 ( last accessed 11/18/15).

215.   Upon information and belief, Sawyers was not subjected to University discipline under its Hilltopics policy at the instruction of Head Coach Butch Jones to handle the matter internally, allowing Sawyers to remain in school (even if off the team) and commit theft.

### July 2015: UT Football Player Arrested

216.   On or around July 22, 2015, UT football player Charles Mosley was arrested for driving under the influence after being pulled over by Tennessee Highway Patrol for driving 79 miles per hour in a 55 mph zone. Reports of the incident (citing the arrest warrant) reflected that marijuana residue was found in the front passenger area and back seat of Mosley's car. *See* http://www.wbir.com/story/sports/college/vols/football/2015/07/22/vols-lineman-charles-mosley-arrested-for-dui/30538423/%20 ( last accessed 11/18/15).

217.   During the annual pre-camp news conference in early August 2015, UT Head Coach Butch Jones confirmed that Mosley was still on the team and stated in reference to the arrest, that "All          discipline          will          be          done          internally."          *See* http://www.wbir.com/story/sports/college/vols/football/2015/08/03/butch-jones-addresses-media--pre-camp-news-conference/31055719/ ( last accessed 11/18/15).

### November 28, 2015: Hostile Environment Remains Uncured

218.   Despite the (still) pending University disciplinary charges and ongoing criminal proceedings, as recently as November 28, 2015, the hostile environment at the University remains uncured and photographs show AJ Johnson enjoying special on-field privileges in staunch disregard of the assurances to the victims that he would no longer be allowed anywhere on the athletic department's footprint. *See* http://www.knoxnews.com/govolsxtra/football/exvol-accused-in-

rape-seeks-emergency-appeal-of-social-media-order_37588200 (*last visited* December 3, 2015).



University of Tennessee defensive lineman/linebacker Curt Maggitt, left, poses for a UT Athletic Department photo with former teammate A.J. Johnson during senior day activities before the game with Vanderbilt Saturday, Nov. 28, 2015. (AMY SMOTHERMAN BURGESS/NEWS SENTINEL)

AMY SMOTHERMAN BURGESS

**COUNT I :Violation of Title IX – 20 U.S.C. § 1681(a)**

219.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

220.   Defendant UT receives federal financial assistance for its education program. Therefore, UT is subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681 (a), *et seq*.

221.   For all Plaintiffs, an "appropriate person" at UT had actual knowledge of the discrimination and harassment as alleged by Plaintiffs. This includes the creation and maintenance of a hostile sexual environment before the five rapes at issue and actual notice and knowledge of the extreme risks of sexual assaults by direct notice from Vice-Chancellor Rogers to Cheek, Hart and DiPietro.

222.   UT acted with deliberate indifference to known acts of harassment in its programs and activities prior to the direct assaults on Plaintiffs detailed herein.  UT was deliberately indifferent as its response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances. [14]

223.  The "Before" Case: UT has liability for the rapes themselves because the UT Administration, Athletic Department and coaches intentionally violated Title IX and had official policies that violated Title IX, especially under the analysis of the *Simpson* and *Gebser* cases (500 F.3d 1170, 10th Cir. 2007; 524 U.S. 274 (1998)):

    a.   Showing high-school football recruits a "good time" on their visits to the UT campus;

    b.   Providing alcohol to recruits and underage UT female students;

    c.   Acting with deliberate indifference to known sexual assaults so as to create a hostile sexual environment;

    d.   Acting with deliberate indifference to athlete parties that involved drug use and furnishing of alcohol by athletes to underage UT female students;

---

[14] Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances. *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000).

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 43 of 64 PageID #: 43

e.  Intentionally creating a long-standing systemic severely hostile sexual environment of rapes by male athletes despite repeated actual notices (from Vice-Chancellor Rogers) of rapes and sexual assaults by male athletes (particularly football and basketball players);

f.  A pattern of deliberate acts without regard to the known risks of Chancellor Jimmy Cheek and Athletic Department Director and Vice-Chancellor Dave Hart's interfering with the disciplinary process for male scholarship football and basketball athletes charged with sexual assaults by undue influence on the Office of Student Judicial Affairs;

g.  A pattern of deliberate acts without regard to the known risks of covering up sexual assaults and rapes by football and basketball players;

h.  A pattern and conspiracy of deliberate acts without regard to the known risks of condoning sexual assaults by a systemic failure to discipline male scholarship football and basketball athletes charged with sexual athletes;

i.  A pattern of deliberate acts without regard to the known risks of providing/arranging housing for scholarship athletes known to have been involved in sexual assaults (rapes) and known to have provided alcohol and illegal drugs to underage recruits and underage female UT students;

j.  A pattern of deliberate acts without regard to the known risks of placing (housing) freshman female students in the athletic dorm (Vol Hall) with upper class athletes from the football and basketball team despite the UT Administration having been specifically warned by Vice-Chancellor Rogers against the risk of such placement given the known prior sexual assaults by male athletic team members;

k.  A pattern of deliberate acts without regard to the known risks of giving special and favorable treatment to male scholarship football and basketball athletes charged with sexual assault by arranging for special outside legal counsel to represent athletes charged with sexual assaults and not affording the same legal resources to victims;

l.  A pattern of deliberate acts without regard to the known risks of supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape;

m. A pattern of deliberate acts, without regard to the known risks, of causing sexual

assault disciplinary cases involving athletes to be handled outside the normal UT student disciplinary process via the Tennessee Uniform Administrative Procedures Act;

n. A pattern of deliberate indifference to student safety by a failure to reform UT policies and procedures to assure compliance with Title IX, namely with respect to the inequitable and non-prompt TUAPA elective hearing process;

o. A pattern of deliberate acts, without regard to the known risks, of unreasonably failing to take prompt, adequate and effective remedial actions and measures to remedy a substantial and known risk of sexual assaults and rapes by athletes;

p. A pattern of deliberate acts, without regard to the known risks, of having actual knowledge that UT's efforts, if any, to remediate the hostile sexual environment by male scholarship athletes was ineffective, yet UT continued to use those same methods to no avail and failed to act reasonably in light of the known circumstances;

q. Acting with deliberate indifference after actual knowledge of sexual assaults. UT administration (Chancellor Cheek), athletic department (Dave Hart) and football coach (Butch Jones) were personally aware (as "appropriate persons" under Title IX) and had actual notice of previous sexual assaults and rapes by football players, yet acted with deliberate indifference to the serious risks of sexual assaults and failed to take corrective actions;

r. A pattern of deliberate acts, without regard to the known risks, of failing to follow UT's own policies of conducting fair and impartial investigations into sexual assault;

s. A pattern of deliberate acts, without regard to the known risks, of failing to conduct investigations into sexual assaults after responsible "appropriate" persons had actual knowledge of sexual assaults by male scholarship athletes; and,

t. A pattern of deliberate acts, without regard to the known risks, of deliberately compromising the fairness and integrity of misconduct and disciplinary investigations by conspiring with accused athletes and witnesses to minimize sexual assault misconduct, "get the stories straight" and paint the female UT student victim as at fault or being "the aggressor." UT's acts and omissions caused discrimination and sexual harassment so severe, pervasive, and objectively offensive that it effectively barred the victims' access (including Plaintiffs herein) to an educational opportunity or benefit. All Plaintiffs were forced to leave school. A

federal court in Tennessee, citing Sixth Circuit case law, has held "even a single incident of rape is sufficient to establish that a child was subjected to severe, pervasive, and objectively offensive sexual harassment for purposes of Title IX."[15]

u. Deliberate difference to prior misconduct by the same perpetrators facilitated the rape of Doe IV and showed a deliberate disregard of and failure to remedy a hostile environment on the basis of sex

224. The official policy of use of the TUAPA for perpetuators is contrary to federal law and has been deliberately used and misused by the University of Tennessee to foster and maintain a hostile and discriminatory sexual environment that not only insulates athletes from discipline and sanctions but facilitates and encourages sexual assaults because athletes know the process can be rigged, dragged out, and used so that they suffer no consequences

225. Based on the foregoing factual allegations, Plaintiffs aver that the actions and inactions of the University of Tennessee constitute a systemic pattern of deliberate decisions by its administrators directly in violation of the rights of its students to be free from a sexually discriminatory and harassing environment. Moreover, the acts of the University were performed in full, conscious disregard of known risks and in staunch violation of Title IX, and its repeated failures to take steps to remedy the hostile environment resulted in the discriminatory acts to Plaintiffs herein and in an ongoing pattern of unreasonably inadequate response, furthering the discrimination suffered by Plaintiffs and ultimately depriving them of their educational opportunities.

226. Plaintiffs would not have been subjected to the discriminatory acts of UT itself, (through the TUAPA process and its general failure to cure the known hostile sexual environment on campus), or to the discriminatory acts of third parties under UT's control, had plaintiffs not been female victims of male (alleged) attackers. Accordingly, Plaintiffs were denied educational opportunities on the basis of sex.

**COUNT II: Violation of 42 U.S.C. § 1983:**

**Declaratory Judgment and Injunctive Relief  & Under Supremacy Clause,**

**Article VI, Clause 2, of the United States Constitution.**

---

[15] *Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009) (citing *Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999).

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 46 of 64 PageID #: 46

227.   Plaintiff avers that the Office of the Director of the Office of Student Conduct & Community Standards has violated the Supremacy Clause and the equal protection rights of Plaintiffs through his application of the TUAPA. Under *Ex parte Young*, 209 U.S. 123 (1908) Plaintiffs may sue challenging the constitutionality of a state official's action as the action is not one against the State. *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945).

228.   By applying TUAPA hearing and discovery procedures and rights only to accused perpetrators of sexual assault but not to alleged victims of sexual assaults (including Plaintiffs), UT administrators (e.g., the Director of Student Conduct & Community Standards), in their official capacities, denied Plaintiffs equal protection of the law in violation of the Supremacy Clause, Article VI, Clause 2, of the United States Constitution and 42 U.S.C. §1983 and equal protection clause of the Fourteenth Amendment of the U.S. Constitution.

229.   The official policy of UT and the Tennessee Board of Regents  is to have two conflicting sets of sexual misconduct policies: one policy that purports to comply with Title IX  (and ensures, for example, that a victim   will not be forced to confront her assailant) http://smrv.utdev4.wpengine.com/wp-content/uploads/sites/34/2015/08/Sexual_Misconduct_and_Relationship-_Violence_Policy-UTK_4844-5950-8507.pdf; and  a second, separate "contested case" procedure under the TUAPA whereby the accused assailant can invoke an adversary proceeding and depose the victim; conduct discovery; and subject the victim to a full blown hearing with a judge and the rules of evidence. . https://policies.tbr.edu/policies/uniform-procedures-cases-subject-tn-uniform-administrative-procedures-act.

230.   Plaintiffs seek a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 that UT's and the Tennessee Board of Regents' application of the TUAPA to sexual assault complaints: is preempted (conflict preemption) by Title IX[16] and the Campus Save Act (VAWA Section 304)[17]; violates Title IX  and the Campus Save Act; deprives Plaintiffs of their

---

[16] Title IX provides in pertinent part: "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, **or be subjected to discrimination under any education program or activity receiving Federal financial assistance**."
[17] The Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, 127 Stat. 54 (codified in scattered sections of the U.S. Code), included, as section 304, the Campus Sexual Violence Elimination Act, Id. § 304, 127 Stat. at 89-92 (codified at 20 U.S.C. § 1092 (2012)), ("Campus Save") that sets forth detailed

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 47 of 64 PageID #: 47

rights to equal protection of laws under the Fourteenth Amendment and 42 U.S.C. § 1983 such that UT, through the Chancellor, General Counsel, and Director of Student Conduct, in their official capacities, should be enjoined from any present and future acts or efforts to allow or apply the TUAPA to sexual misconduct cases, including the pending actions involving A.J. Johnson, Michael Williams and John Doe II.

231. The above acts and omissions by UT and its officers acting under color of state law deprived Plaintiffs or federal civil rights of which a reasonable person (and/or school administrator) would have known.[18]

### **Count III: Declaratory and Injunctive Relief for Violations of Title IX.**

232. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

233. Plaintiffs seek a mandatory injunction ordering the UT to refrain from unlawful discrimination and/or retaliation, ordering UT to undertake and rectify any and all Title IX violations and/or inequities, ordering UT and its athletic department to refrain from creating and condoning a hostile sexual harassment and/or discrimination environment against individuals on the basis of sex by immediately ceasing deliberate indifference to sexual assaults; direct interference with the disciplinary process in favor of male athletes who were charged with rape; directly supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape; arranging for/facilitating lawyers for athletes accused of sexual assault, providing or subsidizing premises known as party houses for athletes used for underage drinking and drugs to entice recruits to come UT; unlawfully discriminating against

---

requirements for compliance with Title IX and the Clery Act, see 20 U.S.C. § 1092. See https://www.gpo.gov/fdsys/pkg/PLAW-113publ4/pdf/PLAW-113publ4.pdf (section 304 being the Campus Save Act that amended the Clery Act). Although the Clery Act (containing the Campus Save act) provides no private cause of action, the courts of appeals have uniformly held that when proceeding under the Supremacy Clause to enforce a safety net statute, plaintiffs need not meet the requirements for a cause of action set forth in *Gonzaga*./107/ Indeed, for a preemption claim, there is no need for a statutory cause of action./108/ A claim that a federal law has preemptive force under the Supremacy Clause is distinct from a statutory claim to enforce the federal law, and therefore, the absence of a cause of action in the statute does not defeat the preemption claim.

[18] A federal District Court in Colorado has specifically held that a student's right to be free from sexual assault perpetrated by another student is "clearly established," such that school officials were not entitled to the defense of qualified immunity. *McArthur v. Acad. Sch. Dist. Twenty,* 2007 U.S. Dist. Lexis 20971, *14 (Colo. Dist. Ct. 2007)

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 48 of 64 PageID #: 48

victims of sexual assault and fostering a hostile sexual environment by the misuse of a one-sided Tennessee Uniform Administrative Procedures Act ("TUAPA") procedure.

**Plaintiff Doe I's Claims Under Title IX**

234.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

235.   Plaintiff avers that UT has violated OCR regulations, policies, and "Dear Colleague" letters and that such violations constitute evidence of Title IX violations. *See Biediger v. Quinnipac University*, 728 F.Supp. 2d 6210 (Conn. 2010).

236.   Plaintiff avers that UT unlawfully applies the Tennessee Uniform Administrative Procedures Act ("TUAPA") to provide hearings only to alleged perpetrators of sexual assaults.

237.   Plaintiff avers that application of TUAPA procedures to campus sexual assault investigations subjects victims of sexual assaults to unlawful harassment and undue hardship, and that such inequitable procedures are are preempted by Title IX and the Campus Save Act.

238.   UT's own policies recognize that TUAPA procedures must be modified to comply with Title IX and federal law (Sexual Misconduct and Relationship Violence Policy (2015)).

239.   The rape of Plaintiff Doe I was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

240.   UT is also liable under the after theory of liability under Title IX.

241.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

242.   The discrimination, consisting of Makanjuola's rape of Plaintiff Doe I, the risks to Plaintiff Doe I's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe I's access to educational opportunities and benefits.

243.   Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including,

Case 3:16-cv-00199   Document 1   Filed 02/09/16   Page 49 of 64 PageID #: 49

without limitation:

a. UT's deliberate decisions not to disclose Makanjuola's rape of Plaintiff or the investigation so that Makanjuola's basketball season or eligibility to transfer would not be affected;

b. The provision or facilitation of access to special counsel (Don Bosch) by UT;

c. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that Makanjuola would not attend or participate in any hearing—thereby subjecting Plaintiff Doe I not only to unnecessary delay, but also an unnecessary hearing during which she was forced to relive her rape and was subjected to offensive and needless examination;

d. UT's deliberate decision not to seek any form of discipline for Makanjuola that would affect him (or the basketball program) in any way;

e. UT's deliberate decision not to adequately advise Plaintiff Doe I of her right to appeal the inadequate and ineffective discipline of an "indefinite suspension" to a player who had already been granted a release and effectuated a transfer, thereby allowing him to subsequently make contact;

f. UT's deliberate decision not to take action to remedy the effects of the hostile environment required by Title IX (and separate from any interim measures) at the conclusion of the disciplinary proceedings such as notifying Plaintiff's teachers of the traumatic experience, the provision of academic support services or arranging for Plaintiff to have extra time to re-take a class or withdraw from a class without academic or financial penalty and instead disqualifying Plaintiff from the nursing program for a shortcoming in her GPA of less than one tenth (0.1) of a point despite being provided medical evidence that Plaintiff's academic performance had suffered as a direct result of the rape;

g. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

244. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination

and, further, had UT not taken self-serving action to protect the interests of its athletic department, basketball program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Makanjuola would have been removed as a threat to Plaintiff and Plaintiff would have completed the nursing program. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while Makanjuola was praised by members of the athletic department, granted a transfer and allowed to continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

## Plaintiff Doe II's Claims Under Title IX

245.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

246.   Plaintiff Doe II pleads the "erroneous outcome" doctrine under Title IX, set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994), as to UT's flawed investigation into the sexual assault of Doe II.

247.   The rape of Plaintiff Doe II was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment.  UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

248.   UT is also liable under the after theory of liability under Title IX.

249.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

250.   The discrimination, consisting of Mr. Doe I's rape of Plaintiff Doe II, the risks to Plaintiff Doe I's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe II's access to educational opportunities and benefits.

251.   Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions not to disclose Mr. Doe I's rape of Plaintiff or the investigation so that Mr. Doe I's (or the University's, see fn 2, supra) football season would not be affected;

b. UT's deliberate decisions during the "disciplinary process": to reverse the initial findings (against Mr. Doe I) without providing any substantive basis and without any appeal communicated to Plaintiff; to remove the investigator and instead appoint a new investigator of its own choice; to subject Plaintiff Doe II to clearly retaliatory allegations and concurrent investigations in an effort to intimidate and dissuade her from pursuing her claims; to take no action whatsoever against Mr. Doe I for the retaliatory and completely false accusations against Plaintiff; to allow additional time (and multiple interviews) wherein football players were given an opportunity to "get their stories straight"; to fail to accurately characterize the statements provided by witnesses or investigate said statements with sufficient diligence upon receiving notice of the discrepancies and to utilize a biased appeal system contra to its own policies that utterly failed Plaintiff Doe II in favor of a football player assisted by prominent counsel;

c. UT's deliberate decision (in its "second" investigative findings) to include, in its findings, an unnecessary and highly unusual conclusion that, not only could it not proceed with disciplinary charges, but that the sexual encounter was consensual;

d. UT's deliberate decision not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation or at the conclusion of the disciplinary proceedings such as: notifying Plaintiff's teachers of the traumatic experience or providing academic support services or arranging for Plaintiff to have extra time to re-take a class or withdraw from a class without academic or financial penalty despite specifically finding that Plaintiff was traumatized by the event (while simultaneously finding that the encounter was consensual).

e. UT's denial to Jane Doe II of procedural equal rights and refusing to conduct a hearing on her case.

f. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

256. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Mr. Doe I would have been removed as a threat to Plaintiff and Plaintiff would have maintained her academic track and be working towards earning her degree at UT. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and underwent further emotional trauma while Mr. Doe I remained on campus and was allowed to continue playing collegiate sports suffering no substantive consequences whatsoever.

### Plaintiff Doe III's Claims Under Title IX

257. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

258. The rape of Plaintiff Doe III was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment. UT's deliberate decisions not to take any actual disciplinary action as to Treyvon Paulk so that he could potentially return to the team at a later point when he could actually play (when he was not medically red-shirted) and instead allowing him to remain in school and on scholarship while continuously maintaining the hostile and dangerous environment in Vol Hall and practice of providing alcohol to minors as was done to Plaintiff Doe III on the evening she was eventually raped by Mr. Doe II and others.

259. UT is liable under the after theory of liability under Title IX.

260. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

261. The discrimination, consisting of Mr. Doe II's rape of Plaintiff Doe III, the risks to Plaintiff Doe III's safety, the acts and omissions by members of UT's administration in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe III's access to educational opportunities and benefits.

262. Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including,

without limitation:

a. UT's deliberate decisions to continue to employ known ineffective interim measures and allowing Mr. Doe II to remain on campus and to be present in Plaintiff's dorm, thereby subjecting Plaintiff to additional contact with her rapist;

b. UT's deliberate decision not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: notifying Plaintiff's teachers of the traumatic experience, the provision of academic support services or arranging for Plaintiff to have extra time to re-take a class or withdraw from a class without academic or financial penalty;

c. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that Mr. Doe II will likely not participate in the hearing and with full knowledge that additional delay would disadvantage the prosecution of the disciplinary charges charged;

d. UT's deliberate decision to refrain from seeking retroactive punishment against Mr. Doe II, provide explanation as to why retroactive punishment was not being sought, despite repeated requests by Plaintiff and Plaintiff's counsel;

e. UT's deliberate decision to make scheduling accommodations at Mr. Doe II's (and his attorney & outside counsel's) request —thereby subjecting Plaintiff Doe III not only to unnecessary delay, but also in fear that she would be required to give additional statements and deposition testimony that would force her to relive her rape and subject her to examination by Mr. Doe II's counsel;

g. UT's deliberate decisions during the "disciplinary process": to refrain from implementing any interim measures and instead delay its investigation, thereby allowing additional time wherein witnesses and the rapists were given an opportunity to "get their stories straight."

h. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

263.   Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and instead employed effective interim measures and a disciplinary process that was prompt and equitable, Mr. Doe II would have been removed as a threat to Plaintiff and Plaintiff would have maintained her academic track and be working towards earning her degree at UT. Instead, Plaintiff was subjected to further contact with one of her rapists, additional emotional and psychological trauma, forced to leave campus, set back years from her academic track (incurring significant costs in the process) all while Mr. Doe II was allowed to remain on campus, suffering no substantive consequences whatsoever and facing no substantive punishment (punishment retroactive to the date of Mr. Doe II's raping of Plaintiff)—punishment available under its policies and requested by Plaintiff.

**Plaintiff Doe IV's Claims Under Title IX**

264.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

265.   The rape of Plaintiff Doe IV was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment. UT consciously disregarded the known risks posed by the specific group of students by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby allowing this same group of players to continue the pattern of providing alcohol to minors, violent and discriminatory behavior including sexual assault, the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses UT resulted in the assault against Plaintiff.

266.   UT is also liable under the after theory of liability under Title IX.

267.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

268.   The discrimination, consisting of Johnson and Williams' rape of Plaintiff Doe IV, the risks to Plaintiff Doe IV's safety, the acts and omissions by members of UT's administration and

athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe IV's access to educational opportunities and benefits.

269. Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation in the wake of Plaintiff's allegations so as to mitigate any negative effect on its football season and the athletic department;

b. UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapists and witnesses to the Title IX investigation; to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated; and, to take any action whatsoever against persons under its control (football players and coaches) who threatened and assaulted witnesses to the investigation and instead allowing said persons to continue playing and coaching football in direct contradiction of its own policies and Title IX;

c. The provision or facilitation of access to special counsel by UT;

d. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that neither Johnson nor Williams are likely to attend or participate in any hearing—thereby subjecting Plaintiff Doe IV not only to unnecessary delay, but also additional and unnecessary interviews and an unnecessary hearing during which she has been, and will be in the future, forced to relive her rape while potentially being subjected to offensive and needless examination;

e. UT's deliberate decision to allow Johnson and Williams to remain on campus and on scholarship throughout the Fall, 2014 (Johnson) and Spring, 2015 (Williams) semester(s);

f. UT's deliberate decisions to publicly support, through the statements and actions of its administrators (including Chancellor Cheek) and football coaches, the men who raped

Plaintiff; and,

g. UT's deliberate decisions to publicly support, through the statements and actions of the athletic department and football coaches, the men known to have threatened and assaulted witnesses to the Title IX investigation.

h. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

270. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Williams, Johnson and the football players and coaches that interfered with the investigation including football players Marlin Lane, Geraldo Orta and Curt Maggitt, would have been removed as a threat and Plaintiff would have retained her scholarship and be representing the University through athletics while pursuing her degree. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football players were praised by members of the athletic department, allowed to remain in school on scholarship and, as to Orta and Maggitt, continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

### Plaintiff Doe V's Claims Under Title IX

271. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

272. UT is liable under the before theory of liability because UT had actual knowledge of the involvement of Orta and Lane as persons responsible for a prior sexual assault (in April of 2013) and a severely hostile sexual environment including post-assault communications with the victim in an effort to dissuade her from pursing the complaint. UT administrators and its athletic department, including Coach Jones, had specific knowledge of these facts as set forth in the police report. As set forth above, Orta and Lane violently retaliated against a material witness to the Doe IV rape (i.e. Drae Bowles) and this violent act of retaliation was witnessed by Jane Doe V.

273. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. UT consciously disregarded the known risks posed by this specific group of students

by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby allowing this same group of players to continue the pattern of providing alcohol to minors, violent and discriminatory behavior including sexual assault, the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses UT resulted in the assault against Plaintiff and UT is therefore liable for sexual discrimination and retaliation to Plaintiff Doe V under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

274.   UT is also liable under the *after* theory of liability under Title IX.

275.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

276.   The discrimination, consisting of Maggitt and Johnson's post-assault communications and the violent retaliatory acts of UT football players including Orta, Lane and Maggitt posed risks to Plaintiff Doe V's safety. The acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe V's access to educational opportunities and benefits.

277.   Plaintiff was subjected to discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

   a.   UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation so as to mitigate any negative effect on its football season and the athletic department;

   b.   UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapists and witnesses to the Title IX investigation, to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated, to take any action whatsoever against

persons under its control (football players and coaches) who threatened and assaulted witnesses to the investigation and instead allowing said persons to continue playing and coaching football in direct contradiction of its own policies and Title IX;

    c.   The provision or facilitation of access to special counsel by UT;

    d.   UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that neither Johnson nor Williams are likely to attend or participate in any hearing—thereby unnecessarily delaying the process;

    e.   UT's deliberate decision to allow Johnson and Williams to remain on campus and on scholarship throughout the Fall, 2014 (Johnson) and Spring, 2015 (Williams) semester(s);

    i.   UT's deliberate decisions to publicly support, through the statements and actions of the athletic department and football coaches, the men known to have threatened and assaulted witnesses to the Title IX investigation;

    j.   UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

    k.   UT's deliberate indifference to allegations of retaliation against Plaintiff Doe V for her participation in a Title IX sexual assault investigation, which indifference makes UT a party to the retaliation itself.

278.  Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by employing a disciplinary process that was prompt and equitable, Williams, Johnson and the football players and coaches that interfered with the investigation including football players Marlin Lane, Geraldo Orta and Curt Maggitt, would have been removed as a threat and Plaintiff would have retained her scholarship and be representing the University through athletics while pursuing her degree. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football

players were praised by members of the athletic department, allowed to remain in school on scholarship and, as to Lane, Orta and Maggitt, continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

**Plaintiff Doe VI's Claims Under Title IX**

279. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

280. Plaintiff Doe II pleads the "erroneous outcome" doctrine under Title IX, set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994), as to UT's flawed investigation into the sexual assault of Doe VI.

281. The rape of Plaintiff Doe VI was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. UT consciously disregarded the known risks posed by the specific group of students by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby allowing football players to continue the pattern of violent and discriminatory behavior including sexual assault as well as the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses resulted in the assault against Plaintiff. UT is therefore liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

282. UT is also liable under the after theory of liability under Title IX.

283. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

284. The discrimination, consisting of Jones' rape of Plaintiff Doe VI, the risks to Plaintiff Doe VI's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe VI's access to educational opportunities and benefits.

285. Plaintiff was subjected to the discrimination because of the University's deliberate

indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

    a. UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation in the wake of Plaintiff's allegations so as to mitigate any negative affect on its football season and the athletic department;

    b. UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapist and witnesses to the Title IX investigation, to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated, to take any action whatsoever against persons under its control (football players) who threatened and/or attempted to dissuade Plaintiff and other witnesses to the investigation and instead allowing said persons to continue this pattern and remain in school on scholarship in direct contradiction of its own policies and Title IX;

    c. UT's deliberate decision to refrain from imposing any discipline and prompt resolution within the required timeframe under Title IX and its own policies—thereby subjecting Plaintiff Doe VI to unnecessary delay;

    d. UT's deliberate decision to allow Jones and the men (other football players) known to have threatened and assaulted witnesses to the Title IX investigation to remain on campus and on scholarship throughout the Spring, 2015 semester;

    e. UT's deliberate decisions to publicly support, through the statements and actions of its administration, the athletic department and football coaches, Riyahd Jones and the men (other football players) known to have threatened and assaulted witnesses to the Title IX investigation; and,

    f. UT's deliberate decisions in relying on the failure of witnesses to participate who were known to have been contacted by football players as the primary basis for the outcome of its investigation.

    g. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic

program.

285.  Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Jones and the football players and coaches that interfered with the investigation would have been removed as a threat and Plaintiff would have remained in school and pursuing her degree. Instead, Plaintiff was forced to leave campus, forced to deviate from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football players were praised by members of the athletic department, allowed to remain in school on scholarship and effectuate a transfer (as to Jones) and, as to others, continue playing collegiate sports at UT (on scholarship) --- suffering no consequences whatsoever.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

a. Defendant be served with process and answer herein;

b. An award of damages in an amount to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiffs' tuition or related expenses; payment of Plaintiffs' expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by UT; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future enjoyment of life;

c. An Order enjoining UT, along with all of its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment;

d. Injunctive relief requiring UT to redress its violations of Title IX including: 1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy, including procedures for effective reporting of sexual harassment incidents, an effective and immediate crisis response, and an expanded victim assistance and protection program; 2) adopting a real "zero tolerance policy" under which there will be expedited proceedings and punishment proportional to the offense for violation of sexual harassment policies; 3) providing for an annual, independent review by the UT Board of Trustees, with the participation of outside reviewers, of Athletic Department compliance with the sexual harassment and recruiting policies and any other relief to be determined at trial requiring UT to comply with federal law under Title IX; and 4) enjoining UT from utilizing the TUAPA administrative process in sexual assault investigations.

e. Attorneys' fees pursuant to 42 U.S.C. § 1988(b);

f. For the court costs of trying this action;

g. For a jury to hear this cause of action;

h. For costs to be taxed to the Defendant;

i. For such other and further relief as the Court may deem proper; and,

j. For pre- and post-judgment interest.

k.  Plaintiffs respectfully reserve the right to amend this Complaint to conform to the evidence.

Respectfully submitted this 8th day of February, 2016.

DAVID RANDOLPH SMITH & ASSOCIATES

/s/ David Randolph Smith
David Randolph Smith, TN BPR#011905
Dominick R. Smith, TN BPR # 028783
W. Lyon Chadwick, TN BPR # 029599
Christopher W. Smith, TN BPR #034450
DAVID RANDOLPH SMITH & ASSOCIATES
1913 21st Avenue South
Nashville, Tennessee 37212
(615)742-1775 phone
(615)742-1223 fax
drs@drslawfirm.com

*Attorneys for Plaintiffs*