# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| Jane Doe I, Jane Doe II,<br>Jane Doe III, Jane Doe IV<br>Jane Doe V, Jane Doe VI,<br>Jane Doe  VII,  and Jane Doe VIII | )<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )<br>) |
| The University of Tennessee | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendant. | ) |

**Case 3:16-cv-00199**

**Judge Aleta Trauger**

JURY DEMAND

_____

## FIRST AMENDED COMPLAINT
_____

### PRELIMINARY STATEMENT AND INTRODUCTION

1.     This is a civil action for declaratory, injunctive and monetary relief for injuries Plaintiffs Jane Does I, II, III, IV, V, VI, VII and  VIII sustained as a result of the acts and omissions of The University of Tennessee at Knoxville ("UT" or the "University") relating to sexual assaults, aggravated assault and false imprisonment  involving UT football and basketball players (six rapes of female UT students, one aggravated sexual assault and false imprisonment)[1]

---

[1]  Four Plaintiffs (Does II, IV, VI and VII) were raped by five UT football players. One Plaintiff (Doe I) was raped by a UT basketball player and one Plaintiff (Doe III) raped by a non-athlete UT student where the underage victim became intoxicated with alcohol provided by football players at a party at Vol Hall. One Plaintiff (Doe VIII) sustained an aggravated sexual assault and false imprisonment when she refused sex from a UT football player.

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 1 of 87 PageID #: 963

and the University's deliberately indifferent actions before the rapes and afterwards in response in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"). Plaintiffs also sue under the Supremacy Clause, Article VI, Clause 2, of the United States Constitution to bar UT from application and enforcement of a state statute and official policy (the Tennessee Uniform Administrative Procedure Act, T.C.A. § 4-5-101 *et seq*.) in sexual assault cases on campus in derogation of Title IX and the Campus Save Act, 20 U.S.C. § 1092 (2012 (that *preempt* the TUAPA).[2]

2. Plaintiffs assert two separate theories of liability for damages under Title IX: 1) deliberate indifference and clearly unreasonable acts and omissions that created a hostile sexual environment to female students *before* a sexual assault on a student by a fellow student by conduct and policies making a student more vulnerable to sexual assault itself; and 2) deliberate indifference and a clearly unreasonable response *after* a sexual assault that causes a student to endure additional harassment.

3. UT intentionally acted by an official policy of deliberate indifference to known sexual assaults so as to create a hostile sexual environment and systemic failure that was a substantial factor is causing the sexual assaults at issue. The number of sexual assaults by male athletes, particularly football players is statistically significant evidence of a systemic failure (including failure to train) by UT. UT had actual notice (and itself created) a long-standing, severely hostile sexual environment of rape by male athletes (particularly football players) that was condoned and completely unaddressed by UT officials, including Chancellor Jimmy Cheek ("Cheek"), President Joe DiPietro ("DiPietro), Athletic Department Director and Vice-Chancellor Dave Hart ("Hart"), and head football coach Butch Jones ("Jones").

4. UT intentionally acted in a clearly unreasonable fashion in violation of Title IX by acts of custom and an official policy of: deliberate indifference to sexual assaults; direct interference with the disciplinary process in favor of male athletes who were charged with rape; directly supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape; and unlawfully

---

[2] *Burgio and Campofelice, Incorporated v. New York State Department of Labor*, 107 F.3d 1000, 1006-07 (2d Cir. 1997); *Wright Electric, Incorporated v. Minnesota State Board of Electricity*, 322 F.3d 1025, 1028 (8th Cir. 2003).

discriminating against victims of sexual assault and fostering a hostile sexual environment by the misuse of a one-sided Tennessee Uniform Administrative Procedures Act ("TUAPA") procedure.

5. UT's lack of promptness in investigating and remedying campus sexual assaults further constitutes deliberate indifference, because these investigative delays by UT helped to create the hostile sexual environment for discriminatory acts of these third parties by UT's repeated failure timely to remedy.

6. The TUAPA procedure, was (and is, if not declared in violation of Title IX and preempted by the Campus Save Act (enacted as VAWA Section 304)) a deliberate rule and policy decision by UT to allow perpetrators of sexual assaults, particularly varsity football and basketball players, to delay and altogether avoid sanctions and discipline for sexual assault by the use of a discriminatory TUAPA procedure that allows only accused perpetrators of sexual assaults (and not victims) to have the right of confrontation, cross-examination and a right to an evidentiary administrative hearing.

7. UT, in clear violation of Title IX and the constitutional right to equal protection, is unique among U.S. colleges and universities by virtue of its use of a one-sided TUAPA administrative hearing procedure ("contested case") that denies victims the rights to a hearing and to the same equal procedural, hearing, and process rights as given to perpetrators of rape and sexual assault. UT further acted (and acts) intentionally and in clear violation of Title IX by acts of custom and an official policy whereby Chancellor Cheek appoints administrative judges and hearing officers favorable to athletes and then *also decides any appeals* from TUAPA hearings in a clear conflict of interest. A hostile sexual environment was created by this procedure and policy as varsity athletes were condoned and encouraged to have parties with alcohol and drugs, entertain recruits, provide alcohol to underage female students and commit sexual assaults with no discipline or deterrence against committing sexual assaults as perpetrators of assaults faced no serious consequences.

8. Athletes knew in advance that UT would: support them even after a complaint of sexual assault; arrange for top quality legal representation; and then direct them to the TUAPA process, which was and continues to be a one-sided and unfair system of adjudication. Varsity athletes knew that they (not victims) would be fully supported by the UT athletic department and administration's process and that the perpetrators and athletic department could deter and

discourage victims from pursuing complaints by: having their lawyers depose female victims; subjecting victims to extensive discovery; cross-examining sexual assault victims in a full blown hearing before an administrative law judge(appointed by Cheek); and delaying the investigation process until the athlete perpetrators transferred to another school or graduated without sanction or discipline. This is precisely what happened in the cases of Does I, II, IV, VI and VII and is the very practice that was the principal basis for UT Vice-Chancellor Tim Rogers resignation from UT in March 2013 in protest over the violation of Title IX and the UT administration's and athletic department's deliberate indifference to the clear and present danger of sexual assaults by UT athletes.[3]

9.     UT administration (Chancellor Cheek), athletic department (Dave Hart) and football coaches (including head coach Butch Jones) were personally aware (as "appropriate persons" under Title IX) and had actual notice of previous sexual assaults and rapes by football players, yet acted with deliberate indifference to the serious risks of sexual assaults and failed to take corrective actions despite express warnings and notice from UT Vice-Chancellor Tim Rogers and direct knowledge of numerous prior instances of sexual assaults.   Under *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1171, 1173 (10th Cir. 2007), a University may be held liable for the *occurrence* of a sexual assault, and not merely for the post-assault response, where the sexual assault resulted from an "official policy" of the University.[4]

10.     The "before" theory of university liability for the rapes themselves recognized in *Simpson* has specifically been adopted by a Tennessee federal court in *Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 917-918 (M.D. Tenn. 2009). [5]

---

[3] Attached as **Exhibit 1** hereto is the **Declaration of W. Timothy Rogers**, attesting that the allegations in this complaint are true and correct with respect to the statements and descriptions of events pertaining to Rogers as to his interactions with Chancellor Cheek and President DiPietro.

[4] Under *Gebser*, "actual knowledge" is not a required element in cases that "involve official policy." *See Gebser*: "Consequently, *in cases like this one that do not involve official policy of the recipient entity*, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999 (1998).  *See also Simpson,* 500 F.3d at 1176.

[5] "Title IX liability can flow from two 'harassment' time periods: (a) when a school exhibits deliberate indifference, before a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack itself; or (b) when a school exhibits deliberate indifference after an attack, that causes

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 4 of 87 PageID #: 966

## Tolling Agreement with the University of Tennessee

11.    The University of Tennessee and Plaintiffs entered into a "Tolling Agreement," that tolled the applicable statute(s) of limitations such that this suit is timely filed as to Jane Does I-VI. Jane Doe VII and Jane Doe VIII were sexually assaulted (raped) on April 24, 2015 and September 20, 2015, respectively and suit is therefore timely filed.

12.    Plaintiff Jane Doe I is a resident of Knox County, Knoxville, Tennessee. Plaintiff Doe I was a student at UT from August 2012-May 2014.

13.    Plaintiff Jane Doe II is a resident of Hamilton County, Chattanooga, Tennessee. Plaintiff Doe II was a student at UT from August 2014-January 2015.

14.    Plaintiff Jane Doe III is a resident of Spring Hill, Tennessee. Plaintiff Doe III was a student at UT from August 2014-December 2014.

15.    Plaintiff Jane Doe IV is a resident of Orlando, Florida. Plaintiff Doe IV was a student-athlete at UT from August 2013-November 2014.

16.    Plaintiff Jane Doe V is a resident of Rhinebeck, New York. Plaintiff Doe V was a student-athlete at UT from August 2013-January 2015.

17.    Plaintiff Jane Doe VI is a resident of Knox County, Knoxville, Tennessee.  Plaintiff Doe VI was a student at UT at the time she was sexually assault in February 2015.

18.    Plaintiff Jane Doe VII is a resident of Brentwood, Williamson County, Tennessee. Plaintiff Doe VII was a student at UT before leaving in the Spring of 2015.

19.    Plaintiff Jane Doe VIII is a resident of Smyrna, Rutherford County, Tennessee. Plaintiff Doe VI was a student at UT at the time she was sexually assaulted on February 14, 2016.

20.    Defendant University of Tennessee at Knoxville is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses throughout Tennessee.  The University is an instrumentality of the State of Tennessee, and is administered by the UT Board of Trustees.

---

a student to endure additional [*918] harassment." . . . *see*, *Simpson v. Univ. of Colorado*, 500 F.3d 1170, 1173 (10th Cir. 2007) (summary judgment in Title IX case inappropriate where claim was that coach failed to adequately supervise high school recruits because even before female students were sexually assaulted "there were a variety of sources of information suggesting the risks that sexual assault would occur if recruiting was inadequately supervised)."  *Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 917-918 (M.D. Tenn. 2009).

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 5 of 87 PageID #: 967

Further, the University receives state and federal funding under Title IV and therefore is subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). The University can be served with legal process c/o Herbert H. Slattery III Attorney General, State of Tennessee, Office of the Attorney General and Reporter 425 5th Ave N #2, Nashville, TN 37243.

## Jurisdiction

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and the Supremacy Clause, Article VI, Clause 2, of the United States Constitution.

22.     Venue is proper in the Nashville Division of the U.S. District Court in the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)1) and § 1391(c)(2) because, *inter alia*, UT, as an arm of the State of Tennessee,  resides in the Nashville Division in the Middle District, is subject to this Court's personal jurisdiction, and Plaintiffs cannot receive a fair and an impartial trial by jury in accordance with the Seventh Amendment to the U.S. Constitution in any other judicial district in which venue would be proper. UT maintains several campuses in Nashville (College of Social Work, Pharmacy and Health Sciences).[6] UT's Board of Trustees regularly holds its meetings in Nashville. http://trustees.tennessee.edu/ (last visited December 9, 2015). *See also* T.C.A. 4-5-223 (Davidson County, Tennessee is proper venue for TUAPA declaratory judgment suits); *Jain v. University of Tennessee*, 670 F.Supp. 1388 (W.D. Tenn. 1987) (*aff'd* 843 F.2d 1391 (6th Cir. 1988) (*UT is an arm of the State of Tennessee*).

## FACTUAL ALLEGATIONS

### Notice of Ongoing Issues to the University's Administration and Athletic Department

23.     Incidents involving athletes and misconduct, including specifically sexual violence,

---

[6] UT President DiPietro gave the 2016 "State of UT Address" in Nashville at the Linda and Mike Curb Institute for Advanced Medical Education at St. Thomas West Hospital in connection with the University of Tennessee's Health Science Center and Saint Thomas Health System residency program. http://tennessee.edu/state-of-ut/transcript/ (last visited February 24, 2016). UT has a Nashville campus for the College of Social Work located at 193 Polk Avenue, Suite E, Nashville, TN 37210. http://www.csw.utk.edu/mssw/ (last visited February 24, 2016). UT's Health Sciences Center also has a Nashville campus for its pharmacy program located at 193 Polk Avenue, Suite 2D Nashville, TN 37210 https://www.uthsc.edu/pharmacy/nashville/index.php (last visited February 24, 2016). UT's Health Sciences Center's College of Medicine also has a Nashville Internal Medicine Residency Program. http://comnashville.uthsc.edu/content/internal-medicine/. UT also has campuses in Chattanooga (https://www.utc.edu), Martin (https://www.utm.edu) and Memphis (https://www.uthsc.edu) (sites last visited February 24, 2016).

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 6 of 87 PageID #: 968

have been part of a hostile sexual environment and culture of the University of Tennessee Athletic Department for more than a decade. Plaintiffs aver that the University's official policies and actions affirmatively and deliberately created (and creates) a hostile discriminatory sexual environment for female students, and that UT acted with deliberate indifference in its response to incidents of sexual assault in a pattern, practice, practice, policy, and custom of grossly inadequate discipline and resolution in specific favor of male, "major sports" athletes. Plaintiffs further aver that said favoritism included interfering with and stopping the disciplinary process, concealing charges and investigations involving male athletes, arranging for specialized defense counsel for male athletes at UT facing criminal and sexual assault charges, encouraging parties with underage drinking to benefit recruiting, discouraged reporting by creating a culture of known tolerance for and protection of misconduct, and misusing the Tennessee Uniform Procedures Act by Chancellor (Cheek) selecting judges to hear cases involving athletes in a delaying process not in compliance with Title IX.

24.     Under the "before" Title IX case, official policies and a prior known history of sexual misconduct by male athletes (football and basketball players) subject the University to liability for the creation of a hostile environment for sexual assaults and making female students vulnerable to assaults. *Simpson v. University of Colorado*, 500 F.3d 1170, 1179-1184 (10th Cir. 2007).

25.     In 1995, UT football player Nilo Sylvan was arrested and charged with raping a 17-year-old youth in his West Knoxville apartment where he lived with other UT football players. *See* http://dailybeacon.webfactional.com/sports/1995/sep/19/athlete-arrested-for-rape/ (last visited December 9, 2015). Sylvan was eventually dismissed from the team but remained under scholarship for the remainder of the semester. *See* http://dailybeacon.webfactional.com/sports/1995/sep/20/nilo-silvan-dismissed-from-team/ (last visited December 9, 2015). The arrest occurred less than one week after his teammate, Leslie Ratliffe, was arrested and charged for assaulting his girlfriend. *See* http://dailybeacon.webfactional.com/sports/1995/sep/19/athlete-arrested-for-rape/ (last visited December 9, 2015).

26.     In 1996, (then) Jamie Whited, the first female associate trainer in UT's history, reported an incident to the Sexual Assault Crisis Center in Knoxville alleging that UT football player Peyton Manning had, in brief, "sat on her face" while she was assessing the extent of an

injury. The incident was settled in 1997 for an undisclosed amount conditioned on the victim leaving her job at the University. *See* http://usatoday30.usatoday.com/sports/football/nfl/colts/2003-11-04-manning-suit_x.htm (*last visited* December 9, 2015). Ms. Whited reported this incident to Mike Rollo, then the Head Trainer at UTK. Mr. Rollo engaged in an effort to "cover up" the incident by inventing a false narrative that the incident was merely a "mooning." Rollo also suggested blaming the incident on a black athlete instead of Manning. Following the incident, Ms. Whited sent numerous letters (to the President of the University as well as the Athletic Director) complaining of a hostile and discriminatory sexual environment.[7]

27.     In May of 2003, UT football player Antwan Stewart was arrested and charged with raping a 16-year-old girl with a learning disorder in an on-campus dormitory. UT Athletic Department personnel (including head coach Phil Fulmer) were made aware of the incident within hours and met with the victim and her mother before the authorities were contacted. *See* http://dailybeacon.webfactional.com/news/2003/aug/1/da-will-not-charge-player-with-rape/ (last visited December 9, 2015). Charges were eventually dropped and Stewart played in all 13 games of the 2003 season.

28.     In January 2005, UT football player Tony McDaniel was arrested and charged with aggravated assault after hitting another student during a pickup basketball game on campus. McDaniel was represented by Knoxville attorney Don Bosch, a former UT Athlete and Member of the Board of Athletics, in the incident. *See* http://usatoday30.usatoday.com/sports/college/football/sec/2005-05-18-tennessee-indictment_x.htm (last visited December 8, 2015).

29.     At that time, McDaniel was one of 13 UT football players who had been arrested or cited for crimes ranging from aggravated assault to underage drinking in less than a year (since February of 2004). *Id*.

30.     McDaniel was suspended from the team at the time (it was the offseason) and he

---

[7] Evidence of prior incidents is relevant in a Title IX case. *Simpson v. Univ. of Colorado*, 500 F.3d 1170 (10th Cir. 2007). Students raped at University of Colorado in 2001 (when Gary Barnett was head football coach) were allowed to show the University of Colorado knew of prior sexual assaults from as far back as 1989 to show "that there had been no change in atmosphere" since the prior assaults had occurred "that would make such misconduct less likely in 2001."

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 8 of 87 PageID #: 970

remained enrolled at UT for the duration of the Spring, 2005 semester. The victim was another UT student whose face was broken in four places, requiring a metal plate. McDaniel was indicted on a felony charge of aggravated assault in May of 2005 but the University's discipline was limited to a suspension for the summer school sessions and "indefinite probation," and McDaniel was not allowed to use the student recreational center. *See* http://usatoday30.usatoday.com/sports/college/football/2005-07-28-notes_x.htm (last visited December 8, 2015).

31. In July 2005, McDaniel pleaded guilty but, in a deal obtained by his attorney, the charges were reduced to misdemeanor assault and he was allowed to return to the team following the first two games of the season. *Id*.

32. In November of 2009, UT football players Nu'Keese Richardson, Janzen Jackson and Mike Edwards were arrested and charged with attempted armed robbery. http://thegrio.com/2009/11/12/3-university-of-tennessee-football-players-arrested-for-robbery/ (last visited December 8, 2015).

33. Former UT Athlete and Member of the Board of Athletics, Knoxville attorney Don Bosch, represented UT football player Janzen Jackson in the incident. *See* http://espn.go.com/ncf/news/story?id=4647094 (last visited December 8, 2015). Jackson was reinstated to the team that season and continued to play for the Volunteers throughout the 2010 season before withdrawing from school during the Spring 2011 semester (he was reinstated in July of that year) and ultimately being kicked off the team for issues relating to substance abuse in August 2011. *See* http://www.utsports.com/sports/m-footbl/mtt/jackson_janzen00.html (last visited December 8, 2015), *see also* (http://www.teamspeedkills.com/2011/8/24/2381418/janzen-jackson-dismissed-tennessee-volunteers-football?_ga=1.110006467.735610754.1426605234 (last visited December 9, 2015). Jackson has since been arrested for murder and, as of 2014, was being held on a $1-million-dollar bond. *See* http://theadvocate.com/sports/9579990-128/rabalais-for-janzen-jackson-football (last visited December 8, 2015).

34. In July of 2010, UT football players Da'Rick Rogers and Darren Myles, Jr. were arrested following a brawl at a bar where multiple (reports ranging from 6-12) football players were partying on an evening that left an off-duty police officer seriously injured. *See* http://www.myfoxmemphis.com/story/18526635/da-no-more-charges-in-bar-brawl-with-vols (last

visited December 8, 2015). Myles was arrested on charges of assault, evading and resisting arrest and Rogers was arrested on charges of disorderly conduct and resisting arrest. http://www.wrcbtv.com/story/12778928/updated-calhouns-darick-rogers-arrested-in-knoxville-bar-fight (last visited December 8, 2015).

35. Myles was dismissed from the football team; however, in a deal arranged by his attorney, Don Bosch, Rogers agreed to perform 16 hours of community service and the charges were dropped in September, without Rogers missing a single game of the 2010 season. *See* http://www.myfoxmemphis.com/story/18526635/da-no-more-charges-in-bar-brawl-with-vols (last visited December 8, 2015).

36. In February of 2011, UT football player Brent Brewer was arrested and charged with domestic assault. *See* http://www.rockytoptalk.com/2011/2/14/1992611/tennessee-safety-brent-brewer-suspended-indefinitely-after-domestic?_ga=1.104791110.735610754.1426605234 (last visited December 7, 2015).

37. Brewer was represented by attorney Don Bosch in the incident and although initially given an "indefinite suspension" from the football team, Brewer was reinstated to the team five weeks later after reaching a plea agreement that reduced the charges to "offensive touching." *See* http://usatoday30.usatoday.com/sports/college/football/2011-03-21-2474544407_x.htm (last visited December 8, 2015); http://www.sbnation.com/2011/3/21/2063625/brent-brewer-reinstated-at-tennessee (last visited December 8, 2015).

38. In 2011 and 2012, multiple separate allegations were made to the University relating to sexual assaults by UT athletes. (Then) University of Tennessee Vice-Chancellor, Tim Rogers ("Rogers"), made repeated efforts to bring concerns over serious ongoing problems involving sexual assaults by football and basketball players and with the University's response as it relates to sexual assault cases to the attention of school administrators.

39. In June of 2011, UT Athletic Director, Mike Hamilton, resigned amidst significant criticism by Tennessee fans for setbacks on and off the field in three major sports (men's basketball, baseball and football). *See* http://espn.go.com/ncaa/news/story?id=6634194 (last visited December 10, 2015).

40. Hamilton was succeeded by Dave Hart[8], the athletic director for Florida State University. During his tenure at FSU, the University (and, specifically, the athletic department) came under serious scrutiny after attempting to cover up an alleged rape of a female FSU student athlete by a football player in 2003. The incident resulted in the commission of multiple reports to study the athletic department's operations, one by the Inspector General. The Inspector General report found that Hart's department maintained a policy that ""all athletic department personnel should go to their supervisor before contacting officers in the university and state administration." "The 'tone at the top' typically indicates the culture of most business units or organizations," the inspector general report went on to state. "Within the Athletics Department, we believe the culture of isolation has been established by the tone of the Athletics Director (Dave Hart), who is ultimately responsible for all facets of the Department's operations." The report also found that the athletics department did not seek counsel from FSU police or other university departments on potential criminal matters. And in the MGT report, Hart was criticized for "not holding head coaches accountable for the enforcement of rules for players, including classroom attendance and student conduct." http://www.tennessean.com/story/news/local/2015/02/16/dave-hart-helm-florida-state-athletics-mishandled-rape-claim/23458011/ (last visited December 10, 2015). In a later interview, former FSU general counsel, Betty Steffens, who headed the task force implemented to review the athletic department's dealings, said the way Hart's athletics department handled the sexual assault claim made by a student-athlete "was totally not the right way to do business." *Id*.

41. After Hart's hiring during the 2011 football season, the athletic department received a report of an alleged sexual assault against UT football player Da'Rick Rogers. The University never disclosed the allegation. The athletic department interfered with the Office of Student Conduct by conducting its own internal investigation of the rape allegations against Rogers without the knowledge of the Office of Student Conduct. The athletic department interviewed witnesses and football players who "got their stories straight" before the matter was taken to the Office of Student Conduct. This clearly unreasonable investigation process was in violation of Title IX's

---

[8] During a January, 2013 interview, Hart commented on his plan to cure the ongoing financial woes of Tennessee's athletic department left in the wake of repeated unsuccessful seasons in major sports, stating: "We've got to get football healthy," "That's our economic engine. When that program is successful, everybody wins." *See* http://www.sportsbusinessdaily.com/Journal/Issues/2013/01/28/Colleges/Tennessee.aspx (*last visited* December 10, 2015).

requirement of an equitable and impartial investigation and is evidence of a University policy that creates a hostile sexual environment.

42.     The athletic department exercised improper and undue influence on the disciplinary process and Director of Student Judicial Affairs, Jenny Wright.[9] The athletic department criticized Ms. Wright's investigations and their outcomes in incidents involving athletes that included in a verbal berating by Athletic Director and Vice Chancellor Dave Hart.

43.     No action was taken against Da'Rick Rogers by the University or football team as a result of the alleged rape and he continued to play in every game of 2011, earning all-conference accolades before eventually being kicked off the team in 2012.

44.     In 2012, accusations were made against Hart and the University by athletics department staffers and associate athletic director Debby Jennings for discrimination and two separate lawsuits were filed alleging, in-part, that Hart and the athletic department's actions in removing  female staff and administrators and replacing them with male counterparts were intended to facilitate the running of the department as a "good ol' boys club," consistent with the specific findings and criticisms of the Inspector General reports from FSU. *See Deborah Jennings v. The University of Tennessee and Dave Hart*, Case No. 3:12-cv-00507, USDC EDTN, Second Amended Complaint Doc. 35 at 24, ¶ 105; *see also*, http://www.tennessean.com/story/opinion/editorials/2015/02/16/university-tennessee-operate-impunity/23521043/ (last visited December 10, 2015).

45.     In May 2013, (then) University of Tennessee Vice-Chancellor, Tim Rogers again voiced his concerns relating to serious ongoing problems involving sexual assaults by football and basketball players and with the University's response as it relates to sexual assault cases.  Rogers met with Chancellor Cheek, provided direct notice to Cheek of the hostile sexual environment, rape culture and increased risk of placing athletes with freshman woman at Vol Hall. Rogers provided written memos to Cheek detailing these concerns. The University has stated to Plaintiffs' counsel that these memos are no longer available.

46.     These issues raised by Rogers were memorialized in a document specifically

---

[9]Attached hereto as **Exhibit 2** is **Declaration of Jenny M. Wright**, attesting that the allegations in this Complaint are true and correct with respect to the statements and descriptions pertaining to her.

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 12 of 87 PageID #: 974

addressing a pattern of undue influence and involvement by the Athletic Department and Administration.

47. Mr. Rogers again attempted to discuss these concerns in May 2013, directly to Cheek before he communicated them directly to University of Tennessee President Joe DiPietro ("President DiPietro").

48. Specifically, in a written memorandum, Rogers raised the following "examples" of interference by the Athletic Department:

5. **Examples**
   a. **Vol Hall residential parameters modification (freshmen now eligible)**
   b. **Refusal to address inordinate # of disciplinary cases involving athletes**
   c. **Refusal to discuss inordinate number of sexual assault allegations in Vol Hall, some alleging athletes were involved**
   d. **Refusal to allow me to discuss a proposal to launch a campus–wide program to address the issue of sexual assault**
   e. **Constant criticism of disciplinary penalties assigned to athletes**
   f. **Consideration of a new residence hall on the Stokely site when there exists no logical reason for that siting other than to benefit Athletics at the detriment of University Housing and the residential student body at-large**

49. Rogers presented the memorandum to Chancellor Cheek, who refused to read Mr. Rogers' written memorandum.

50. Rogers subsequently met with President DiPietro, but no substantive action was taken to address the problems raised by Rogers. Rogers resigned from UT on March 6, 2013 due to "the intolerable situation" created by the UT administration and athletic department of interfering with the disciplinary process for athletes and being deliberately indifferent to the risks of sexual assaults and rapes by football players and basketball players, particularly at Vol Hall. This was specific notice of the risk of sexual assault and the existence of a University created atmosphere of a hostile sexual assault environment created and condoned by the UT administration and athletic department.

51. Jenny Wright, then Director of Student Judicial Affairs, voiced concerns relating to

a pattern and practice of active interference by the Athletic Dept. that included "coaching witnesses to get their stories straight."

52.    Jenny Wright was specifically instructed to "hold up" and not pursue an investigation or disciplinary action in an incident relating to allegations of sexual assault against UT football player Marlin Lane in April, 2013 (discussed *infra*).

53.    Plaintiffs herein each allege injuries occurring *after* the University created and was on notice of a hostile sexual environment created by University acts and policies as proven by direct notice and knowledge of Ms. Wright and Mr. Rogers to UT administrators including at various and numerous times, Cheek, Hart and DiPietro. This prior notice and facts establishing UT's policy of creating a hostile sexual environment include, *inter alia*, the following *facts*:

    a.    The athletic department and UT administration directly and actively interfered with the student conduct office's investigation and disciplinary process when male athletes were charged with sexual assaults.

    b.    The athletic department and UT administration covered up sexual assaults to preserve player eligibility.

    c.    Chancellor Cheek was directly and repeatedly warned in weekly and bi-weekly meetings with Vice-Chancellor Rogers of the inordinate and alarming number of sexual assaults by football and basketball players and was urged to take action. Cheek deliberately ignored these warnings and permitted UT, Hart and the athletic department to tolerate sexual assaults. Rogers prepared a statistical analysis of misconduct cases that showed, disproportionally, a high number of misconduct cases by varsity athletes including, in particular, sexual assaults

    d.    Cheek and DiPietro were directly warned by Rogers that female students were at risk, in fact in peril, from the risk of sexual assaults by athletes and especially in connection with an out of control situation at Vol Hall. Again the UT administration ignored these warnings.

    e.    The risk of sexual assaults related to Vol Hall and football players, directly warned against by Rogers to Cheek, was exacerbated by having a former UT football player, Issac Mobley serve as an RA at Vol Hall. Mobley was arrested in February 2014 along with other

football players (including AJ Johnson) at a party and charged with providing alcohol for underage drinking . Mobley was not removed from his position as an RA after this arrest. Both before and after this arrest Mobley permitted underage consumption of alcohol, drug use and sex parties at Vol Hall thereby contributing to and creating a hostile sexual environment in the athletic dorm for female students and women.

f.   Cheek was directly notified and warned by Rogers that the TUAPA procedure was being abused and misused by the UT administration especially for athletes charged with sexual assaults to delay and ward off discipline. Cheek requiring that he be personally briefed *ex parte* on the case facts before he appointed an ALJ hearings' officer(judge). This special procedure was an *ex parte* conflict of interest (especially as he would later hear any appeal from a TUAPA hearing) and he appointed ALJ/hearing judges who often were without tenure and served at the pleasure of Chancellor Cheek.

g.   Cheek, in weekly/bi-weekly meetings from 2011 forward was regularly and repeatedly briefed by Rogers about the growing risk of sexual assaults from an out of control situation with athletes drinking, using drugs and having parties where sexual assaults occurred but Cheek took no action and allowed female students to remain vulnerable.

h.   The athletic department failed to train athletes, including, football players,  not to interfere with investigations of sexual assaults, including both the Da'Rick Rogers incident, and the April 7, 2013 rape of an 18-year-old Oak Ridge female high school student at Vol Hall by football player Marlin Lane in a suite shared by football players Geraldo Orta and AJ Johnson.). *See* **Exhibit 3** April, 2013 UT Police Report.

i.     On April 13, 2013, running back Marlin Lane was suspended from the Vols football team with no specific explanation from university or team individuals. Coach Butch Jones said only he was off the team for "disciplinary reasons."

ii.   Lane was reinstated to the team less than two months later, after missing four spring practices and the Orange and White game, a scrimmage that marks the end of spring practice. Jones at the time called Lane a "success story." See http://www.tennessean.com/story/news/local/2014/10/31/ut-never-disclosed-rape-allegations-athletes/18267043/ (last visited February 15, 2016).

iii. Director of Student Judicial Affairs, Jenny Wright was instructed to stop any investigation of Marlin Lane for this rape.

i. UT administration (Cheek & DiPietro) had direct notice and personal knowledge off a hostile sexual environment that placed UT female students at risk from sexual assault and acted with deliberate indifference in a clearly unreasonable manner by failing to prevent sexual assaults, by failing to discipline athletes for sexual assaults, by covering up sexual assaults and by failing to investigate and discipline athletes after sexual assaults occurred including unreasonably misusing the TUAPA process to drag out proceedings, discourage victims to pursue complaints and keep athletes in school.

j. UT's statement in response to Plaintiffs' original complaint in this case (through counsel) that "[t]o claim that we have allowed a culture to exist contrary to our institutional commitment to providing a safe environment for our students or that we do not support those who report sexual assault is just false"[10] is false (for the reasons set forth in this paragraph and in this complaint) and is evidence of continuing deliberate indifference to the risk of sexual assault. *See e.g. Tennessee lineman Alexis Johnson charged with aggravated assault,* http://www.tennessean.com/story/sports/2016/02/17/vols-dl-alexis-johnson-suspended-after-arrest/80538668/ (last visited February 18, 2016).

k. UT's statement in response to Plaintiffs' original complaint in this case (through counsel) that "the implication that the UAPA is a process created by the University of Tennessee and reserved for student-athletes is ludicrous"[11] is seriously misleading in context so as to be false (for the reasons set forth in this paragraph and complaint) and is evidence of continuing deliberate indifference to the risk of sexual assault by male varsity athletes.

---

[10] http://www.tennessean.com/story/news/2016/02/09/sweeping-sexual-assault-suit-filed-against-ut/79966450/ (last visited February 18, 2016).

[11] http://www.tennessean.com/story/news/2016/02/13/campus-discipline-heart-ut-lawsuit/80250438/ (Last visited February 16, 2016). Although the TUAPA procedure was not *created* by UT and *reserved* for athletes, the procedure was routinely used by Cheek for athletes charged with misconduct (including sexual assaults) via a pre-hearing *ex parte* briefing for Cheek before UAPA hearings. In addition, athletes disproportionately invoked TUAPA to stall, delay and deter discipline in a "run out the clock" stratagem of delay, delay, delay. This violates Title IX and federal law (§ 304 of the Violence Against Women Act).

**Plaintiff Jane Doe I**

54.     Yemi Makanjuola, a varsity basketball player, was adjudicated by UT to have sexually assaulted Jane Doe I after an administrative hearing and order dated July 24, 2013. UT is estopped from litigating or denying that a sexual assault occurred in the case of Jane Doe I.

55.     In February, 2013, Plaintiff Jane Doe I met Yemi Makanjuola, a 6' 9" (then) UTK student and basketball player from Nigeria. Makanjuola initially asked Plaintiff Doe I out for Valentine's day (February 14, 2013) but when she informed him she had dinner plans, Makanjuola proposed instead that they order lunch and eat at his on campus apartment in Vol Hall.

56.     While at his apartment on February 14, 2013, Makanjuola made sexual advances towards Plaintiff Doe I that were expressly and clearly rejected. Plaintiff Doe I left the apartment and later that evening exchanged text messages with Makanjuola.

57.     During the exchange, Plaintiff Doe I again explained that she was only interested in friendship and did not want to have a physical relationship with someone she had just met. Makanjuola replied, indicating that he both understood and respected her position and additionally invited Plaintiff Doe I to come over the next day.

58.     Based on Makanjuola's expressed understanding of her intentions, Plaintiff Doe I accepted the invitation and arrived at Vol Hall the following day on February 15, 2013, around noon. Initially, Makanjuola's conduct was acceptable and the two made small talk while watching TV.

59.     Both Makanjuola and Plaintiff Doe I were sitting on his bed. Approximately an hour and a half later, Makanjuola lay down on his bed and pulled his pants down. He forcefully grabbed Plaintiff Doe I's head, pushing it towards his penis. Plaintiff Doe I resisted and verbally said "no" repeatedly. Makanjuola ignored Plaintiff Doe I's objections and got on top of her, forcefully removing her clothes.

60.     Using her hands, Plaintiff Doe I attempted to block Makanjuola from vaginally penetrating her with his penis until Makanjuola grabbed both of her hands and held them above her head. Plaintiff yelled for him to stop repeatedly and continued struggling but was unable to stop the 6'9" athlete, who stared at Plaintiff throughout the ordeal without speaking other than repeatedly "shhh-ing" her.

61.     When Plaintiff attempted to leave and began putting on her clothes Makanjuola told Plaintiff to let him dress her. Makanjuola attempted to take a photograph of Plaintiff Doe I while she was naked but Plaintiff refused. After her clothes were on, Makanjuola again attempted to take a picture of the two of them together but Plaintiff Doe I refused.

62.     Plaintiff Doe I was scared to leave and sat in the room until Makanjuola informed her that it was time to leave because he had pre-game. Makanjuola followed Plaintiff out of the dorm and instructed her to get into a vehicle he flagged down that was being driven by another basketball player, Jarnell Stokes. Makanjuola instructed Stokes to stop the car and let Plaintiff out at the bottom of Peyton Manning Pass. As she exited the vehicle Makanjuola instructed her to text him when she got back to the dorm.

63.     Plaintiff Doe I was in shock at the events and did not know what to do. Makanjuola later contacted her but when she refused to meet him at his apartment he became angry and asked why she was being difficult.

64.     The following morning on February 16, 2013, Plaintiff went to the hospital where she underwent a sexual assault exam. The assault was reported by the nurses to the police, who interviewed Plaintiff while at the hospital. That same afternoon, on February 16, 2013, Makanjuola played in Tennessee's win at home over the University of Kentucky.

65.     A police report detailing the incident was filed with UT's police department ("UTPD").

66.     Upon information and belief action was taken by the University through its media relations department to limit public access to UTPD's records of the investigation. *See* Kuykendall, Blair, Open access laws ignored by UT, The Daily Beacon at p 4, April 23, 2013.

67.     On February 17, 2013, a No-Contact Directive was sent to Plaintiff and Makanjuola by UT via email.

68.     UT sent notification to faculty over Plaintiff's Spring, 2013 classes that Plaintiff had suffered a "traumatic personal experience," would "likely miss some of her classes" and that "the Dean of Students Office is working with her, and would appreciate any support you can provide."

69.     Plaintiff Doe I subsequently sought a protective order against Makanjuola where she was represented by a court appointed attorney. Although Makanjuola obtained representation by

Don Bosch, a well known Knoxville attorney, a former UT athlete and member of the UT Board of Athletics, Makanjuola did not appear for the initial hearing and arrived several hours late for the rescheduled hearing because of conflicts with his UT basketball schedule.

70.     UT's investigation concluded that Makanjuola had violated the University's General Standard of Conduct 5 and 6 and provided notification of same in early March, 2013.

71.     The process was then delayed by an openly disingenuous request by Makanjuola's attorney for an administrative hearing to contest the charges.

72.     Upon information and belief, this practice of requesting a disciplinary hearing was routinely utilized by UT athletes who had been accused of sexual assault for the sole purpose of delaying implementation of disciplinary action without any intent of actually participating in the hearing.

73.     Upon information and belief, the purpose of requesting a disciplinary hearing was to allow Makanjuola to continue to play basketball throughout the remainder of the season and to allow UT to effectuate his transfer to another school, the University of North Carolina at Wilmington, where UT's Head of Basketball Operations, Houston Fancher, had accepted a coaching job (announced April 23, 2013).

74.     On March 7, 2013, Plaintiff received a copy of correspondence from UT Chancellor, Jimmy Cheek, sent to Makanjuola's attorney, Don Bosch, notifying Makanjuola that, per his request for a hearing the matter had been assigned to an administrative law judge.

75.     On March 17, 2013 ("Selection Sunday"), the NCAA Selection Committee announced the participants and tournament brackets for the 2013 NCAA Men's Division I Basketball Tournament. UT did not make the tournament.

76.     On March 18, 2013, counsel for UT wrote the administrative law judge to request a hearing date, indicating that the parties would need until May 2013, to complete depositions.

77.     The administrative law judge appointed to preside over the hearing sent a request to counsel for dates to schedule the hearing on March 18, 2013, and requested a response from counsel for UT and Makanjuola by March 21, 2013.

78.     Makanjuola's attorneys did not initially respond to the administrative law judge's request and on April 1, 2013, the hearing date was set for May 22, 2013. Only after the May 22

hearing date was selected did Makanjuola's attorney contact the judge to instead request a later hearing date of May 30, 2013.

79. Upon information and belief, Makanjuola requested the later hearing date in order to ensure that any disciplinary action would be imposed after he was able to complete academic courses at UT so that his eligibility for transfer would not be adversely affected.

80. Upon information and belief, UT routinely delayed matters relating to disciplinary proceedings and announcements until time periods when school was not in regular session so as to mitigate the negative impact of related media.

81. No depositions were taken in the case as initially represented when scheduling the disciplinary hearing.

82. On April 20, 2013, UT announced that Makanjuola had been granted a release in a statement from Tom Satkowiak, Associate Director of Media Relations for the University of Tennessee Athletics. There was no mention of the pending disciplinary charges, protective order or the allegations by Plaintiff. In announcing the release, the (then) UT head basketball coach Cuonzo Martin stated "Yemi is leaving the team on good terms. He's respected by his teammates and coaches, we all appreciate the work he's put in during his time here and I'm confident that he'll be successful." *See* http://www.timesfreepress.com/news/sports/college/story/2013/apr/21/vols-makanjuola-transferring-out-ndiaye-signs/105926/ (*last visited* December 3, 2015).

83. On April 23, 2013, the University of North Carolina at Wilmington ("UNCW") announced the hiring of Houston Fancher (UT's Head of Basketball Operations) as its newest assistant basketball coach.

84. Makanjuola subsequently announced his intent to transfer to UNCW to play basketball.

85. Makanjuola continued to take classes at UT through the spring semester.

86. On May 1, 2013, the administrative law judge contacted counsel for UT and Makanjuola to confirm the May 30, 2013, hearing date. That same day, counsel for UT replied, confirming the May 30, 2013, hearing date but noting that Makanjuola did not plan on participating.

87. On May 30, 2013, counsel for UT received an email from counsel for Makanjuola

confirming that Makanjuola would not be participating in the hearing and that no one would be appearing on his behalf.

88. Neither Makanjuola nor his attorneys appeared for the hearing and, at the onset, counsel for UT indicated to the administrative law judge that a motion for default would be forthcoming.

89. Plaintiff appeared for the hearing and testified via Skype despite the fact that Makanjuola did not appear and despite the fact that counsel for UT had already moved orally for default and announced a forthcoming motion for default judgment. Plaintiff was subjected to direct examination by counsel for UT, forcing her to relive the incident in detail. Plaintiff was further subjected to subsequent examination by the administrative law judge, that included questions inappropriately classifying Mr. Makanjuola's actions as "a little friendlier than you would have him be?" and further inquiry of whether Plaintiff's response to the encounters with Makanjuola (in reporting the incident) were related to his statements that he "didn't like you [Plaintiff]" and whether Plaintiff was "being vindictive in any way." May 30, 2013, Transcript of Proceedings.

90. Although the administrative law judge indicated at the onset of the hearing that retroactive disciplinary action dating back to the assault was an available remedy, the only disciplinary action sought by UT was an indefinite suspension.

91. The administrative law judge issued her decision on July 24, 2013, finding that Makanjuola had violated the General Standards of Conduct set forth in the initial charges and, as a "penalty," issued an "indefinite suspension," effective July 24, 2013.

92. Following the "indefinite suspension," Plaintiff continued her enrollment at UTK in the nursing program, an academic track to which she had already committed three years of work.

93. In December of 2013, less than five months after the date the decision was issued, Plaintiff was contacted via text message by Makanjuola, resulting in recurrence of significant PTSD symptoms directly attributable to the February assaults.

94. The contact directly impacted Plaintiff's academic performance and class attendance; however, the measures initially taken to notify her teachers and provide academic assistance and support (required under Title IX), were not continued and as a result Plaintiff's grades suffered.

95.     Plaintiff was not notified by UT until May of 2014, when it was too late to transfer to another program, that her GPA (3.12) was .08 points below the nursing program requirement (3.2) and therefore insufficient to remain in the UT nursing program. Upon being informed that her GPA did not meet the requirements, Plaintiff even provided medical evidence (in the form of a letter from her therapist at UT) establishing that the drop in academic performance was largely attributable to the assault, the subsequent contact by her assailant and resulting recurrence of PTSD.

96.     Despite the medical evidence (and UT's duties under Title IX), on May 21, 2014, Jane Doe I was informed that the school would offer no leniency and she was precluded from continuing in the nursing program for failing to meet the 3.2 GPA requirement.

**April 2013: Another Allegation of Sexual Assault by Football Players at Vol Hall**

97.     In April 2013, yet another report was made alleging sexual assault at Vol Hall, this time involving UT football players, Geraldo Orta and Marlin Lane (who the victim alleged raped her). (Then) ineligible UT football player Izauea Lanier[12] (Lanier played for UT during the 2011 football season before being ruled ineligible by the NCAA for the 2012 season) was also involved in the incident.

98.     The assault occurred on April 7, 2013, in the suite shared by these and other football players, including roommate A.J. Johnson.

99.     During the investigation, UT football players were interviewed but only after they had already been made aware of the allegations by UT and had conversations with their teammates.

100.    Upon information and belief, these conversations and prior actions by UT allowed the players to "get their stories straight."

101.    The victim's account of the incident described nearly identical circumstances to those found by UT in its investigation of the assault on Plaintiff Jane Doe IV (*see infra*), including

---

[12] Lanier, a 2008 high school graduate, originally committed to Auburn but was ruled ineligible and subsequently transferred to East Mississippi Community College for two seasons. He played for the University of Tennessee during the 2011 football season but was ruled ineligible by the NCAA for the entire 2012 season. He then transferred (again) to West Alabama, where he played in 2014. *See* http://www.tuscaloosanews.com/article/20140912/NEWS/140919838?p=1&tc=pg (last visited December 7, 2015).

but not limited to a sexual encounter with one player (Orta) that was initially consensual before another player (Lane) joined in without consent; the provision of alcohol by UT football players to minors; and, a claim by one of the accused that communications with the victim included a "pinky promise." *See* Ex. 1, April 2013 UTPD Police Report.

102. No disciplinary action was ever taken against the football players involved in the incident by the University.

103. No disciplinary action was taken at all against the football players except a nominal "suspension" on April 13, 2013, when UT football player Marlin Lane was suspended from the football team for what was stated by Head Coach Butch Jones as "disciplinary reasons." *See* http://www.tennessean.com/story/news/local/2014/10/31/ut-never-disclosed-rape-allegations-athletes/18267043/ (last visited December 4, 2015).

104. The purely facial "suspension" only consisted of Lane missing four practices and a scrimmage before he was fully reinstated to the team less than two months later at which time Head Coach Butch Jones described him as a "success story," and Lane has since been promoted to a member of the Vols' 13-man player staff of team leaders. *Id.*

105. The April, 2013 incident marked the third such allegation of sexual assault (including the assault against Plaintiff Doe I) in the Vol Hall student apartments in a two-month period; however, the University's disclosure of these incidents was limited to Head Coach Jones's announcement of Lane's suspension for "disciplinary reasons" and (then) Head Basketball Coach Cuonzo Martin's statements relating to Makanjuola's release, supra —without any reference to the allegations of sexual assault.

**February 2014: UT Football Player Arrests**

106. On February 2014, later in the week of "National Signing Day" police responded to a party at an apartment in Knoxville where former UT football player Dontavis Sapp and (then) current UT football players AJ Johnson, Curt Maggitt, Jalen Reeves-Maybin and Jakob Johnson lived. *See* http://knoxblogs.com/evanseleven/2014/02/10/butch-jones-faces-1st-field-incident-tenure-9-vols-arrested-cited-sunday/ (last visited December 1, 2015).

107. No fewer than 9 UT football players were arrested or cited in connection to the incident and fourteen partygoers (including at least four UT football players, Dontavius Blair, Dimarya Mixon, Justin Coleman and Malik Brown) were cited for underage drinking. *See*

http://knoxblogs.com/evanseleven/2014/02/10/butch-jones-faces-1st-field-incident-tenure-9-vols-arrested-cited-sunday/ (last visited December 1, 2015). Upon information and belief, drugs were in use at the party.

108.   (Then) current football players Curtis Maggitt, Jalen Reeves-Maybin and Jakob Johnson were cited for providing alcohol to underage persons. *Id.*

109.   Two former UT football players were arrested and another former UT football player was cited during the incident. *Id.*

110.   UT football player Danny O'Brien was arrested and charged with criminal impersonation with a false identification, underage consumption and resisting arrest.[13] *Id.*

111.   UT football player AJ Johnson was arrested and charged with providing alcohol to a minor and for resisting arrest. *Id.*

112.   In addition, a member of the UT football coaching staff was present during the police response and attempted to dissuade police from arresting football players and recruits, efforts that were captured on police video of the incident.

113.   Police video also shows two other individuals identified on the scene as an assistant strength coach and a defensive line coach who were not detained. *See* https://www.questia.com/newspaper/1P2-36371392/camera-footage-reveals-ut-football-staff-member-was (last visited December 3, 2015).

114.   The UT football coach was initially placed in handcuffs and in the back of a squad car. *Id.*

115.   Despite the charges, media coverage and the fact that a coach witnessed the incident, all charges were dropped in lieu of community service and no school discipline was imposed as Head Football Coach Butch Jones publicly announced his decision that "I'll handle all punishment inside." *See* http://www.timesfreepress.com/news/sports/college/story/2014/feb/27/ut-players-punishments-to-be-team-issue/132907/ (last visited December 3, 2015).

---

[13] Since the events complained of herein, Danny O'Brien has again been the subject of "internal" team discipline (but not University discipline) after reportedly failing a drug test in 2015. He was suspended from playing for one game and subsequently reinstated without further disciplinary action by the University. *See* http://allfortennessee.com/2015/09/10/why-danny-obrien-was-suspended-by-vols/ (last visited December 2, 2015).

116. Upon information and belief, the above-described "party" included (then) non-UT football players or UT student attendees considered "recruits."

117. Upon information and belief, the party was organized in relation to "National Signing Day" that occurred the previous week.

118. Upon information and belief, at all times relevant UT football staff was aware of the above described "party" and, specifically, that recruits would be in attendance.

**Plaintiff Jane Doe II**

119. John Doe I, a varsity football player, was determined by UT to have sexually assaulted Jane Doe II after an investigation by UT's Office of Student Judicial Affairs. UT later withdrew this finding and found no violation of the student conduct (for sexual assault) with no hearing offered to Jane Doe II.

120. Plaintiff Jane Doe II, a freshman UT student, suffered a forcible rape at Vol Hall, with attendant emotional suffering, and further suffered when she was subjected to a clearly unreasonable investigatory response by the University.

121. The assault occurred on September 6, 2014, in Vol Hall by Mr. John Doe I, a UTK football player.

122. The assault occurred after Plaintiff attended a party at a fraternity, where alcohol was provided.

123. Initially, the investigation was headed by (then) Director of Student Conduct and Community Standards, Tim Burkhalter ("Mr. Burkhalter").

124. During the investigation, Plaintiff informed UTK investigators that, prior to the assault, she had never had sexual intercourse and that, at the time it occurred, she was on her period. Plaintiff also informed UTK investigators that when she woke up the morning after the assault, she found a strap had been ripped off her top and the button ripped off her shorts and photographs were taken of the torn clothes.

125. On October 1, 2014, at 12:34 PM (EST), based on Mr. Burkhalter's findings, the University provided (via email) notice of intent to move forward with disciplinary action against Mr. Doe I for violations of General Standards of Conduct (sexual assault) and that a hearing was scheduled for October 6, 2014. Notice of Charges and Hearing.

126. On October 1, 2014, at approximately 4:30 PM (EST), John Doe filed two baseless complaints against Plaintiff in retaliation to her reporting of the sexual assault. The first complaint Mr. Doe I filed alleged theft of a sweater against the victim of a sexual assault. The second was for filing a false complaint.

127. The completely baseless and retaliatory reports filed by Mr. Doe I were premised in-part on Plaintiff's actions in leaving the dorm the following morning wearing a sweatshirt, actions she were forced to take because her clothes had been torn off during the sexual assault.

128. On October 3, 2014, Mr. Doe I rescinded an earlier waiver and requested an administrative hearing under the Tennessee Uniform Administrative Procedures Act, pushing back the previously noticed hearing date of October 6, 2014.

129. Without explanation, the University then reassigned the case to the Office of Equity and Diversity (ultimately to the Interim Director, Jenny Richter) and, in an email from Vice Chancellor Vince Carelli (Notice of Withdrawal of Charges) notified Plaintiff Doe II that the pending disciplinary charges against Mr. Doe I were rescinded, initiating a "fresh" investigation. As with other UT investigations, Plaintiff's account was completely discounted and, based on the "collective" (and virtually identical) accounts of Mr. Doe I's teammates and a time-lapsed video from an unspecified time after the assault (that arguably shows Ms. Doe II tripping while trying to walk barefoot in a dorm stairwell), UT determined that, by a preponderance of the evidence, she could not have been incapacitated and, further, that the sexual encounter was consensual.

130. This illusory basis flatly contradicted the statements made to UT on multiple occasions by a witness who knew both Ms. Doe II and Mr. Doe I (indeed, the witness was a member of the same fraternity and played baseball on the same team as Mr. Doe I prior to enrolling at UT). Further, it is consistent with the ongoing theme of victim blaming, which ultimately led to public humiliation and Plaintiff's departure from school in January 2015.

131. Even more contradictory are the University's findings relating to the retaliatory reports by Mr. Doe I (dated November 14, 2014), that denied the imposition of discipline against Plaintiff for allegedly filing a false report finding that they were brought in good faith.

**September 22, 2015: UT Football Player Allegedly Strikes Ex-girlfriend in the mouth**

132. Early Sunday morning on September 22, 2014, police responded to an incident involving UT football player, Treyvon Paulk, after he reportedly punched his ex-girlfriend in the

mouth. *See* http://www.knoxnews.com/govolsxtra/football/tennessee-freshman-tailback-treyvon-paulk-dismissed-from-team (last visited November 18, 2015).

133. No discipline was issued by the University excepting yet another facial suspension from the football team without explanation or reference to the assault.

134. The practical effect of the "suspension" as the sole form of discipline was virtually nil given that, at the time, Paulk was taking a medical red-shirt for the season while rehabbing from an injury the previous year and, in any event, he continued to participate in team activities and disclosed as much to other students, including Plaintiff Jane Doe III.

**Plaintiff Jane Doe III**

135. Plaintiff Jane Doe III was sexually assaulted on October 12, 2014 by UT student Mr. John Doe II and two students attending Tennessee State University. UT charged John Doe II with misconduct (sexual assault) and a TUAPA hearing was held on February 17, 2016. John Doe II did not attend. Having charged John Doe II with sexual assault and having litigated his guilt, UT is estopped from litigating or denying that a sexual assault occurred in the case of Jane Doe III.

136. The details of the assault were contained in the University's Investigative Report (Doe III Investigative Report) and included Plaintiff's Doe III's incapacitation due to alcohol and resulting inability to consent.

137. Although the assault took place off campus, the events leading to the assault began on campus in Vol Hall (the dorm that Vice-Chancellor Rogers warned UT Chancellor Cheek presented a clear and present danger of sexual assaults) where she, a minor, was provided alcohol by several members of the UT football team.

138. The football players that provided the alcohol included Traevon Paulk, who, despite UT's press release, was still attending practice and participating in team events following an allegation of battery by Mr. Paulk's former girlfriend just weeks before.

139. The University was made aware of Plaintiff's assault shortly after it occurred and a no-contact order was issued October 24, 2014.

140. Although a no-contact order was issued, Plaintiff Doe III observed her assailant (who lives off campus where the assault occurred) at her dorm on multiple occasions.

141. Plaintiff Doe III subsequently withdrew from UT and although the grades for those

classes are not reflected negatively on her transcript, the withdrawal mid-semester has impacted her eligibility for scholarships and financial aid.

142.  In addition, Plaintiff Doe III has been unable to fully begin her recovery, as UT's investigation has not yet concluded as of the date of this Complaint.

143.  As in other cases, Mr. Doe II requested an administrative hearing although counsel for UT expressed that it was unlikely Mr. Doe II will actually participate in the hearing.

144.  The timeframe for the investigation under Title IX, following the promptness mandate established in *Davis v. Monroe County Board of Education* (526 U.S. 629, 1999),  would have expired on or around December 11, 2014, which potentially would have allowed Plaintiff Doe III to return to school the following semester in January, 2015; however, even though the family had expressed dissatisfaction with UTK's response (particularly with the timeframe), a hearing did not take place until February, 2016, and a decision is pending as of the date of filing of Plaintiffs' First Amended Complaint.

145.  Her alleged assailant did not, in fact, attend the administrative hearing in February, 2016 and it is unclear when and what notification, required by Title IX, was given to the school of the investigative findings as they relate to the other two alleged assailants.

146.  Further, as to Mr. Doe II, the University only sought potential retroactive application of disciplinary measures to a seemingly arbitrary date in February 2015[14], essentially allowing the alleged sexual assailant to remain in school and earn college credit while the victim has endured precisely the opposite, a withdrawal from school negatively impacting her eligibility for financial aid and scholarship.

147.  The University's explanation for the delay is Mr. Doe II's choice for a hearing even though counsel for the University communicated that was is unlikely he would even participate.  In fact he did not.

### November 9, 2014: Enhancement of a Hostile Sexual Environment

148.  On November 9, 2014, the University's Athletic Department made arrangements to

---

[14] Prior to the administrative hearing in February, 2016, counsel for Plaintiffs herein moved to intervene so as to participate in the hearing and moved, at the hearing, for retroactive punishment as provided in the University's policy; however, as of the date of filing of Plaintiffs' First Amended Complaint, the matter (decision) remains pending.

surprise the football team with a visit from popular rap artist, Lil' Jon.

149.  Prior to this visit and at the specific insistence of the football coaching staff, UT had adopted the rapper's song "Turn Down for What"[15] as its official 3rd down football anthem, playing the song in Neyland stadium during games each third down when the opposing team was on offense and using a play on the lyrics (as "Third Down for What") for printing on official team merchandise.

150.  For more than a decade, the rapper Lil' Jon has been associated with sexual violence and rape culture.[16]

151.  Most recently, his song "Literally I Can't," (released just weeks before his visit with the UT football team and the hit single central to his tour at that time) came under fire and was debated as possibly the most sexist song promoting sexual assault, battery and rape—ever. The theme of the song is "don't take "no" for an answer from women." *See* http://www.knoxnews.com/govolsxtra/columnists/john-adams-bad-rap-lil-jon-has-worn-out-his-welcome_53366907 ( *last visited* December 7, 2015). The verses include the phrase "Girl I know that you can. I don't wanna hear no." In the music video, conservatively dressed sorority sisters arrive at a raucous house party and rebuff the advances of the drunken male party attenders with the refrain "Literally, I can't." After responding "Literally, I can't" to each of the offers, the girls are rushed and tackled by boozed-up jocks, while Lil' Jon aggressively shouts the song's chorus for the women to "Shut the f**k up." *See* http://www.news.com.au/entertainment/music/music-videos/women-should-shut-the-fk-up-is-this-the-most-offensive-song-of-2014/news-story/375a201bf2afa250e96c601adadd355c (last visited December 12, 2015).

---

[15] The official music video for Lil' Jon's "Turn Down for What" features frantic and continuous "humping" of inanimate objects and unwilling bystanders. https://www.youtube.com/watch?v=HMUDVMiITOU (last visited December 7, 2015).
[16] At the 2005 MTV Spring Break concert, one of the most publicized instances of his career, Lil' Jon, performing as Lil Jon & the East Side Boyz infamously demanded that the young women in his concert audience expose their breasts or he would not continue to perform. *See* http://www.crowdsafe.com/new.asp?ID=1486 (last visited December 7, 2015).

152.  The rapper's visit was publicly celebrated by the University's Athletic Department, who produced and published a video showing the football team and specifically football players A.J. Johnson's and Curt Maggitt's (Johnson and Maggit standing in orange) reactions to the



rapper's presence. *See* https://www.youtube.com/watch?v=3PUtD_a8QrI (*last visited* December 7, 2015).

153.  Further, the rapper's presence at practice was praised by UT football coaches in social media repeatedly over the following days and weeks without any disclaimer to the sexual




violence central to the rapper's public persona and music.

**Plaintiff Jane Doe IV**

154.  Plaintiff Jane Doe IV was a sophomore student-athlete (member of a varsity athletic team) at the University of Tennessee when she was forcibly raped by University of Tennessee football players A.J. Johnson and Mike Williams on November 16, 2014. The university's investigation concluded that Johnson and Williams had committed a sexual assault and they invoked the TUAPA to delay any suspension, sanction or other discipline. Having charged Johnson and Williams with sexual assault after an investigation, UT is estopped from litigating or denying that a sexual assault occurred in the case of Jane Doe IV.

155.  The rape occurred at a condominium/apartment owned by a UT Athletic booster, Dr. William Powell. Plaintiffs allege on information and belief that the UT Athletic Department both controlled these premises and arranged for this housing that was paid for with football scholarship funds.

156.  The details of Plaintiff Doe IV's assault as found by the University's investigation

contained in the University's Investigative Report.

157. The assault occurred on or around November 16, 2014, following Tennessee's win in the football game against the University of Kentucky during a party (where marijuana and alcohol were in use) at an apartment where University of Tennessee football players including A.J. Johnson, Curt Maggitt and Geraldo Orta.

158. Orta and Lane had been previously criminally investigated for rape in their suite shared by A.J. Johnson. Chancellor Cheek had directed Jenny Wright to "stop" disciplinary action in connection with this prior incident. *See* http://www.tennessean.com/story/sports/college/vols/2015/03/06/ut-athletics-accused-influencing-student-discipline/24505399/ (last visited December 9, 2015).

159. Upon information and belief, the party was thrown and hosted by football players because of the presence of football recruits who were visiting and had attended the football game.

160. Upon information and belief, the party was attended by UT football players, UT students and football recruits and, at times, included in excess of 70 attendees.

161. Alcohol was purchased by UT football players including Mike Williams and Curt Maggitt for the specific purpose of providing said alcohol to recruits and underage minor women.

162. The University was made aware of the incident on November 16, 2014.

163. Knoxville police were contacted and attempted to interview Williams and Johnson. Initially Johnson indicated he would meet for an interview; however, neither player showed up for the interview and, consistent with previous incidents, instead delayed giving statements until specialized defense counsel had been retained including Johnson's current attorney, Tom Dillard.

164. The head coach of Plaintiff Jane Doe IV's varsity team had already been notified of the assault and contacted Plaintiff Doe IV by text in the early morning of November 16, 2014, before coming to her dorm room.

165. Even though Coach Jones and the athletic department were clearly aware of the rape allegations against Johnson and Williams, calls and texts were made by A.J. Johnson and his roommate and teammate, Curt Maggitt, to Plaintiff Doe IV and her teammates, including her roommate, Plaintiff Doe V, in an effort to convince Plaintiff Doe IV not to pursue any

investigation or disciplinary action.[17]

166.  On Monday November 17, Plaintiff Doe IV met with several University representatives including Jon Gilbert (Executive Senior Associate Athletics Director), Mike Ward (Senior Associate Athletics Director) and her varsity team's head coach.  Gilbert, Ward and the head coach began the meeting by informing Plaintiff that the football team had just announced the immediate suspension of the two football players who had assaulted her, A.J. Johnson and Mike Williams, from all team activities.

167.  When Plaintiff Doe IV asked whether the suspension was limited to football, she was assured that both Johnson and Williams would not be allowed to "step foot on the athletic footprint of the campus."

168.  During the meeting, Plaintiff Doe IV also voiced concerns of how the incident would be handled by the university as she had only recently (after she had been assaulted) become aware of the Marlin Lane incident from 2013, that also involved allegations of sexual assault against football players and reports of subsequent harassment by their supporters against the victim.

169.  While the aforementioned was being discussed, Plaintiff Doe IV received a text message from Plaintiff Doe V who was witnessing (at that moment) football players Marlin Lane and Geraldo Orta assaulting Drae Bowles at Smokey's (discussed below).[18]

---

[17] In an interview with the Tennessean, vice chancellor Margie Nichols indicated that school officials were well aware of the situation as early as 9:00 AM the day of the assault:

> "Knoxville Police Chief David Rausch contacted University of Tennessee Police Chief Troy Lane on Sunday morning, hours after the women reported the alleged assaults. By 9:07 a.m. Sunday, University Chancellor Jimmy Cheek and Athletics Director Dave Hart had been alerted about the allegations, along with nearly a dozen of the university's top academic and athletic officials.

> The alert system prompted the University Division of Student Life to reach out to the alleged victim and is offering her services and support, Nichols said."

> http://www.wbir.com/story/sports/2014/11/20/police-continue-to-conduct-interviews-in-rape-investigation/70039904/ (last visited December 12, 2015).

Even though the Chancellor, Athletics Director and "nearly a dozen top academic and athletic officials" had been alerted early that morning, phone records show repeated calls continuing well into the afternoon from Johnson and his roommate/teammate Curt Maggitt.
[18] Attached hereto as **Exhibit 4** is the **Declaration of Drae Bowles**, attesting that the allegations in this Complaint are true and correct with respect to the statements and descriptions of events pertaining to him.

170. Plaintiff Doe IV informed Gilbert, Ward and her head coach in real time of the Smokey's assault incident against Draw Bowles and even provided the identities of the players, but was told only "we'll look into it."

171. Plaintiff Doe IV later understood that athletic coaches were present at Smokey's during that altercation but has never been informed of any action was ever taken against the players in reference to that incident.

172. Days later, Plaintiff Doe IV became aware of the prior assault on Drae Bowles in the team facility (locker room).

173. Plaintiff Doe IV brought the locker room assault to the attention of school administrators but again, never received information of any action taken by UT against these players although she has since been made aware that Drae Bowles transferred to UTC.

174. In the days following the meeting, Plaintiff Doe IV became aware that Williams and Johnson were and would continue to be allowed to remain on campus and, contrary to the "official statements," would be allowed access to the academic support centers (shared by women's and men's athletics).

175. Plaintiff Doe IV made the decision to stay at home with family until exams out of the fear of a possible encounter simply by following her own class and tutoring schedule.

176. Knowledge of how the University had handled allegations against football players in recent situations during Plaintiff Doe IV's time at UT caused her to leave campus. Plaintiff was aware of the situation earlier that year (in February of 2014), when multiple football players including Johnson were arrested at a party at Johnson's apartment.

177. Plaintiff Doe IV became aware that all charges, including drug and alcohol and charges for resisting arrest/assaulting an officer, had been dropped and that the players only received community service without any team or University discipline.

178. Plaintiff Doe IV also became aware that a football coach was present at that party but, as multiple football players (including Johnson) had later explained to Plaintiff and others, "Coach took care of it so it's no big deal."

179. Despite the assurances offered during the meeting, within days, statements were made by the UTK football coaching staff publicly supporting A.J. Johnson. In a post-practice

interview on November 19, 2014, Linebackers Coach Tommy Thigpen even went so far as to say (in reference to Johnson) "He's a great player, great kid, great ambassador," and "I look forward to him getting back."[19]

180.  The school and athletic department, that Plaintiff Doe IV once considered herself proud to be a part of, made it clear "whose side they were on" and abandoned Plaintiff Doe IV in silence while simultaneously affirming the character of the football players who raped her.

181.  The student body and UTK fan base adopted and mirrored the sentiment expressed by the athletic department and coaching staff and Plaintiff Doe IV was ridiculed, shamed and vilified in virtually every public forum.

182.  A few weeks later in December 2014, A.J. Johnson was allowed to graduate in a special ceremony from which photos were posted of him posing with Chancellor Jimmy Cheek and Athletic Director Dave Hart (in the very athletic facility Plaintiff had been told Johnson would not be allowed to "step foot on").

---

[19] http://www.tennessean.com/story/news/2014/11/19/ut-student-leaders-decry-victim-blaming-amid-rape-allegations/19301797/

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 35 of 87 PageID #: 997

183.   The ceremony itself was significant as it was held and offered exclusively to members of the athletic department and, moreover, some of the photos were published by the official UT





Twitter (vol_football) account.[20]

---

[20] Plaintiffs have since learned that the University had access and authority to control A.J. Johnson's (and other "major sports" athletes') social media accounts.

184.   Photos of A.J. Johnson and Curt Maggitt from the 2014 Student-Athlete Winter



Graduation remain on the official UT sports website (utsports.com) as recently as December, 2015.

185.   Even though the media had already highlighted the lack of empathy or support for the victims of sexual assault at UT (*see* fn. 1, *supra*), the athletic department through its football coaches and players continued to publicly support the men who raped Plaintiff Doe IV-as shown in the photographs published after the bowl game[21].

---

[21] The photographs below were taken following Tennessee's Bowl Game victory with both players and coaches using their hands to show number "45" in support of A.J. Johnson, who reposted the photos and acknowledged the support with the caption "My squad showing Much Love*** Great Win*** Thats how you #LightEmUp#LB's #VFL". These photographs (and numerous similar photos) were widely published on social media including direct postings by UT coaches, including Coach Larry Knight.




186. During a telephone conversation with her varsity team's head coach in February of 2015, Plaintiff Doe IV specifically requested a conference with the University's Title IX coordinator. Despite the coach's assurances, no such conference was ever scheduled and Plaintiff Doe IV has not received further communication from the Title IX coordinator.

187. The University's investigation took nearly six months (the report was provided to Plaintiff on May 4, 2015) but no actual disciplinary action has been taken despite the findings of student misconduct.

188. Plaintiff Doe IV was subjected to numerous character attacks and threats on social media and sports blogs that caused her severe emotional distress, and created and deepened a hostile environment for her on the basis of her sex.

189. Because of the actions by the University, its coaches, administration and athletics program, Plaintiff could not continue her education at the University of Tennessee at Knoxville and was forced to sit out the Spring, 2015 semester while trying to find another place to continue her education and collegiate athletics (which had afforded Plaintiff the financial opportunity to attend school in the first place).

**Drae Bowles assists rape victim, is twice assaulted by teammates
and told by Head Coach Jones that he "betrayed the team"**

190.   Varsity football player Drae Bowles had picked up Plaintiff Doe IV (and her friends) in his vehicle the night of her assault (early morning hours of Nov. 16th) when he noticed Jane Doe IV was distraught in the parking lot.

191.   Jane Doe IV was hyperventilating and crying near bushes in the parking lot.

192.   Doe IV told Bowles in the car about the rape and, after discussion, she called 911 from his car to report the rape to the authorities. Bowles drove Jane Doe IV and her friends from the Woodlands apartment/condominium complex to Volunteer Hall where she was taken by ambulance to UT Medical Center where a rape/sexual exam was conducted.

193.   Later that day (Sunday) Bowles was in the locker room when he was confronted by player Curt Maggitt. Maggitt was a roommate of A.J. Johnson and Geraldo Orta. Maggitt had been at the party the night before and had seen the girls (including Jane Doe IV) in the parking lot. Maggitt, who had heard that rape had been reported, asked accusing questions to Bowles about the events the night before. Bowles told Maggitt what had happened.  Maggitt became violently upset, said that Bowles was trying to "fuck up AJ" and suddenly punched Bowles in the mouth with great force, causing Bowles's lip to bleed. Bowles fought back and threw punches before the fight and assault was broken up by teammates.

194.   After this assault by Maggitt, on Sunday, Bowles called Coach Jones to relate what had happened. Coach Jones stated to Bowles he was very disappointed in Bowles and that he had "betrayed the team." Bowles became extremely upset, broke down and cried.

195.   Several hours after this phone call Jones called Bowles and apologized for calling Bowles a traitor to the team.

196.   The next day, Monday November 17th Bowles went to eat at Smokey's Sports Grill in the Anderson Training Center.  He purposively sat by himself away from other teammates.

197.  He was not alone for long.  Football players Geraldo Orta and Marlin Lane aggressively came over to Bowles' table to jump him as they shouted at him. Another fight was about to break out but was stopped when football strength coach Brandon Myles physically intervened to hold back Orta and Lane. Bowles got up to leave and as he walked out up the stairs

Orta and Lane followed him. Coach Myles again intervened and Orta and Lane stopped following him.

198.   The assault/altercation of Bowles at Smokey's was witnessed by Jane Doe V and she saw the confrontation broken up by UT football strength coach Brandon Myles.

199.   In his interviews with police, UT football player Geraldo Orta stated that he felt Bowles had betrayed the team and that where he (Orta) came from, people got shot for doing what Bowles did. These facts are set forth in the Knoxville Police Department Incident Report.

200.   During the interview Orta also admitted having confronted Drae Bowles in Smokey's Cafe (the athletic dining facility), getting "in his face" and saying "some threatening things."

201.   Orta further acknowledged that UT football player Curt Maggitt had also, in a separate incident, confronted Drae Bowles in the team locker room and that Head Coach Butch Jones had "instructed the team to stay away from Bowles and Bowles was given time away from the team."

202.   Curt Maggitt  admitted to police assaulting Drae Bowles. Maggitt also admitted the fact that he had purchased alcohol for the party.

203.   Jones took no action or discipline against Orta, Lane or Maggitt.

204.   After these events, Bowles was a *persona non grata* and was shunned by other teammates. At that point he moved forward with plans he had considered earlier to leave UT for a smaller school. Upon information and belief UT then arranged for Bowles to transfer to UTC *after* the assault incidents.

205.   Bowles left the team and transferred to the University of Tennessee Chattanooga.

206.   The actions and intent of UT football players against Drae Bowles were also disclosed by Michael Williams in his November 26, 2014, interview with the police, when he stated that his teammate, Geraldo Orta, had told Williams that the football team had "a hit" out on Drae Bowles.

207.   The mistreatment, assaults and shunning of Drae Bowles that was condoned by Coach Jones  caused Jane Does IV and V to fear for their own safety (recrimination, retaliation, being shunned) and were a major causal factor in their decision to leave UT.

208.   Drae Bowles had acted with the utmost kindness and strength of character toward

Jane Doe IV, her friends and Jane Doe V. For his kindness and courage he was beaten up, called a traitor by his head football coach, and ostracized from the team by Coach Jones and other players. Maggitt continued to be touted as a team leader and with Orta and Lane celebrated a bowl victory by posing for cameras flashing rapist AJ Johnson's number (45) with their hands and fingers.

**Plaintiff Jane Doe V**

209.  Plaintiff Jane Doe V was a Title IX investigation witness subjected to retaliation and the collective "victim blaming" that occurred in the wake of the assault of her teammate, roommate and friend, Plaintiff Jane Doe IV. Having charged Johnson and Williams with sexual assault after an investigation, UT is estopped from litigating or denying that a sexual assault occurred in the cases of Jane Does IV and V.

210.  Directly after the assault on Plaintiff Doe IV, Plaintiff Doe V was the recipient of multiple communications from football players, including one of the alleged rapists, intended to discourage both her and Jane Doe IV from reporting the rape of Jane Doe IV. These were reported by Plaintiff Doe V on November 16 and 17 to the varsity coach and Mike Ward, who were already aware of the players' actions but made no assurances that they would be addressed by the University.

211.  The effects on Plaintiff Doe V were traumatic and worsened by UT's repeated failures to cure the environment and effectively implement interim or remedial measures.

212.  In addition to being contacted after UT had notice of the assault and in addition to seeing one of the attackers (Mike Williams) in the academic center for athletes (after being expressly assured neither Williams or Johnson would be allowed in the athletic facilities), Plaintiff Doe V witnessed the intimidation and physical retaliation by other UT football players against another witness in the investigation, Drae Bowles when he was attacked by UT football players Orta and Lane at the Smokey's dining hall.

213.  As a direct result of witnessing the attack on Drae Bowles, and with knowledge of a second assault on Bowles, Jane Doe V was fearful of personal recrimination for her participation in the Title IX investigation of Jane Doe IV.

214.  Plaintiff Doe V reported this directly to UT administrators and, further, reported that the attack on Bowles had been witnessed by members of the coaching staff.

215.  No assurances were made and no action was taken by UT in response to Plaintiff Doe V's reports, even after she notified administrators of accounts of a second physical assault on Bowles by the same players in the team facility (locker room).

216.  Plaintiff Doe V was forced to move dorm rooms and her grades suffered.

217.  Eventually, Plaintiff Doe V was forced to leave school because of UT's failure to protect her from a hostile sexually discriminatory environment and the resulting trauma. As a direct result of the incident, Plaintiff Doe V has been diagnosed with PTSD with severe anxiety and was medically restricted from attending school for the entire Spring 2015, semester.

218.  Plaintiff Doe V attempted to maintain communications with her coach, in an effort to return to UT when she was medically cleared. However, because of UT's continued failure to cure the hostile environment and because during the conversations (on or around March/April 2015), the coach made statements to the effect that Plaintiff's return would be conditioned on requirements that she (Plaintiff Doe V) could not associate or socialize with the same group of people—insinuating that the rape and events that had followed were somehow the result of the girls' (members of the row team, including Plaintiff Doe IV's) actions, Plaintiff Doe V was forced to look to other schools.

**December 2014: Another UT Football Player Arrested, Discipline Handled "Internally"**

219.  On December 3, 2014, UT football player Jalen Hurd (the team's starting running back and leading rusher) was arrested by citation for underage drinking. *See* http://www.tennessean.com/story/vols/2014/12/18/butch-jones-jalen-hurd-discipline/20595979/ ( last visited November 18, 2015).

220.  The incident was not initially publicized until after an article was published by the Tennesseean the following week. *Id.*

221.  In a subsequent press conference, Head Football Coach Butch Jones said the running back was disciplined internally and that the incident would not affect Hurd's status with the team—specifically as to the upcoming bowl game on January 2, 2015. *See* http://www.tennessean.com/story/vols/2014/12/18/butch-jones-jalen-hurd-discipline/20595979/ ( last visited November 18, 2015).

**Plaintiff Jane Doe VI**

222.  Plaintiff Jane Doe VI was sexually assaulted on February 5, 2015, by UT student and

football player Riyahd Jones. The details of Plaintiff Doe VI's assault are documented in the University's Investigative Report.

223.   At the time of the assault, Plaintiff Doe VI was a sophomore (2014/15 academic year) attending UT with full tuition provided through academic scholarship/financial aid, living in an off-campus apartment complex called the "Gateways of Knoxville," with one other roommate who dated Riyahd Jones.

224.   Prior to the assault on February 5, 2015, there were two previous incidents where Riyahd Jones "made a pass" at Plaintiff Doe VI while he was dating her roommate. The first time took place in Plaintiff Doe VI's apartment around October 2014 and the second in December 2014. Plaintiff Doe VI clearly communicated to Mr. Jones that his advances were unwanted and informed her roommate of the incidents on both occasions.[22]

225.   After the assault was reported to the police and while KPD was searching for Riyahd Jones, Plaintiff's roommate was repeatedly called by Riyahd Jones's roommates (also football players) who were threatening/pleading (through roommate) for Plaintiff to drop the allegations.

226.   One of the football players who contacted Plaintiff's roommate in an effort to mitigate the damage was Deanthonie Summerhill (a UT running back who was living with Riyahd Jones).

227.   Given the preceding events at UT, these players should have been educated extensively (and on multiple occasions) regarding the impropriety of attempts to contact a victim of an alleged sexual assault.

228.   Plaintiff is unaware of any effort by UTK to notify her teachers of the situation, in complete abrogation of UTK's duties under Title IX, to afford academic remedies to a victim.

229.   UT Football players should have received training (apart from standard instruction) following each of the preceding incidents involving athletes. The actions by UT football players in wake of the assault in attempting to contact Plaintiff Doe VI (directly and through her friends), follow same. The "advice" communicated by UT football player Todd Kelly to Plaintiff's current

---

[22] It is important to note that, under its obligations under Title IX, Jones would have been subjected to education materials covering sexual assaults and consent on multiple occasions due to other reported incidents that occurred during the academic year leading to the alleged February 5, 2015, assault on Ms. Doe VI. Questions and Answers on Title IX and Sexual Violence at 38.

boyfriend (and his parents) should have been treated as a violation of the no-contact directive, is retaliatory, and is further evidence of a lack of training/instruction-especially considering the nature of the instructions required under Title IX and the repeated preceding incidents involving football players.

230. The University's investigative findings of the incident are completely void of any reference to the post-assault communications by the other UT football players.

231. As in previous investigations, the victim's statement and credibility were completely discounted.

232. Further, the findings represent a fundamental misunderstanding and misapplication of the very definitions of "consent" as set forth by UT in the report.

202. In deciding that Jones's account was more likely than Plaintiff's, UT investigators relied heavily on the fact that certain witnesses to the investigation did not participate or respond to requests for interviews despite Plaintiff's reports to the investigators that Jones and other football players were contacting those witnesses (and their families) and despite other witnesses' statements confirming similar repeated communications by the football players.

203. No discipline resulted from the communications and contact to witnesses by the football players.

204. The UT investigators also relied heavily on a statement offered by Riyahd Jones that provided that Plaintiff "told him to leave" and that he, without obtaining consent, ignored the request and instead kissed her. The statement further provides that Plaintiff then turned her back to Jones before he proceeded, again without obtaining consent, to perform oral sex and vaginally penetrate her.

205. Still, UT determined that, because Plaintiff did not resist and appeared sexually aroused, she consented to the sexual encounter, evidencing an extreme bias for the athlete's statement or, alternatively, a lack of competency and training.

206. As a result of the assault, Plaintiff was forced to move out of the apartment and return home with her parents. She did not have any run-ins with Jones on campus following the incident; however, her current boyfriend was told by other UT football players to "stay away" from her. One of these football players was Todd Kelly ("TK"), who had gone to high school with the

current boyfriend. TK and TK's parents both communicated same to current boyfriend and current boyfriend's parents-again, in staunch violation of the no contact order and contrary to the required education from the prior instances.

207. As a direct result of the incident, Plaintiff Doe VI was forced to miss class on multiple occasions for court and other appointments relating to the alleged assault.

208. Plaintiff informed her teachers whenever she had documentation to support the absence but did not discuss specifics.

209. Eventually, the number of absences necessitated her withdrawal from school for the semester with no credits earned though Title IX assured her academic remedies for such absences.

210. Because of the requirements (to remain a student for duration of scholarship/aid), she was initially determined not to qualify for continuation of her financial aid/scholarships. Plaintiff Doe VI was forced to appeal these decisions-some of which are still pending as of the December 2015.

211. Riyahd Jones was allowed to remain in school, graduate at the end of the spring 2015 semester, granted a release and has since transferred to Georgia Southern where he continues playing football.

212. Jones' graduation occurred on May 7, 2015, nearly a month before the University of Tennessee (in violation of the timing guidelines for investigations under Title IX and UT's own policies) concluded its investigation. Both Jones and the University celebrated his graduation, publishing photos through the school's official website (identifying Jones as an athlete) and on social media.





**March 2015: UT Football Player Arrested**

213.    In March 2015, UT football player Coleman Thomas was arrested and charged with felony theft. *See* http://www.tennessean.com/story/news/crime/2015/03/26/ut-football-player-coleman-thomas-arrested-felony-theft/70504536/ (last visisted November 18, 2015). The property had been stolen from a fellow student's dorm room in Reese Hall and was reported stolen to the University of Tennessee Department on March 13, 2015. *Id.*

214.    Thomas was represented by Knoxville attorney Don Bosch in the incident. *See* http://www.local8now.com/home/headlines/Felony-charges-dropped-against-UT-offensive-lineman-299844811.html (last visited December 8, 2015). The charges were later dropped against Thomas, who claimed he did not realize the property was stolen when he sold it, and an arrest warrant (related to the same charges) was then issued for Michael Sawyers, who had been dismissed from the team (without official University discipline) in a statement earlier that year on February 4, for "violation of team rules." *See* http://www.knoxnews.com/govolsxtra/football/jenkins-wharton-granted-releases-sawyers-dismissed_42943570 ( last visited November 18, 2015).

215. Upon information and belief, Sawyers was not subjected to University discipline under its Hilltopics policy at the instruction of Head Coach Butch Jones to handle the matter internally, allowing Sawyers to remain in school (even if off the team) and commit theft.

**Plaintiff Jane Doe VII**

216. Plaintiff Jane Doe VII was a student-athlete at the University of Tennessee when she was forcibly raped by UT football player Lavon Pearson on April 24, 2015

217. The assault occurred early that morning at "University Walk," an off-campus apartment complex where Pearson lived with other UT football players.

218. On the evening of April 23, 2015, Plaintiff attended a bar off-campus with friends. At the bar, Plaintiff was separated from her friends and could not find them when she was ready to leave. A group of people that included UT football players Von Pearson and Alton "Pig" Howard was also leaving that time and offered Plaintiff a ride and an invitation to their apartment to hang out.

219. Plaintiff indirectly knew the UT football players through a mutual acquaintance (the acquaintance had been a Resident Assistant at Plaintiff's dorm the previous year) and accepted the invitation to go to the football players' apartment.

220. The group at the apartment comprised of UT football players and other UT students.

221. After being at the apartment, Plaintiff and one of the residents, a UT football player, engaged in a brief sexual encounter (without intercourse) in the player's bedroom.

222. The encounter ended shortly after it began and the UT football player got up and left the room to go to Cookout.

223. Plaintiff did not have transportation to return to her on-campus residence and remained in the bedroom. Minutes after the first UT football player left, a different UT football player, Von Pearson, entered the room.

224. Plaintiff was on the bed when Pearson entered the room. Without speaking, Pearson removed the blanket covering Plaintiff and forcibly moved her to the edge of the bed. Plaintiff resisted physically and verbally objected in unambiguous terms, asking what was he doing and telling him to stop as Pearson forcibly kissed her and pulled his pants down.

225.   Pearson ignored Plaintiff's objections and proceeded to grope her and penetrate her vaginally. The physical assault lasted less than one minute before another person opened the bedroom door—causing Pearson to stop his assault on Plaintiff.

226.   Pearson walked away from Plaintiff and into another room talking to the person who had interrupted the assault.

227.   Plaintiff was subsequently told to leave by multiple persons at the apartment and was even physically threatened by another female.

228.   Plaintiff attempted to contact several friends to ask for assistance but eventually began walking back towards her residence on campus. A group of passersby (other college students) saw Plaintiff and noticed that she appeared distressed and was having difficulty exiting the apartment complex, which was gated.

229.   The students offered assistance and took Plaintiff so that she could speak to the police. Plaintiff talked to a member of the University's police department and while waiting in the officer's vehicle, received a call and spoke to the mutual acquaintance (Plaintiff's Resident Assistant from the prior school year).

230.   Plaintiff had informed the acquaintance that she had been sexually assaulted but, during the conversation and without any warning to Plaintiff, the acquaintance enabled Pearson to get on the telephone via conference call.  Plaintiff then ended the call and was taken to the hospital where she underwent a sexual assault examination and was interviewed by a Detective from the Knoxville Police Department's Violent Crimes Unit.

231.   Later that morning after leaving the hospital on Friday, April 24, 2015, Plaintiff received a phone call from UT football players including Von Pearson.

232.   University of Tennessee and Athletic Department administrators and other "responsible persons" (as defined by UT policy and applicable Federal Law) including, specifically and without limitation, UT football coaches, were made aware of the incident and communicated directly about the incident with UT football players early in the morning on April 24, 2015, prior to

UT football players' telephone calls to Plaintiff.[23]

233. Given the preceding events at UT, these players should have been educated extensively (and on multiple occasions) regarding the impropriety of attempts to contact a victim of an alleged sexual assault.

234. On April 25, 2015, the University issued an "interim suspension" as to Pearson.

235. On April 27, 2015, the University issued a No Contact Directive to both Plaintiff and Pearson.

236. Upon information and belief, on May 4, 2015, the University held a hearing before the Assistant Vice Chancellor for student life, Dean Dr. Maxine Davis, who reinstated Pearson at the University, lifting his interim suspension.

237. Upon information and belief, on May 6, 2015, the ruling by Assistant Vice Chancellor Davis was overturned by the Dean of Student Life, Vince Carilli, and Pearson's interim suspension was re-imposed.

238. Plaintiff was never given notice of any hearing or appeal occurring in May 2015. Plaintiff was also never given any notice of any change in the status of Pearson's suspension in May 2015 until after the fact.

239. The University's 2015-2016 Academic Calendar provides that the last day of classes for the Spring, 2015 semester was April 29, followed by a week of exams (from May 3-May 10, 2015). http://registrar.tennessee.edu/academic_calendar/AcadCal15-16.pdf (last visited February 22, 2016).

240. Upon information and belief, the purpose of the University's actions in temporarily lifting the interim suspension was to allow Pearson to take exams to preserve his academic eligibility for reinstatement to the football team the following semester.

241. Upon information and belief, contact was made to multiple witnesses, including Plaintiff's acquaintance (the former RA), by a private investigator hired by Pearson's attorneys concurrent with the University's investigation between April and May, 2015. Plaintiff further avers

---

[23] The University was aware of the allegations against Pearson on April 24, 2015, and confirmed that he had been suspended from all team activities that same day. See http://www.local8now.com/home/headlines/Vols-wide-receiver-Von-Pearson-accused-of-rape-301250291.html (last visited February 21, 2016).

that this contact included communications prohibited by the University's "No Contact Directive" issued April 27, 2015.

242. On Thursday, July 9, 2015, the University issued its findings, concluding that Pearson had engaged in sexual conduct with Plaintiff without her consent in violation of the University's Standards of Conduct.

243. UT Football players should have received training (apart from standard instruction) following each of the preceding incidents involving athletes. The actions by UT football players in wake of the assault in attempting to contact Plaintiff follow same. These communications should have been treated as a violation of no-contact directive and is further evidence of a lack of training/instruction-especially considering the nature of the instructions required under Title IX and the repeated preceding incidents involving football players.

244. On July 22, 2015, the University notified Plaintiff that Mr. Pearson had invoked the TUAPA process and requested a disciplinary hearing.

245. On August 5, 2015, the Knox County District Attorney's Office announced its decision not to pursue charges against Pearson.

246. On August 7, 2015, the University lifted Pearson's interim suspension and reinstated Pearson to its football team. Plaintiff was not afforded any notice or opportunity to participate in the decision to lift the interim suspension and emailed her objections upon becoming aware (through the media) that the suspension had been lifted to the Director of Student Life, Vince Carilli.

247. On August 7, 2015, Plaintiff requested an update on the scheduling of the disciplinary hearing via email to the University's attorney handling the disciplinary charges against Pearson. In Plaintiff's request she again indicated her desire to resolve the matter as quickly as possible.

248. In announcing Pearson's reinstatement to school, Vice Chancellor Margie Nichols stated that Pearson is eligible to re-enroll "just like any other student who's coming for the fall." http://collegefootball.ap.org/article/tennessee-announces-it-has-reinstated-wr-von-pearson (last visited February 22, 2016).

249. Upon information and belief (and in spite of the comments made by Vice

Chancellor Nichols), preferential treatment was made as it relates to Pearson's "re-enrollment" as the deadline for applications for readmission (in the context of both a student in good standing or a dismissal) had already passed. *See* http://admissions.utk.edu/important-dates/ (providing a deadline of June 1 for readmission following a dismissal and a deadline of August 1 for readmission if in good standing)(last visited February 22, 2016).

250. On August 10, 2015, Plaintiff received proposed dates in November (November 9 and 10 of 2015) for the disciplinary hearing.

251. In light of the decision to lift the interim suspension and reinstate Pearson to the football team and the delay in the scheduling of any disciplinary hearing, Plaintiff was forced to leave UT. She dropped her fall courses electronically on August 15, 2015.

252. In October 2015, Plaintiff obtained counsel and moved to intervene as an interested party in the pending TUAPA disciplinary hearing.

253. Plaintiff intended to participate, with the assistance of counsel, in the November hearing; however, shortly before it occurred, Pearson, through his attorney, requested the hearing be continued.

254. The continuance was granted but, in spite of Plaintiff's repeated communications that the hearing occur as quickly as possible, was not reset until late January 2016.

255. During the interim time period, it was represented by the University that Plaintiff's participation and testimony would be essential to its prosecution of the case and, further, would require her to be deposed by Pearson's attorney and subject to cross-examination at the hearing under its administrative hearing procedures. Plaintiff's participation would also require her to incur expenses and time out of school as she had since enrolled at a different school Nashville, Tennessee. Additionally, as the hearing had been delayed until January, 2016 and as the school's procedures allowed months for any order to be issued, any disciplinary action would have been implemented only weeks before the end of the semester and Pearson's inevitable departure (as he had no remaining eligibility to play football) from the University.

256. For all these reasons, Plaintiff ultimately declined to participate in the hearing and notified the University of her decision in January 2016, shortly after she received an apology letter from Pearson for the events in April 2015.

257. The University did not proceed with its prosecution of the disciplinary charges despite the initial findings in its investigation and the January, 2016 hearing did not take place.

258. Ultimately, the only disciplinary measures taken against Pearson consisted of his absence from the April 25, 2015 scrimmage (the University's "Orange and White Game") during the initial interim suspension in April, 2015.

### July 2015: UT Football Player Arrested

259. On or around July 22, 2015, UT football player Charles Mosley was arrested for driving under the influence after being pulled over by Tennessee Highway Patrol for driving 79 miles per hour in a 55 mph zone. Reports of the incident (citing the arrest warrant) reflected that marijuana residue was found in the front passenger area and back seat of Mosley's car. *See* http://www.wbir.com/story/sports/college/vols/football/2015/07/22/vols-lineman-charles-mosley-arrested-for-dui/30538423/%20 (last visited November 18, 2015).

260. During the annual pre-camp news conference in early August 2015, UT Head Coach Butch Jones confirmed that Mosley was still on the team and stated in reference to the arrest, that "All discipline will be done internally." *See* http://www.wbir.com/story/sports/college/vols/football/2015/08/03/butch-jones-addresses-media--pre-camp-news-conference/31055719/ (last visited November 18, 2015).

### September 2015: Another UT Varsity Football Player Sexually Assaults a Female UT Student

261. On September 20, 2015, a female student at UTK was sexually assaulted by a varsity football player.

262. The female student reported the assault to the police and to UTK, and a police report was filed.

**November 28, 2015: Hostile Environment Remains Uncured**

263.   Despite the (still) pending University disciplinary charges and ongoing criminal proceedings, as recently as November 28, 2015, the hostile environment at the University remains uncured and photographs show AJ Johnson enjoying special on-field privileges in staunch disregard of the assurances to the victims that he would no longer be allowed anywhere on the athletic department's footprint. *See* http://www.knoxnews.com/govolsxtra/football/exvol-accused-in-rape-seeks-emergency-appeal-of-social-media-order_37588200 (*last visited* December 3, 2015).



University of Tennessee defensive lineman/linebacker Curt Maggitt, left, poses for a UT Athletic Department photo with former teammate A.J. Johnson during senior day activities before the game with Vanderbilt Saturday, Nov. 28, 2015. (AMY SMOTHERMAN BURGESS/NEWS SENTINEL)

AMY SMOTHERMAN BURGESS

**Plaintiff Jane Doe VIII**

264.   Plaintiff Jane Doe VIII is a student at University of Tennessee at Knoxville and last enrolled in classes in the Spring 2015 semester.

265.   Plaintiff Jane Doe VIII was physically assaulted (for refusing sex) by UT football player Alexis Johnson on February 14, 2016 at Volunteer Hall on the UTK campus. This was less then one week after the filing of the initial Complaint in this case.

266.   Ms. Doe VIII and Mr. Johnson were in Mr. Johnson's Vol Hall apartment when Mr. Johnson attempted repetitively to touch and kiss Ms. Doe VIII and she repeatedly stated that she did not want to have sex with him.

267.   Ms. Doe VIII was asleep in the living room of the apartment with another friend when Mr. Johnson picked her up and brought her to his room and tried to unbutton her pants.

268.   Mr. Johnson repeatedly initiated unwanted physical contact with Ms. Doe VIII in an effort to engage in sexual contact with Ms. Doe VIII.

269.   Ms. Doe VIII attempted to leave the bedroom but Mr. Johnson blocked the door prohibiting her exit.

270.   Upon information and belief, 6-foot-4, 295-pound Johnson placed his hand around the Ms. Doe VIII's throat, repeatedly choking her to the point that she could not fight back and felt she was going to pass out. A witness said that Johnson "appeared to be really punching her," and that the victim's lip was "busted," according to the warrants.[24]

271.   Ms. Doe VIII reported the sexual assault to UT Athletics on Sunday, February 14, 2016. Her report was conveyed to UT's Title IX Coordinator at some point before Wednesday, February 18, 2016. Upon information and belief, Ms. Doe VIII went to the Office of Equity and Diversity (OED) and met with a Title IX Responsible Person from the OED at some point on or before February 18, 2016.

---

[24] *See UT juco transfer Alexis Johnson suspended after arrest*, KNOXNEWS.COM, February 18, 2016, available at http://www.knoxnews.com/sports/vols/football/ut-juco-transfer-alexis-johnson-suspended-after-arrest-2c04a4b9-e0f5-6443-e053-0100007f7e08-369215821.html (last visited February 23, 1016).

272. Accordingly, UTK is currently obligated to conduct and complete a prompt, impartial, and equitable investigation into Ms. Doe VIII's case.

273. Mr. Johnson was charged with aggravated assault and false imprisonment for his conduct.

274. Plaintiff Doe VIII was deprived of an education opportunity because she will not return to school after this incident    .

### The 2011 Dear Colleague Letter

275. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX. The OCR has promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague Letter of April 4th, 2011 ("DCL"), which specifically concerns peer-on-peer sexual harassment and sexual assault.

276. The DOE was authorized by Congress to promulgate regulations to govern the implementation, interpretation and enforcement of Title IX.

277. The DCL is a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow in order to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action...that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to... (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

278. The DCL specifically outlines the requirements that educational institutions must follow regarding peer-on-peer sexual harassment and assault.

279. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

280. The DCL states that Title IX requires that the school's inquiry into peer-on-peer sexual harassment and assault "must be prompt, thorough, and impartial."

281. The DCL requires the school to "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

282. As to any potential conflicts of interest, The DCL states, "a school's investigation and hearings processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed."

283. The DCL requires designated and reasonably prompt timeframes for investigation and resolution. Per the DCL, "Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint."

284. In addition to resolving complaints promptly, the DCL also addresses OCR recommendations regarding the use of preventive education programs and comprehensive victim services. Per the DCL, such education and training may be included in "orientation programs for new students, faculty, staff, and employees."

285. The DCL also outlines OCR recommendations regarding complainant safety. The DCL states, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continues, "When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

286. The DCL specifically addresses retaliation, stating, "Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

### Questions and Answers on Title IX and Sexual Violence

287. On April 29, 2014, the OCR issued a document called Questions and Answers on Title IX and Sexual Violence ("Questions and Answers") in an attempt to "further clarify the legal requirements and guidance articulated in the DCL."

288. As with the DCL, the OCR has determined Questions and Answers to be a "significant guidance document" intended to provide additional guidance concerning obligations under Title IX to address sexual violence as a form of sexual harassment.

289. Questions and Answers states, "Under Title IX, federally funded schools must ensure that students of all ages are not denied or limited in their ability to participate in or benefit from the school's educational programs or activities on the basis of sex. A school violates a student's rights under Title IX regarding student-on-student sexual violence when the following conditions are met: (1) the alleged conduct is sufficiently serious to limit or deny a student's ability to participate in or benefit from the school's educational program, i.e. creates a hostile environment; and (2) the school, upon notice, fails to take prompt and effective steps reasonably calculated to end the sexual violence, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects."

290. In determining what makes for a hostile environment, Questions and Answers states, "The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment." Thereby, "a single or isolated incident of sexual violence may create a hostile environment."

291. Like the DCL, Questions and Answers emphasizes the necessity to protect complainants, stating, "But a school should not wait to take steps to protect its students until students have already been deprived of educational opportunities." Further, "Title IX requires a school to protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation. The school should take these steps promptly once it has notice of a sexual violence allegation and should provide the complainant with periodic updates on the status of the investigation."

292. Questions and Answers identifies appropriate interim steps which include making "the complainant...aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance, and the right to report a crime to campus and local law enforcement." "A school should notify complainants of the right to file a criminal complaint and should not dissuade a complainant from doing so during or after the school's internal Title IX investigation."

293. Interim measures also include notifying "the complainant of his or her options to avoid contact with the alleged perpetrator and allow the complainant to change academic and

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 57 of 87 PageID #: 1019

extracurricular activities or his or her living, transportation, dining, and working situation as appropriate." Further, a school cannot require a complainant to pay for counseling offered.

294. Per Questions and Answers, "If a school delays in responding to allegations of sexual violence or responds inappropriately, the school's own inaction may subject the student to a hostile work environment. If it does, the school will also be required to remedy the effects of the sexual violence that it could reasonably have been prevented had the school responded promptly and appropriately."

295. Questions and Answers identifies the following school policies and practices as "critical to achieve compliance with Title IX:"

- notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- application of the grievance procedures to complaints filed by students or on their behalf alleging sexual violence carried out by employees, other students, or third parties;
- provisions for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence;
- designated and reasonably prompt time frames for the major stages of the complaint process;
- written notice to the complainant and alleged perpetrator of the outcome of the complaint; and
- assurance that the school will take steps to prevent recurrence of any sexual violence and remedy discriminatory effects on the complainant and others, if appropriate.

296. Questions and Answers also addresses reporting duties of "responsible employees." "A responsible employee includes any employee: who has the authority to take action to redress sexual violence; who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee; or whom a student could reasonably believe has this authority or duty." "When a responsible employee knows or reasonably should know of possible sexual violence, OCR deems a school to have notice of the sexual violence."

297. Regarding what must be reported, "A responsible employee must report to the school's Title IX coordinator, or other appropriate school designee, all relevant details about the alleged sexual violence that the student or another person has shared and that the school will need to determine what occurred and to resolve the situation." "To ensure compliance with these reporting obligations, it is important for a school to train its responsible employees on Title IX and the school's sexual violence policies and procedures."

298. In that regard, "Before a student reveals information that he or she may wish to keep confidential, a responsible employee should make every effort to ensure that the student understands: (i) the employee's obligation to report...(ii) the student's option to request that the school maintain his or her confidentiality...and (iii) the student's ability to share the information confidentially with counseling, advocacy, health, mental health, or sexual-assault-related services."

299. Regarding the investigation Questions and Answers states, "All persons involved in conducting a school's Title IX investigations must have training or experience in handling complaints of sexual violence and in the school's grievance procedures."

300. Questions and Answers requires that training ensure responsible employees know how to respond appropriately to reports of sexual violence, that professional counselors, pastoral counselors, and non-professional counselors or advocates also understand the extent to which they may keep a report confidential, and that training is provided to all employees likely to witness or receive reports of sexual violence, including teachers, professors, school law enforcement unit employees, school administrators, school counselors, general counsels, athletic coaches, health personnel, and resident advisors.

301. Substantively, Questions and Answers requires training for employees include:

- practical information about how to prevent and identify sexual violence;
- behaviors that may lead to and result in sexual violence;
- attitudes of bystanders that may allow conduct to continue;
- potential for revictimization by responders and its effect on students;
- appropriate methods for responding to a student who may have experienced sexual violence, including the use of nonjudgmental language;
- the impact of trauma on victims; and
- the person(s) to whom such misconduct must be reported.

302. Questions and Answers requires training for employees involved in school grievance procedures include:

- working with and interviewing persons subject to sexual violence;

- particular types of conduct that would constitute sexual violence;

- the proper standard of review for sexual violence complaints;

- consent and the role drugs or alcohol can play in the ability to consent;

- how to determine credibility;

- confidentiality; and

- the effects of trauma, including neurobiological change.

303. To ensure students understand their rights under Title IX, Questions and Answers indicates a school should provide age-appropriate training to its students regarding Title IX and sexual violence. In Questions and Answers, OCR recommends, at a minimum, the following topics be covered in this training:

- Title IX and what constitutes sexual violence, including same-sex sexual violence, under the school's policies;

- the school's definition of consent applicable to sexual conduct, including examples;

- how the school analyzes whether conduct was unwelcome under Title IX;

- how the school analyzes whether unwelcome sexual conduct creates a hostile environment;

- reporting options, including formal reporting and confidential disclosure options and any timeframes set by the school for reporting;

- the school's grievance procedures used to process sexual violence complaints;

- disciplinary code provisions relating to sexual violence and the consequences of violating those provisions;

- effects of trauma, including neurobiological changes;

- the role alcohol and drugs often play in sexual violence incidents, including the deliberate use of alcohol and/or other drugs to perpetrate sexual violence;

- strategies and skills for bystanders to intervene to prevent possible sexual violence;

- how to report sexual violence to campus or local law enforcement and the ability

to pursue law enforcement proceedings simultaneously with a Title IX grievance; and

- Title IX's protections against retaliation.

304. Questions and Answers reiterates that Title IX prohibits retaliation against a complainant and that a school should take steps to prevent retaliation against a student who filed a complaint. Questions and Answers asserts schools should be aware of the likelihood of retaliation against the complainant by the alleged perpetrator or his or her associates. When a school knows or reasonably should know of possible retaliation by other students or third parties, it must take immediate and appropriate steps to investigate, to protect the complainant, and reiterate Title IX's prohibition of retaliation and the strong responsive steps will be made.

305. Questions and Answers requires that, "a school must give the complainant any rights that it gives to the alleged perpetrator. A balanced and fair process that provides the same opportunities to both parties will lead to sound and supportable decisions." "Specifically:

- Throughout the investigation, the parties must have an equal opportunity to present relevant witnesses and other evidence.
- If the school permits one party to have lawyers or other advisors at any stage of the proceedings, it must do so equally for both parties. Any school-imposed restrictions on the ability of lawyers or other advisors to speak or otherwise participate in the proceedings must also apply equally.
- If the school provides for an appeal, it must do so equally for both parties."

306. Questions and Answers reiterates the DCL's prompt timeframe as the entire investigation process as 60 calendar days.

### COUNT I : Violation of Title IX – 20 U.S.C. § 1681(a)

307. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

308. Defendant UT receives federal financial assistance for its education program. Therefore, UT is subject to the provisions of Title IX of the Education Act of 1972, 20 U.S.C. § 1681 (a), *et seq*.

309. For all Plaintiffs, an "appropriate person" at UT had actual knowledge of the discrimination and harassment as alleged by Plaintiffs. This includes the creation and maintenance of a hostile sexual environment before the five rapes at issue and actual notice and knowledge of

the extreme risks of sexual assaults by direct notice from Vice-Chancellor Rogers to Cheek, Hart and DiPietro.

310.  UT acted with deliberate indifference to known acts of harassment in its programs and activities prior to the direct assaults on Plaintiffs detailed herein.  UT was deliberately indifferent as its response to the harassment or lack thereof was clearly unreasonable in light of the known circumstances.[25]

311.  The "Before" Case: UT has liability for the rapes themselves because the UT Administration, Athletic Department and coaches intentionally violated Title IX and had official policies that violated Title IX, especially under the analysis of the *Simpson* and *Gebser* cases (500 F.3d 1170, 10th Cir. 2007; 524 U.S. 274 (1998)):

   a.  Showing high-school football recruits a "good time" on their visits to the UT campus;

   b.  Providing alcohol to recruits and underage UT female students;

   c.  Acting with deliberate indifference to known sexual assaults so as to create a hostile sexual environment and systemic failure to address sexual assaults by assaults and failure to train;

   d.  Acting with deliberate indifference to athlete parties that involved drug use and furnishing of alcohol by athletes to underage UT female students;

   e.  Intentionally creating a long-standing systemic severely hostile sexual environment of rapes by male athletes despite repeated actual notices (from Vice-Chancellor Rogers) of rapes and sexual assaults by male athletes (particularly football and basketball players);

   f.  A pattern of deliberate acts without regard to the known risks of Chancellor Jimmy Cheek and Athletic Department Director and Vice-Chancellor Dave Hart's interfering with the disciplinary process for male scholarship football and basketball athletes charged with

---

[25] Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances. *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000).

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 62 of 87 PageID #: 1024

sexual assaults by undue influence on the Office of Student Judicial Affairs;

g. A pattern of deliberate acts without regard to the known risks of covering up sexual assaults and rapes by football and basketball players;

h. A pattern and conspiracy of deliberate acts without regard to the known risks of condoning sexual assaults by a systemic failure to discipline male scholarship football and basketball athletes charged with sexual athletes;

i. A pattern of deliberate acts without regard to the known risks of providing/arranging housing for scholarship athletes known to have been involved in sexual assaults (rapes) and known to have provided alcohol and illegal drugs to underage recruits and underage female UT students;

j. A pattern of deliberate acts without regard to the known risks of placing (housing) freshman female students in the athletic dorm (Vol Hall) with upper class athletes from the football and basketball team despite the UT Administration having been specifically warned by Vice-Chancellor Rogers against the risk of such placement given the known prior sexual assaults by male athletic team members;

k. A pattern of deliberate acts without regard to the known risks of giving special and favorable treatment to male scholarship football and basketball athletes charged with sexual assault by arranging for special outside legal counsel to represent athletes charged with sexual assaults and not affording the same legal resources to victims;

l. A pattern of deliberate acts without regard to the known risks of supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape;

m. A pattern of deliberate acts, without regard to the known risks, of causing sexual assault disciplinary cases involving athletes to be handled outside the normal UT student disciplinary process via the Tennessee Uniform Administrative Procedures Act;

n. A pattern of deliberate indifference to student safety by a failure to reform UT policies and procedures to assure compliance with Title IX, namely with respect to the inequitable and non-prompt TUAPA elective hearing process;

o. A pattern of deliberate acts, without regard to the known risks, of unreasonably

failing to take prompt, adequate and effective remedial actions and measures to remedy a substantial and known risk of sexual assaults and rapes by athletes;

p.  A pattern of deliberate acts, without regard to the known risks, of having actual knowledge that UT's efforts, if any, to remediate the hostile sexual environment by male scholarship athletes was ineffective, yet UT continued to use those same methods to no avail and failed to act reasonably in light of the known circumstances;

q.  Acting with deliberate indifference after actual knowledge of sexual assaults. UT administration (Chancellor Cheek), athletic department (Dave Hart) and football coach (Butch Jones) were personally aware (as "appropriate persons" under Title IX) and had actual notice of previous sexual assaults and rapes by football players, yet acted with deliberate indifference to the serious risks of sexual assaults and failed to take corrective actions;

r.  A pattern of deliberate acts, without regard to the known risks, of failing to follow UT's own policies of conducting fair and impartial investigations into sexual assault;

s.  A pattern of deliberate acts, without regard to the known risks, of failing to conduct investigations into sexual assaults after responsible "appropriate" persons had actual knowledge of sexual assaults by male scholarship athletes; and,

t.  A pattern of deliberate acts, without regard to the known risks, of deliberately compromising the fairness and integrity of misconduct and disciplinary investigations by conspiring with accused athletes and witnesses to minimize sexual assault misconduct, "get the stories straight" and paint the female UT student victim as at fault or being "the aggressor."  UT's acts and omissions caused discrimination and sexual harassment so severe, pervasive, and objectively offensive that it effectively barred the victims' access (including Plaintiffs herein) to an educational opportunity or benefit. All Plaintiffs were forced to leave school.  A federal court in Tennessee, citing Sixth Circuit case law, has held "even a single incident of rape is sufficient to establish that a child was subjected to severe, pervasive, and objectively offensive sexual harassment for purposes of Title IX."[26]

---

[26] *Lopez v. Metro Gov't*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009) (citing *Soper v. Hoben*, 195 F.3d 845 (6th Cir. 1999).

u.  Deliberate difference to prior misconduct by the same perpetrators facilitated the rape of Doe IV and showed a deliberate disregard of and failure to remedy a hostile environment on the basis of sex

312.  The official policy of use of the TUAPA for perpetuators is contrary to federal law and has been deliberately used and misused by the University of Tennessee to foster and maintain a hostile and discriminatory sexual environment that not only insulates athletes from discipline and sanctions but facilitates and encourages sexual assaults because athletes know the process can be rigged, dragged out, and used so that they suffer no consequences.  The process is neither prompt, impartial, nor equitable, as required under federal law.

313. Based on the foregoing factual allegations, Plaintiffs aver that the actions and inactions of the University of Tennessee constitute a systemic pattern of deliberate decisions by its administrators directly in violation of the rights of its students to be free from a sexually discriminatory and harassing environment. Moreover, the acts of the University were performed in full, conscious disregard of known risks and in staunch violation of Title IX, and its repeated failures to take steps to remedy the hostile environment resulted in the discriminatory acts to Plaintiffs herein and in an ongoing pattern of unreasonably inadequate response, furthering the discrimination suffered by Plaintiffs and ultimately depriving them of their educational opportunities.

314.  Plaintiffs would not have been subjected to the discriminatory acts of UT itself, (through the TUAPA process and its general failure to cure the known hostile sexual environment on campus), or to the discriminatory acts of third parties under UT's control, had plaintiffs not been female victims of male (alleged) attackers.  Accordingly, Plaintiffs were denied educational opportunities on the basis of sex.

**Count II: Declaratory and Injunctive Relief for Violations of Title IX.**

315.  Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

316.  Plaintiffs seek a mandatory injunction ordering the UT to refrain from unlawful discrimination and/or retaliation, ordering UT to undertake and rectify any and all Title IX violations and/or inequities, ordering UT and its athletic department to  refrain from creating and condoning a hostile  sexual harassment and/or discrimination  environment  against individuals on the basis of  sex by  immediately ceasing  deliberate indifference to  sexual assaults; direct

interference with the disciplinary process in favor of male athletes who were charged with rape; directly supporting, maintaining and controlling environments for athletes in the major sports of football and basketball that encouraged underage drinking, drug use and rape; arranging for/facilitating lawyers for athletes accused of sexual assault, providing or subsidizing premises known as party houses for athletes used for underage drinking and drugs to entice recruits to come UT; unlawfully discriminating against victims of sexual assault and fostering a hostile sexual environment by the misuse of a one-sided Tennessee Uniform Administrative Procedures Act ("TUAPA") procedure.

### Count III: Preemption of TUAPA by Title IX and the Campus Save Act

317. UTK's application of the TUAPA process is preempted by federal law, since these TUAPA procedures "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). *See also Maryland v. Louisiana*, 451 U.S. 725, 747 (1981).

318. One of the central requirements imposed upon a Title IX funding recipient (such as the Defendant in this case) is the obligation to "provide for prompt and equitable resolution of complaints of sex discrimination." 34 CFR 106.8(b).

319. Under the Office for Civil Rights ("OCR") 2001 Sexual Harassment Guidance document (adopted pursuant to notice and comment procedures), universities such as Defendant must provide "designated and reasonably prompt timeframes for the major stages of the complaint process" as well as "notice to students, parents of elementary and secondary students, and employees of the procedure, including where complaints may be filed."

320. The 2011 Dear Colleague Letter recommends a timeframe of 60 calendar days for a typical investigation. While this timeline is not itself a binding legal requirement, it is nevertheless highly probative and persuasive authority as to what "promptness" means in the Title IX context.[27]

---

[27] U.S. Department of Education Office for Civil Rights, Dear Colleague, 2011, available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf, last visited February 11, 2016. It is noteworthy that courts have accorded substantial deference to OCR's regulations and a non- regulatory Policy Interpretation document in the context of assessing whether institutions are complying with the athletics equity requirements of Title IX. *See McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 290 (2004) (holding that deference to Department of Education's non- regulatory Policy Interpretation regarding Title IX's athletics equity requirements was appropriate because it is "both persuasive and not unreasonable"). At

321. UT, in its current implementation of TUAPA procedures, attempts to incorporate OCR's 60-day timeline.

322. In the document entitled "Information For Agency Heads Regarding Contested Case Proceedings Under the Tennessee Uniform Administrative Procedures Act" (the document provided to Chancellor Cheek prior to his selection of an Administrative Law Judge from a provided list of three potential candidates), there is a provision titled "Timing," that reads:

> Sexual Misconduct and Relationship Violence cases must be resolved more quickly than the typical APA contested case proceeding. For example, taking the full sixty (60) days after receipt of briefs and oral argument to rule on a party's appeal of an Initial Order, or to review the Initial Order on the Agency Head's own motion, could impact whether the University's resolution was prompt and equitable as required by federal law. Outside counsel should advise you on timing matters.

323. On its face, this policy attempts to incorporate OCR's 60-day timeline for investigating sexual assault cases. However, the policy in fact provides that the 60-day timeline does not start until "after receipt of briefs and oral argument to rule on a party's appeal of an Initial Order, or . . . review [of] the Initial Order on the Agency Head's own motion." *Id.* Thus, investigations, can drag on for more than 400 days before briefs are submitted or oral arguments heard, and then the 60-day clock would start. (In the cases of both Plaintiff Doe III and Doe IV, TUAPA hearings remained pending for over a year with Jane Doe V's still pending). This convoluted application of the OCR's guidelines is utterly incongruous with any meaningful notion of promptness.

324. Accordingly, the TUAPA process as applied by UT stands as a significant obstacle to the Congressional objective of prompt resolution of Title IX investigations.

325. UT's application of the TUAPA procedures also runs afoul of the Congressional objectives of protecting victims from secondary trauma, encouraging reporting, increasing accountability, reducing sexual assault, and making campuses a safer place to learn.

---

least one court has extended the holding of the *McCormick* decision to also accord deference to OCR Dear Colleague letters regarding Title IX athletics equity issues. *See Biediger v. Quinnipiac University*, 728 F.Supp.2d 62, 92-93 (D. Conn. 2010).

326. The Campus Save Act was intended, in part, to "foster greater transparency and accountability around institutional policies and procedures; strengthen institutional efforts to prevent dating violence, domestic violence, sexual assault, and stalking; and ensure proper training for individuals who are involved in institutional disciplinary proceedings." The Act was also intended to "foster *more supportive environments for victims* of dating violence, domestic violence, sexual assault, and stalking *to come forward to report these crimes*." *See* Department of Education, Vol. 79 No. 202 Fed. Reg. 62, 753 (Oct. 20, 2014) (codified at 34 C.F.R. pt. 668).

327. In furtherance of these Congressional policy goals, the OCR "strongly discourages schools from allowing the parties personally to question or cross-examine each other during [a Title IX] hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment." 2011 DCL p. 12.

328. It is the position of UT's Counsel, in *this* case, that "even if . . . cross-examination is an optional element of a constitutional student due process hearing, the Tennessee General Assembly has determined that cross-examination is a mandatory element of a student due process hearing." D.E. #16, Defendants' Response in Opposition to Plaintiff' Second Amended Motion For Temporary Restraining Order, p. 15.

329. Accordingly, TUAPA's mandatory (direct) cross-examination conflicts with the Congressional policy of "fostering more supportive environments" for victims of sexual assault and "encourag[ing] victims . . . of sexual assault . . . to come forward to report" these assaults, since these victims are significantly less likely to report assaults if they must face cross-examination from the accused (or the accused's attorney) in order to do so.

330. Additionally, as set forth more fully in Plaintiff's Second Amended Motion for Temporary Restraining Order and Memorandum of Law in Support of Motion (D.E. #11), the TUAPA process is preempted under federal law because 1) UTK's sexual assault policies do not place Complainants on notice of the TUAPA process; and 2) UTK's application of the TUAPA process is not impartial, since the Complainant's case is "prosecuted" by General Counsel for the University, in contravention of Title IX and OCR guidance documents.

**Plaintiff Doe I's Claims Under Title IX**

331. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

332. Plaintiff avers that UT has violated OCR regulations, policies, and "Dear Colleague" letters and that such violations constitute evidence of Title IX violations. *See Biediger v. Quinnipac University*, 728 F.Supp. 2d 6210 (Conn. 2010).

333. Plaintiff avers that UT unlawfully applies the Tennessee Uniform Administrative Procedures Act ("TUAPA") to provide hearings only to alleged perpetrators of sexual assaults.

334. Plaintiff avers that application of TUAPA procedures to campus sexual assault investigations subjects victims of sexual assaults to unlawful harassment and undue hardship, and that such inequitable procedures are are preempted by Title IX and the Campus Save Act.

335. UT's own policies recognize that TUAPA procedures must be modified to comply with Title IX and federal law (Sexual Misconduct and Relationship Violence Policy (2015)).

336. The rape of Plaintiff Doe I was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment.[28] UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

337. UT is also liable under the after theory of liability under Title IX.

338. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

339. The discrimination, consisting of Makanjuola's rape of Plaintiff Doe I, the risks to Plaintiff Doe I's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe I's access to educational opportunities and benefits.

340. Plaintiff was subjected to the discrimination because of the University's deliberate

---

[28] Under *Gebser*, "actual knowledge" is not a required element in cases that "involve official policy." *See Gebser*: "Consequently, *in cases like this one that do not involve official policy of the recipient entity*, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290, 118 S. Ct. 1989, 1999 (1998). *See also Simpson*, 500 F.3d at 1176.

indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions not to disclose Makanjuola's rape of Plaintiff or the investigation so that Makanjuola's basketball season or eligibility to transfer would not be affected;

b. The provision or facilitation of access to special counsel (Don Bosch) by UT;

c. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that Makanjuola would not attend or participate in any hearing—thereby subjecting Plaintiff Doe I not only to unnecessary delay, but also an unnecessary hearing during which she was forced to relive her rape and was subjected to offensive and needless examination;

d. UT's deliberate decision not to seek any form of discipline for Makanjuola that would affect him (or the basketball program) in any way;

e. UT's deliberate decision not to adequately advise Plaintiff Doe I of her right to appeal the inadequate and ineffective discipline of an "indefinite suspension" to a player who had already been granted a release and effectuated a transfer, thereby allowing him to subsequently make contact;

f. UT's deliberate decision not to take action to remedy the effects of the hostile environment required by Title IX (and separate from any interim measures) at the conclusion of the disciplinary proceedings such as notifying Plaintiff's teachers of the traumatic experience, the provision of academic support services or arranging for Plaintiff to have extra time to re-take a class or withdraw from a class without academic or financial penalty and instead disqualifying Plaintiff from the nursing program for a shortcoming in her GPA of less than one tenth (0.1) of a point despite being provided medical evidence that Plaintiff's academic performance had suffered as a direct result of the rape;

g. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

341. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, basketball program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Makanjuola would have been removed as a threat to Plaintiff and Plaintiff would have completed the nursing program. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while Makanjuola was praised by members of the athletic department, granted a transfer and allowed to continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

342. As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits.

### Plaintiff Doe II's Claims Under Title IX

343. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

344. Plaintiff Doe II pleads the "erroneous outcome" doctrine under Title IX, set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994), as to UT's flawed investigation into the sexual assault of Doe II. UT's investigation and hearing process was flawed due to Jane Doe II's sex. UT failed to take action to against a male athlete (football player) to protect its football players, demonstrate that its varsity athletes were not rapists and show was no rape culture problem with the football program. UT had a pattern of decision-making when male athletes faced discipline that ultimately resulted in a false outcome that the male football player was not guilty of rape.

345. The rape of Plaintiff Doe II was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

346. UT is also liable under the after theory of liability under Title IX.

347. UT's responses to the harassment were clearly unreasonable in light of the known

circumstances.

348.  The discrimination, consisting of Mr. Doe I's rape of Plaintiff Doe II, the risks to Plaintiff Doe II's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe II's access to educational opportunities and benefits.

349.  Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a.  UT's deliberate decisions not to disclose Mr. Doe I's rape of Plaintiff or the investigation so that Mr. Doe I's or the University's football season would not be affected;

b.  UT's deliberate decisions during the "disciplinary process": to reverse the initial findings (against Mr. Doe I) without providing any substantive basis and without any appeal communicated to Plaintiff; to remove the investigator and instead appoint a new investigator of its own choice; to subject Plaintiff Doe II to clearly retaliatory allegations and concurrent investigations in an effort to intimidate and dissuade her from pursuing her claims; to take no action whatsoever against Mr. Doe I for the retaliatory and completely false accusations against Plaintiff; to allow additional time (and multiple interviews) wherein football players were given an opportunity to "get their stories straight"; to fail to accurately characterize the statements provided by witnesses or investigate said statements with sufficient diligence upon receiving notice of the discrepancies and to utilize a biased appeal system contra to its own policies that utterly failed Plaintiff Doe II in favor of a football player assisted by prominent counsel;

c.  UT's deliberate decision (in its "second" investigative findings) to include, in its findings, an unnecessary and highly unusual conclusion that, not only could it not proceed with disciplinary charges, but that the sexual encounter was consensual;

d.  UT's deliberate decision not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation or at the conclusion of the disciplinary proceedings such as: notifying Plaintiff's teachers of the traumatic experience or providing academic support services or arranging for Plaintiff to

Case 3:16-cv-00199   Document 22   Filed 02/24/16   Page 72 of 87 PageID #: 1034

have extra time to re-take a class or withdraw from a class without academic or financial penalty despite specifically finding that Plaintiff was traumatized by the event (while simultaneously finding that the encounter was consensual).

e. UT's denial to Jane Doe II of procedural equal rights and refusing to conduct a hearing on her case.

f. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

350. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Mr. Doe I would have been removed as a threat to Plaintiff and Plaintiff would have maintained her academic track and be working towards earning her degree at UT. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and underwent further emotional trauma while Mr. Doe I remained on campus and was allowed to continue playing collegiate sports suffering no substantive consequences whatsoever.

351. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

352. As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

### Plaintiff Doe III's Claims Under Title IX

353. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

354. The rape of Plaintiff Doe III was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for

the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment. UT's deliberate decisions not to take any actual disciplinary action as to Treyvon Paulk so that he could potentially return to the team at a later point when he could actually play (when he was not medically red-shirted) and instead allowing him to remain in school and on scholarship while continuously maintaining the hostile and dangerous environment in Vol Hall and practice of providing alcohol to minors as was done to Plaintiff Doe III on the evening she was eventually raped by Mr. Doe II and others.

355. UT is liable under the after theory of liability under Title IX.

356. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

357. The discrimination, consisting of Mr. Doe II's rape of Plaintiff Doe III, the risks to Plaintiff Doe III's safety, the acts and omissions by members of UT's administration in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe III's access to educational opportunities and benefits.

358. Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions to continue to employ known ineffective interim measures and allowing Mr. Doe II to remain on campus and to be present in Plaintiff's dorm, thereby subjecting Plaintiff to additional contact with her rapist;

b. UT's deliberate decision not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: notifying Plaintiff's teachers of the traumatic experience, the provision of academic support services or arranging for Plaintiff to have extra time to re-take a class or withdraw from a class without academic or financial penalty;

c. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that Mr. Doe II will likely not participate in the hearing and with full knowledge that additional delay would

disadvantage the prosecution of the disciplinary charges charged;

     d. UT's deliberate decision to refrain from seeking retroactive punishment against Mr. Doe II, provide explanation as to why retroactive punishment was not being sought, despite repeated requests by Plaintiff and Plaintiff's counsel;

     e. UT's deliberate decision to make scheduling accommodations at Mr. Doe II's (and his attorney & outside counsel's) request —thereby subjecting Plaintiff Doe III not only to unnecessary delay, but also in fear that she would be required to give additional statements and deposition testimony that would force her to relive her rape and subject her to examination by Mr. Doe II's counsel;

     g. UT's deliberate decisions during the "disciplinary process": to refrain from implementing any interim measures and instead delay its investigation, thereby allowing additional time wherein witnesses and the rapists were given an opportunity to "get their stories straight."

     h. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

    359. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and instead employed effective interim measures and a disciplinary process that was prompt and equitable, Mr. Doe II would have been removed as a threat to Plaintiff and Plaintiff would have maintained her academic track and be working towards earning her degree at UT. Instead, Plaintiff was subjected to further contact with one of her rapists, additional emotional and psychological trauma, forced to leave campus, set back years from her academic track (incurring significant costs in the process) all while Mr. Doe II was allowed to remain on campus, suffering no substantive consequences whatsoever and facing no substantive punishment (punishment retroactive to the date of Mr. Doe II's raping of Plaintiff)—punishment available under its policies and requested by Plaintiff.

    360. As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

361. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

362. The rape of Plaintiff Doe IV was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment. UT consciously disregarded the known risks posed by the specific group of students by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby allowing this same group of players to continue the pattern of providing alcohol to minors, violent and discriminatory behavior including sexual assault, the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses UT resulted in the assault against Plaintiff.

363. UT is also liable under the after theory of liability under Title IX.

364. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

365. The discrimination, consisting of Johnson and Williams' rape of Plaintiff Doe IV, the risks to Plaintiff Doe IV's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe IV's access to educational opportunities and benefits.

366. Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation in the wake of Plaintiff's allegations so as to mitigate any negative effect on its football season and the athletic department;

b. UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapists and witnesses to the Title IX investigation; to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated; and, to take any action whatsoever against persons under its control (football players and coaches) who threatened and assaulted witnesses to the investigation and instead allowing said persons to continue playing and coaching football in direct contradiction of its own policies and Title IX;

c. The provision or facilitation of access to special counsel by UT;

d. UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that neither Johnson nor Williams are likely to attend or participate in any hearing—thereby subjecting Plaintiff Doe IV not only to unnecessary delay, but also additional and unnecessary interviews and an unnecessary hearing during which she has been, and will be in the future, forced to relive her rape while potentially being subjected to offensive and needless examination;

e. UT's deliberate decision to allow Johnson and Williams to remain on campus and on scholarship throughout the Fall, 2014 (Johnson) and Spring, 2015 (Williams) semester(s);

f. UT's deliberate decisions to publicly support, through the statements and actions of its administrators (including Chancellor Cheek) and football coaches, the men who raped Plaintiff; and,

g. UT's deliberate decisions to publicly support, through the statements and actions of the athletic department and football coaches, the men known to have threatened and assaulted witnesses to the Title IX investigation.

h. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

367. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its

athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Williams, Johnson and the football players and coaches that interfered with the investigation including football players Marlin Lane, Geraldo Orta and Curt Maggitt, would have been removed as a threat and Plaintiff would have retained her scholarship and be representing the University through athletics while pursuing her degree. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football players were praised by members of the athletic department, allowed to remain in school on scholarship and, as to Orta and Maggitt, continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

368.  As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

### Plaintiff Doe V's Claims Under Title IX

369.  Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

370.  UT is liable under the before theory of liability because UT had actual knowledge of the involvement of Orta and Lane as persons responsible for a prior sexual assault (in April of 2013) and a severely hostile sexual environment including post-assault communications with the victim in an effort to dissuade her from pursing the complaint. UT administrators and its athletic department, including Coach Jones, had specific knowledge of these facts as set forth in the police report. As set forth above, Orta and Lane violently retaliated against a material witness to the Doe IV rape (i.e. Drae Bowles) and this violent act of retaliation was witnessed by Jane Doe V.

371. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. UT consciously disregarded the known risks posed by this specific group of students by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby

allowing this same group of players to continue the pattern of providing alcohol to minors, violent and discriminatory behavior including sexual assault, the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses UT resulted in the assault against Plaintiff and UT is therefore liable for sexual discrimination and retaliation to Plaintiff Doe V under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

372. UT is also liable under the *after* theory of liability under Title IX.

373. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

374. The discrimination, consisting of Maggitt and Johnson's post-assault communications and the violent retaliatory acts of UT football players including Orta, Lane and Maggitt posed risks to Plaintiff Doe V's safety. The acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe V's access to educational opportunities and benefits.

375. Plaintiff was subjected to discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation so as to mitigate any negative effect on its football season and the athletic department;

b. UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapists and witnesses to the Title IX investigation, to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated, to take any action whatsoever against persons under its control (football players and coaches) who threatened and assaulted witnesses to the investigation and instead allowing said persons to continue playing and coaching football in direct contradiction of its own policies and Title IX;

c.   The provision or facilitation of access to special counsel by UT;

d.   UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act with full knowledge that neither Johnson nor Williams are likely to attend or participate in any hearing—thereby unnecessarily delaying the process;

e.   UT's deliberate decision to allow Johnson and Williams to remain on campus and on scholarship throughout the Fall, 2014 (Johnson) and Spring, 2015 (Williams) semester(s);

i.   UT's deliberate decisions to publicly support, through the statements and actions of the athletic department and football coaches, the men known to have threatened and assaulted witnesses to the Title IX investigation;

j.   UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

k.   UT's deliberate indifference to allegations of retaliation against Plaintiff Doe V for her participation in a Title IX sexual assault investigation, which indifference makes UT a party to the retaliation itself.

376.   Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by employing a disciplinary process that was prompt and equitable, Williams, Johnson and the football players and coaches that interfered with the investigation including football players Marlin Lane, Geraldo Orta and Curt Maggitt, would have been removed as a threat and Plaintiff would have retained her scholarship and be representing the University through athletics while pursuing her degree. Instead, Plaintiff was forced to leave campus, set back years from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football players were praised by members of the athletic department, allowed to remain in school on scholarship and, as to Lane, Orta and Maggitt, continue playing collegiate sports (on scholarship) ---suffering no consequences whatsoever.

377. As a result of UT's policies and discrimination, consisting of retaliation for participation in a Title IX investigation and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

**Plaintiff Doe VI's Claims Under Title IX**

378. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

379. Plaintiff Doe VI pleads the "erroneous outcome" doctrine under Title IX, set forth in *Yusuf v. Vassar College*, 35 F.3d 709 (2nd Cir. 1994), as to UT's flawed investigation into the sexual assault of Doe II. UT's investigation and hearing process was flawed due to Jane Doe II's gender. UT failed to take action to against a male athlete (football player) to protect its football players, demonstrate that its varsity athletes were not rapists and show was no rape culture problem with the football program. UT had a pattern of decision-making when male athletes faced discipline that ultimately resulted in a false outcome that the male football player was not guilty of rape.

380. Plaintiff also avers UT acted with deliberate indifference, failed to institute corrective measures and had actual notice of, and failed to correct, misconduct, in this case a hostile sexual environment by male athletes. The rape of Plaintiff Doe VI was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. UT consciously disregarded the known risks posed by the specific group of students by refusing to investigate or pursue disciplinary action in the April 2013 rape that occurred in Vol Hall at the direct instruction of its administrators, specifically including Chancellor Cheek. UT's deliberate decisions not to investigate that incident, implement remedial measures required by Title IX or otherwise take effective action to remedy the hostile environment, thereby allowing football players to continue the pattern of violent and discriminatory behavior including sexual assault as well as the coordinated collaboration of statements in the wake of allegations and retaliation against victims and witnesses resulted in the assault against Plaintiff. UT is therefore liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

381. UT is also liable under the after theory of liability under Title IX.

382. UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

383. The discrimination, consisting of Jones' rape of Plaintiff Doe VI, the risks to Plaintiff Doe VI's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX including the failure to take remedial action was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe VI's access to educational opportunities and benefits.

384. Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a. UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation in the wake of Plaintiff's allegations so as to mitigate any negative affect on its football season and the athletic department;

b. UT's deliberate decisions not to take interim measures or action to remedy the effects of the hostile environment required by Title IX during the investigation such as: to take effective measures to prevent contact between the rapist and witnesses to the Title IX investigation, to make any assurances to the victims and/or witnesses to the Title IX investigation that retaliation would not be tolerated, to take any action whatsoever against persons under its control (football players) who threatened and/or attempted to dissuade Plaintiff and other witnesses to the investigation and instead allowing said persons to continue this pattern and remain in school on scholarship in direct contradiction of its own policies and Title IX;

c. UT's deliberate decision to refrain from imposing any discipline and prompt resolution within the required timeframe under Title IX and its own policies—thereby subjecting Plaintiff Doe VI to unnecessary delay;

d. UT's deliberate decision to allow Jones and the men (other football players) known to have threatened and assaulted witnesses to the Title IX investigation to remain on campus and on scholarship throughout the Spring, 2015 semester;

e. UT's deliberate decisions to publicly support, through the statements and actions

of its administration, the athletic department and football coaches, Riyahd Jones and the men (other football players) known to have threatened and assaulted witnesses to the Title IX investigation; and,

f. UT's deliberate decisions in relying on the failure of witnesses to participate who were known to have been contacted by football players as the primary basis for the outcome of its investigation.

g. UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

385. Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Jones and the football players and coaches that interfered with the investigation would have been removed as a threat and Plaintiff would have remained in school and pursuing her degree. Instead, Plaintiff was forced to leave campus, forced to deviate from her academic track (incurring significant costs in the process) and undergo further emotional trauma while the football players were praised by members of the athletic department, allowed to remain in school on scholarship and effectuate a transfer (as to Jones) and, as to others, continue playing collegiate sports at UT (on scholarship) ---suffering no consequences whatsoever.

386. As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

**Plaintiff Jane Doe VII's Claims Under Title IX.**

387. Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

388. The rape of Plaintiff Doe VII was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the

rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment.

389.  The discrimination, consisting of Pearson's rape of Plaintiff Doe VII, the risks to Plaintiff Doe VII's safety, the acts and omissions by members of UT's administration and athletic department in violation of Title IX, including the failure to take remedial action, was so severe, pervasive, and objectively offensive that it barred Plaintiff Doe VII's access to educational opportunities and benefits.

390.  Plaintiff was subjected to the discrimination because of the University's deliberate indifference to known acts of harassment, sexual violence, discrimination and retaliation, including, without limitation:

a.  UT's deliberate decisions and actions, by and through its coaches and administrators, to interfere in the investigation in the wake of Plaintiff's allegations so as to mitigate any negative effect on its football season and the athletic department;

b.  UT's deliberate decision to lift Pearson's interim suspension in May, 2015 so that he could remain eligible for the next football season;

c.  UT's deliberate decision to lift Pearson's interim suspension in August, 2015 and to reinstate him to the football team after its investigation determined he had more likely than not sexually assaulted Plaintiff;

d.  UT's deliberate decision to refrain from imposing any discipline within the required timeframe under Title IX and its own policies under the guise of complying with the Tennessee Uniform Administrative Procedures Act;

e.  UT and the athletics department failure to train and educate their players to prevent and remedy a known hostile environment toward women that existed within the athletic program.

391.  Had UT not been deliberately indifferent to Plaintiff's harassment and discrimination and, further, had UT not taken self-serving action to protect the interests of its athletic department, football program, coaches and players and instead complied with its own policies and federal law by acknowledging Plaintiff's rape and employing a disciplinary process that was prompt and equitable, Plaintiff Doe VII would not have transferred from UTK and would still

be pursuing her education at a public university.

392.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

393.   As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

### Plaintiff Jane Doe VIII's Claims Under Title IX

394.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

395.   The sexual assault of Plaintiff Doe VIII was a causal result of UT's deliberate indifference and policy decisions to create a hostile sexual environment. UT consciously disregarded the general and specific warnings raised by Jenny Wright and Tim Rogers. As set forth above, UT is liable for the rape itself under the before theory of liability under Title IX for its direct actions in creating and maintaining a hostile sexual environment, specifically as to football athletes in Vol Hall.

396.   In addition to suffering a sexual assault that could have been avoided had UTK not acted in a clearly unreasonable manner by not curing an atmosphere of repeated sexual assaults by football players (including, specifically, at Vol Hall), Plaintiff's prior plans to re-enroll classes are now on an indefinite hold.

397.   UT's responses to the harassment were clearly unreasonable in light of the known circumstances.

398.   As a result of UT's policies and discrimination, consisting of sexual assault and post-event failures to discipline in accordance with Title IX, Plaintiff was subjected to an environment that was so severe, pervasive, and objectively offensive that Plaintiff was barred from access to educational opportunities and benefits

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.   Defendant be served with process and answer herein;

b.   An award of damages in an amount to be established at trial, including, without

limitation, reimbursement and prepayment for all of Plaintiffs' tuition or related expenses; payment of Plaintiffs' expenses incurred as a consequence of the sexual assault; damages for deprivation of equal access to the educational benefits and opportunities provided by UT; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future enjoyment of life;

c. An Order enjoining UT, along with all of its agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent, and/or remedy sexual harassment;

d. Injunctive relief requiring UT to redress its violations of Title IX including: 1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy, including procedures for effective reporting of sexual harassment incidents, an effective and immediate crisis response, and an expanded victim assistance and protection program; 2) adopting a real "zero tolerance policy" under which there will be expedited proceedings and punishment proportional to the offense for violation of sexual harassment policies; 3) providing for an annual, independent review by the UT Board of Trustees, with the participation of outside reviewers, of Athletic Department compliance with the sexual harassment and recruiting policies and any other relief to be determined at trial requiring UT to comply with federal law under Title IX; and 4) enjoining UT from utilizing the TUAPA administrative process in sexual assault investigations.

e. Attorneys' fees pursuant to 42 U.S.C. § 1988(b);

f. For the court costs of trying this action;

g. For a jury to hear this cause of action;

h. For costs to be taxed to the Defendant;

i. For such other and further relief as the Court may deem proper; and,

j. For pre- and post-judgment interest.

k. Plaintiffs respectfully reserve the right to amend this Complaint to conform to the evidence.

Respectfully submitted this 24th day of February, 2016.

DAVID RANDOLPH SMITH & ASSOCIATES

/s/ David Randolph Smith
David Randolph Smith, TN BPR#011905
Dominick R. Smith, TN BPR # 028783
W. Lyon Chadwick, TN BPR # 029599
Christopher W. Smith, TN BPR #034450
DAVID RANDOLPH SMITH & ASSOCIATES
1913 21st Avenue South
Nashville, Tennessee 37212
(615)742-1775 phone
(615)742-1223 fax
drs@drslawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, today, February 24, 2016 a copy of the forgoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt or as otherwise indicated below.

/s/ David Randolph Smith