# UNITED STATES DISTICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JANE DOE I, JANE DOE II, JANE DOE III,  )
JANE DOE IV, JANE DOE V, JANE DOE VI,  )
JANE DOE VII, and JANE DOE VIII,  )
    )
    Plaintiffs,  )
    )
v.  )    **Case No. 3:16-cv-199**
  )    **Judge Aleta A. Trauger**
THE UNIVERSITY OF TENNESSEE,  )
    )
    Defendant.  )

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 31) filed by the defendant the University of Tennessee ("UT"), to which the plaintiffs have filed a Response in opposition (Docket No. 35), and UT has filed a Reply (Docket No. 41).  For the reasons discussed herein, the motion will be granted in part and denied in part.

## BACKGROUND[1]

This is an action against UT for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX") and the Campus Save Act, 20 U.S.C. § 1092, arising from allegations that plaintiffs Jane Does I-IV and VI-VIII, while students at UT, were sexually assaulted by male UT students (UT basketball and football players or others affiliated with them) and were subsequently treated in an unfair and discriminatory manner by UT throughout the investigation and disciplinary proceedings and thereafter.  Jane Does I-IV and VI-VIII allege two separate types of Title IX violations that would render UT liable for injuries they have suffered.

---

[1] For purposes of this Motion to Dismiss, all facts in this section are drawn from the First Amended Complaint (Docket No. 22).

First, they raise claims under Title IX based on the theory that UT's official and unofficial policies – including its deliberate indifference to a pattern of prior sexual assaults and other misconduct by male UT athletes, as well as its fostering of a sexually hostile environment – rendered female students vulnerable to sexual assault, and therefore UT is liable for the sexual assaults against the plaintiffs. These claims are referred to by the parties as the "before" claims, because they arise from allegations about UT's actions *before* the plaintiffs were assaulted. Second, Jane Does I-IV and VI-VII raise claims under Title IX that UT's inadequate and discriminatory response to the plaintiffs' reports of their sexual assaults (including implementing disciplinary proceedings that violate Title IX and the Campus Save Act) have subjected the plaintiffs to further denial of access to educational benefits and opportunities at UT. These claims are referred to as the "after" claims, because they arise from allegations about UT's actions *after* UT was notified of the plaintiffs' assaults.[2] Jane Doe V, who was not sexually assaulted but who was allegedly involved in the investigation of Jane Doe IV's assault, brings only a claim for Title IX retaliation, based on the theory that UT retaliated against her for her participation in the investigation, or allowed others to do so.

I       <u>**Allegations Related to the "Before" Claims**</u>

According to the First Amended Complaint (Docket No. 22 (the "FAC")), "UT had actual notice (and itself created) a long-standing, severely hostile sexual environment of rape by male athletes (particularly football players) that was condoned and completely unaddressed by UT officials, including Chancellor Jimmy Cheek ('Cheek'), President Joe DiPietro ('DiPietro'),

---

[2] Jane Doe VIII, whose assault took place only days before the First Amended Complaint was filed, does not raise an "after" claim against UT.

Athletic Department Director and Vice-Chancellor Dave Hart ('Hart'), and head football coach Butch Jones ('Jones')." (Docket No. 22 ¶ 3.)

The FAC alleges that, prior to the assaults against the plaintiffs, a number of sexual assaults were committed by male UT football and basketball players, starting as long ago as 1995, and that UT – and in particular the UT Athletic Department – knew of these assaults and responded inadequately, including attempting to cover up the incidents, failing to report to – and work with – the police and other UT administrators such as the UT Office of Student Conduct, failing to implement appropriate disciplinary measures (or, in some cases, any discipline at all), and/or allowing the perpetrators to continue to play on their teams or remain on campus. (Docket No. 22 ¶¶ 25-27, 38-43, 97-105 (outlining some of these incidents in greater detail).)[3] The FAC contains additional allegations that UT football and basketball players have engaged in other misconduct, sometimes in the presence of Athletic Department coaches, including non-sexual assaults, underage drinking, drug use, and other crimes, and that UT has been aware of these incidents and condoned, ignored, or failed to adequately discipline the behavior. (*Id*. ¶¶ 28-37, 106-118, 132-134, 219-221 (p. 42), 213-215 (pp. 46-47), 259-260.)[4]

Further, with respect to disciplinary proceedings involving UT athletes, the FAC alleges that UT has a pattern of using and misusing the Tennessee Uniform Administrative Procedure Act ("TUAPA") procedures so as to favor athlete perpetrators at the expense of victims and

---

[3] Some of the specific incidents of alleged athlete misconduct referenced in the FAC took place before *all* of the assaults against Jane Does I-IV and VI-VIII, while others took place after one or more of the plaintiffs had already been assaulted. On the whole, however, the FAC alleges that a pattern was present before any of the plaintiffs was assaulted, which was exacerbated over time as additional incidents took place.

[4] The FAC inadvertently contains two sets of paragraphs numbered 202-232, so citations to these paragraphs will also include page numbers for clarity.

potential victims. The FAC alleges that UT's practices "allow perpetrators of sexual assaults, particularly varsity football and basketball players, to delay and altogether avoid sanctions and discipline for sexual assault by the use of a discriminatory TUAPA procedure that allows only accused perpetrators of sexual assaults (and not victims) to have the right of confrontation, cross-examination and a right to an evidentiary administrative hearing." (*Id.* ¶ 6). It further alleges that:

> UT . . . is unique among U.S. colleges and universities by virtue of its use of a one-sided TUAPA administrative hearing procedure ('contested case') that denies victims the rights to a hearing and to the same equal procedural, hearing, and process rights as given to perpetrators of rape and sexual assault. UT further acted (and acts) intentionally and in clear violation of Title IX by acts of custom and an official policy whereby Chancellor Cheek appoints administrative judges and hearing officers favorable to athletes and then *also decides any appeals* from TUAPA hearings in a clear conflict of interest. A hostile sexual environment was created by this procedure and policy as varsity athletes were condoned and encouraged to have parties with alcohol and drugs, entertain recruits, provide alcohol to underage female students and commit sexual assaults with no discipline or deterrence against committing sexual assaults as perpetrators of assaults faced no serious consequences.

(*Id.* ¶ 7.)

The FAC also alleges that UT has engaged in an ongoing pattern of "interfering with and stopping the disciplinary process, concealing charges and investigations involving male athletes, arranging for specialized defense counsel for male athletes at UT facing criminal and sexual assault charges, discourag[ing] reporting by creating a culture of known tolerance for and protection of misconduct, and misusing the Tennessee Uniform Procedures Act by Chancellor (Cheek) selecting judges to hear cases involving athletes in a delaying process not in compliance with Title IX." (*Id.* ¶ 23.)

The FAC further alleges that, in addition to its improper response to allegations of athlete misconduct, UT has engaged in other practices that actually *foster* the creation of a sexually

4

hostile environment and make female UT students vulnerable to sexual assault. In particular, the FAC alleges that the UT Athletic Department has engaged in a pattern of "encouraging parties with underage drinking to benefit recruiting" (Docket No. 22 ¶ 23.) As a further example of UT's fostering of a sexually hostile environment, the FAC points to the fact that UT has adopted as its football anthem the song "Turn Down for What" by rapper Lil' Jon, who – according to the FAC – has been long associated with "sexual violence and rape culture." Further, on November 19, 2014, UT's Athletic Department surprised the football team with a visit from Lil' Jon, following his recent release of the song and music video "Literally, I can't," which contains crass lyrics and images about pressuring women to engage in sexual activity. (Docket No. 22 ¶¶ 148-153.)

In addition, the FAC alleges that complaints have been made to UT administrators by several UT officials, which demonstrate that UT was on notice of the need to address ongoing practices that encourage or condone ongoing misconduct by athletes, including sexual assault. According to the FAC, former Director of Student Judicial Affairs Jenny Wright raised concerns about a pattern and practice by the UT Athletic Department of interfering with disciplinary proceedings by "coaching witnesses to get their stories straight." (Docket No. 22 ¶ 51.) In 2011, Ms. Wright had been criticized and verbally berated by Mr. Hart for the outcomes of her investigations into alleged misconduct by UT athletes and, in April of 2013, Ms. Wright was allegedly instructed not to pursue an investigation into sexual assault allegations against a UT football player. (*Id*. ¶¶ 42, 52.)

The FAC also alleges that, in 2012, staff of the UT athletic department, including associate athletic director Debby Jennings, lodged complaints and lawsuits against Athletic Director and Vice Chancellor Dave Hart and the UT Athletic Department for replacing female

staff and administrators with male employees in order to create a "good ol' boys club." (Docket No. 22 ¶44.)

Last, according to the FAC, in May of 2013, Tim Rogers, UT's former Vice-Chancellor, was repeatedly rebuffed by Chancellor Cheek when he tried to voice concerns about a number of issues, including the following: 1) the Athletic Department's refusal to address or discuss the "inordinate" number of disciplinary cases and sexual assault allegations involving UT athletes (in particular, football and basketball players); 2) UT's refusal to consider changing its practice of housing female freshman students in a residence hall called Volunteer Hall alongside upper class male athletes; 3) UT's allowing a former football player to continue to serve as a Resident Assistant at Volunteer Hall, despite knowledge that he permitted underage consumption of alcohol, drug use, and sex parties to take place in the dorm; 4) UT's refusal to discuss launching a campus-wide program to address sexual assault or to otherwise train athletes about sexual assault and investigations; 5) the Athletic Department's constant criticism of disciplinary penalties given to athletes; 6) the Athletic Department's interference with, and cover-up of, allegations of misconduct by athletes, in order to preserve athletes' eligibility to compete; and 7) UT's abuse of TUAPA procedures to delay or prevent discipline of athletes. (Docket No. 22 ¶¶ 45-49, 53.) The FAC alleges that Mr. Rogers subsequently met with UT President Joe DiPietro, who also failed to respond with any substantive action, and, as a result, Mr. Rogers resigned from UT on March 6, 2013. (*Id*. ¶ 50.)

II. **Allegations Related to the Plaintiffs' Sexual Assaults and the "After" Claims**[5]

---

[5] The FAC contains many explicit details about the alleged sexual assaults of the plaintiffs, which the court will not recount for purposes of this motion. It is sufficient to note that there is no dispute as to whether the allegations qualify as allegations of sexual assault.

## A. Jane Doe I

According to the FAC, on February 15, 2013, plaintiff Jane Doe I was forcibly raped by a UT varsity basketball player at his apartment in Volunteer Hall and, the next day, a report was filed with the UT Police Department ("UTPD"). (Docket No. 22 ¶¶ 54-65.) The FAC alleges that UT attempted to limit public access to the records of the investigation into this assault that was conducted by the UTPD. (*Id.* ¶ 66.) Jane Doe I's assailant was allegedly represented in the subsequent disciplinary proceedings by an attorney who is a former UT athlete and a member of the UT Board of Athletics. (*Id.* ¶ 69.) This attorney allegedly frivolously requested an administrative hearing, and then requested a delayed hearing date, as part of a routinely-employed tactic to postpone disciplinary action until the assailant had been able to complete the remainder of the basketball season and successfully transfer to another school. (*Id.* ¶¶ 71- 81, 86-88.) The FAC alleges that Jane Doe I's assailant finished the season and the spring 2013 semester at UT, and then UT publicly announced that he was leaving the school on "good terms." (*Id.* ¶¶ 82-85.) Despite the fact that the assailant did not attend the evidentiary hearing and a default judgment was ultimately issued, Jane Doe I was allegedly subject to examination at the hearing by UT counsel and the administrative law judge, in which she was forced to recount her assault in detail and to answer questions that attempted to undermine or trivialize the incident. (*Id.* ¶ 89.) According to the FAC, the discipline sought by UT, and ultimately issued to Jane Doe I's assailant, was limited to indefinite suspension that went into effect after the assailant had already transferred to a different school. (*Id.* ¶¶ 90-91.)

Despite UT having issued a no-contact directive in February of 2013, Jane Doe I was allegedly contacted by her assailant in December of 2013, when he was no longer a UT student, which caused her to suffer from trauma and impaired her class attendance and academic

performance. (*Id.* ¶ 93.) While UT had previously notified Jane Doe I's Spring 2013 teachers that she had suffered a traumatic experience and would likely miss classes and need additional support, UT allegedly did not continue these efforts with respect to Jane Doe's classes in subsequent semesters, including following the December 2013 contact from her assailant. (*Id.* ¶¶ 68, 94.) As a result, Jane Doe I was informed by UT in May of 2014 that she was ineligible to remain in the nursing program because her GPA had dropped to .08 points below the mandatory minimum requirement. (*Id.* ¶¶ 92, 95-96.) UT was allegedly unwilling to offer any leniency on this policy, despite being provided with a letter from Jane Doe I's therapist at UT that her drop in academic performance was related to her assault. (*Id.*)

### B. Jane Doe II

On September 6, 2014, according to the FAC, plaintiff Jane Doe II was forcibly raped by a UT varsity football player in Volunteer Hall, during a fraternity party where alcohol was provided. (Docket No. 22 ¶¶ 119-122.) An initial investigation by the Director of Student Conduct and Community Standards led to a determination by UT's Office of Student Judicial Affairs that Jane Doe I's assailant had sexually assaulted her. (*Id.* ¶ 119, 123-131.) UT later withdrew that finding, however, without offering Jane Doe II a hearing. (*Id.*) In doing so, UT relied on the suspiciously identical accounts of the assailant's teammates and a video of Jane Doe II at an unspecified time after the assault, in which she tripped while walking barefoot in a dorm stairwell. (*Id.*) UT also discounted the accounts of Jane Doe II and other witnesses as well as photographs of Jane Doe II's torn clothing, and, ultimately, found that: 1) Jane Doe II could not have been incapacitated at the time of the incident; 2) the sexual encounter had been consensual; and 3) there had been no student conduct violation. (*Id.*) Nevertheless, and in seeming contradiction to these findings, UT declined to officially find that Jane Doe II's report

of sexual assault had not been made in good faith. (*Id.*) As a result of UT's finding that her perpetrator did not commit any misconduct and would not be disciplined and the public humiliation of being presumed to have made a false report, Jane Doe II left UT in January of 2015. (*Id.* ¶ 130.)

### C. Jane Doe III

The FAC alleges that, on October 12, 2014, plaintiff Jane Doe III, while incapacitated, was sexually assaulted by a male UT student and two other individuals. (Docket No. 22 ¶¶ 135-138.) The assault allegedly took place after a party at Volunteer Hall where Jane Doe III, a minor, was provided alcohol by several members of the UT football team. (*Id.*) UT was notified of the assault shortly after it took place and issued a no-contact order, but Jane Doe III allegedly spotted the UT student who assaulted her at her dorm on multiple subsequent occasions, despite the fact that he lived elsewhere in off-campus housing. (*Id.* ¶ 140.) A hearing did not take place in this matter until February of 2016, and the investigation and disciplinary proceedings remain pending. (*Id.* ¶¶ 143-147.) According to the FAC, UT has not sought adequate disciplinary measures and has allowed the assailant to remain in school. (*Id.*) The FAC alleges that, as a result, Jane Doe III withdrew from UT mid-semester and has not returned, and this has negatively impacted her eligibility for scholarships and financial aid. (*Id.* ¶¶ 141-142.)

### D. Jane Doe IV

In the early morning of November 16, 2014, according to the FAC, plaintiff Jane Doe IV was forcibly raped by two UT football players during a party hosted by the football team to celebrate a victory and to entertain visiting football recruits. (Docket No. 22 ¶¶ 154-161.) Alcohol and marijuana were allegedly in use at the party, and UT football players provided alcohol to minors, including the recruits. (*Id.*) The FAC alleges that the apartment where the

party was held was owned by a UT athletic booster and controlled by the UT Athletic Department and that it was occupied by one of the UT athletes who had been involved in a prior alleged sexual assault (in which Jenny Wright was allegedly told to stop any disciplinary action, as mentioned above).  (*Id*.)  UT allegedly became aware of Jane Doe IV's sexual assault on the same day it occurred.  (*Id*. at 162.)

Immediately after she was assaulted, Jane Doe IV and her friends were picked up from the parking lot outside the apartment complex by UT varsity football player Drae Bowles, who noticed that Jane Doe IV was distressed and drove her and her friends to Volunteer Hall; during the ride, Jane Doe IV informed Mr. Bowles of the rape and then called 911 to report it.  (*Id*. ¶¶ 190-92.)  Later that same day, Mr. Bowles was allegedly approached in the locker room by one of his teammates who had been at the party where Jane Doe IV was assaulted.  This teammate asked about Mr. Bowles' involvement in reporting the rape, accused Mr. Bowles of trying to incriminate one of Jane Doe IV's assailants (who was, apparently, a prominent member of the UT football) team, and then punched Mr. Bowles in the mouth.  (*Id*. ¶ 193.)  When Mr. Bowles reported this incident to Coach Jones, Coach Jones allegedly said that he was disappointed in *Mr. Bowles* and that Mr. Bowles had betrayed the team.  (A few hours later, Coach Jones apologized to Mr. Bowles.)  (*Id*. ¶¶ 194-95.)  The following day, November 17, 2014, Mr. Bowles was eating alone at a grill inside an athletic training center, when he was allegedly shouted at and physically threatened by two other members of his team in the presence of team coaches, who then intervened to allow Mr. Bowles to leave unharmed.  (*Id*. at 196-198.)  Jane Doe IV learned of this incident in real time through text messages, while she was in a meeting with UT representatives about her assault; she relayed the incident to the UT administrators, but they said only that they would look into it.  (*Id*. ¶¶ 169-171.)  Jane Doe IV later learned of the earlier

locker room attack on Mr. Bowles and brought that to the attention of UT administrators as well, but, again, she allegedly received no response. (*Id.* ¶¶ 172-173.) In subsequent interviews with the police, one of the teammates who had threatened Mr. Bowles allegedly stated that Mr. Bowles had betrayed the team. (*Id.* 199.) According to the FAC, following these incidents, Coach Jones instructed the team to stay away from Mr. Bowles and did not discipline any of the team members who had assaulted or threatened Mr. Bowles, despite their having admitted to the police that they did. (*Id.* 199-203 (p. 40).) As a result of being shunned by his team and Coach Jones, Mr. Bowles ultimately left UT and transferred to a different school. (*Id.* ¶¶ 204-208 (pp. 40-41).)

Despite Jane IV's assault having been immediately reported to the Knoxville police and UT, including to Coach Jones and the Athletic Department, one of the assailants, along with another teammate, allegedly began calling and texting Jane Doe IV and her roommate and teammates in an attempt to persuade Jane Doe IV to not pursue an investigation or disciplinary proceeding. (*Id.* ¶¶ 163-165.) The FAC suggests that this demonstrates a failure of the UT Athletic Department to properly instruct athletes about appropriate behavior in the aftermath of an assault allegation against a teammate. During the meeting between Jane Doe IV and UT representatives on the day after her assault, Jane Doe IV allegedly voiced her concerns about prior victims of assault by UT football players having been harassed on campus. (*Id.* ¶174.) The administrators assured Jane Doe IV that the assailants would be immediately suspended from team activities but, over the following days, Jane Doe IV allegedly discovered that her assailants had been allowed to remain on campus and to access the academic support centers shared by women's and men's athletics. (*Id.*) Also within days of the assault, public statements were allegedly issued by UT's football coaching staff in support of one of Jane Doe IV's assailants,

who was then allowed to graduate a few weeks later in a special assembly for members of the UT Athletic Department. (*Id.* ¶¶ 166-168, 179-184.) Photos of him from that assembly were publicly posted on the official UT football Twitter account. (*Id.*) According to the FAC, photos and messages that have been posted on social media, some as recently as November of 2015, show UT football coaches and players continuing to stand behind Jane Doe IV's assailant. (*Id.* ¶¶ 185, 263.) The FAC alleges that, in February of 2015, Jane Doe IV asked the coach of her own UT varsity team to schedule a conference for her with UT's Tile IX Coordinator but, despite the coach's agreement to do so, no such conference was ever scheduled, and Jane Doe IV has allegedly received no further communication from the Title IX Coordinator. (*Id.* ¶ 186.)

According to the FAC, UT's investigation into Jane Doe IV's assault took six months and resulted in a finding of student misconduct, but no disciplinary action has yet been taken. (*Id.* ¶ 187.) Jane Doe IV has been subject to character attacks and threats on social media and sports blogs. (*Id.* ¶ 188.) As a result of this and the actions of UT's coaches, administration, and Athletics Department, Jane Doe IV was forced to "sit out the Spring, 2015 semester while trying to find another place to continue her education and collegiate athletics (which had afforded [her] the financial opportunity to attend school in the first place)." (*Id.* ¶ 189.) Jane Doe IV ultimately left UT because she was afraid of encountering her assailants and because, based on her knowledge of prior discipline taken against athletes (or lack thereof), she did not believe her assailants would be adequately disciplined or that she would be adequately protected. (*Id.* ¶¶ 175-178.)

### E. Jane Doe VI

The FAC alleges that, on February 5, 2015, plaintiff Jane Doe VI was sexually assaulted by a UT football player who had been dating her roommate and who had made prior sexual

advances toward Jane Doe VI, which she had informed him were unwanted. (Docket No. 22 ¶ 222 (pp. 42-43).) After the assault was reported to the police, the assailant's roommates, who were also UT football players, allegedly made repeated calls to Jane Doe VI's roommate, pleading and threatening for Jane Doe VI to drop the accusations; this is despite the fact that these football players should have received extensive education about the impropriety of attempting to contact the victim of an alleged sexual assault. (*Id*. ¶¶ 225-229 (pp. 43-44).) UT football players, not including the assailant, then allegedly told Jane Doe VI's boyfriend, and his parents, that he should "stay away" from Jane Doe VI, in violation of a no-contact order between the players and Jane Doe VI that the FAC alleges should have extended to her friends and family. (*Id*. ¶¶ 229, 206 (pp. 43-45).) According to the FAC, UT's investigative findings did not include any reference to these communications, and there was no resulting discipline to the UT football players who communicated with Jane Doe VI and her boyfriend and roommate. (*Id*. ¶¶ 230, 203 (p. 44).) Jane Doe VI is not aware of any efforts by UT to notify her teachers of her assault in order to afford her any necessary academic remedies. (*Id*. ¶ 228 (p. 43).)

UT's investigation of Jane Doe VI's assault allegedly followed a pattern of discounting the victim's statement and credibility, were biased toward the athlete's version of events, conveyed a misunderstanding and misapplication of "consent," and heavily relied on the refusal of certain witnesses to participate in the investigation, while overlooking evidence that these witnesses and their families had been contacted by football players. (*Id*. ¶¶ 231-232, 202, 204-05 (p.44).) According the FAC, as a result of the assault, Jane Doe VI "was forced to move out of the apartment and return home with her parents" and was "forced to miss class on multiple occasions for court and other appointments relating to the alleged assault." (*Id*. ¶¶ 206-207.) Despite providing her teachers with documentation to support her absences, the volume of

absences eventually necessitated Jane Doe VI's withdrawal from school for the semester with no credits earned. (*Id*. ¶¶ 208-210 (p.45).) As a result, UT allegedly determined that she no longer qualified for a continuation of her scholarships and financial aid and offered no accommodations in light of her assault. (*Id*.) Some of Jane Doe VI's challenges to these decisions remain pending. (*Id*.) Meanwhile, Jane Doe VI's assailant was allegedly permitted to remain in school through his graduation at the end of the spring 2015 semester, with photos of him at his graduation posted through UT's official website, identifying him as an athlete. (*Id*. ¶¶ 211-212 (p. 45).)

### F. *Jane Doe VII*

According to the FAC, in the early morning of April 24, 2015, plaintiff Jane Doe VII was forcibly raped by a UT football player at an off-campus apartment where he lived with other football players, after having accepted an invitation by him and his friends, some of whom she knew, to go to the apartment the night before and hang out with the football players and some other UT students. (Docket No. 22 ¶¶216-227 (pp. 47-48).) Immediately after the assault, while exiting the apartment complex, Jane Doe VII was allegedly assisted by other students, who took her to the UT Police Department. (*Id*. ¶¶228-229 (p. 48).) UT and Athletic Department administrators, including UT football coaches, were made aware of the assault soon after and spoke to the UT football players about the incident early that same morning. (*Id*. ¶232 (pp. 48-49).) During the course of the day, after the football players were advised by their coaches, Jane Doe VII allegedly received two phone calls from other students and football players, with the assailant participating in the call. (*Id*. ¶¶ 230-231 (p. 48).) This is despite the fact that, the FAC alleges, the football players should have already received extensive education about contacting the victim of an alleged sexual assault. (*Id*. ¶¶ 233, 243.)

The FAC alleges that, on April 25, 2015, UT issued an interim suspension for Jane Doe VII's assailant, and, two days later, also issued a no-contact order between Jane Doe VII and the assailant. (*Id*. ¶¶ 234-235.) On May 4, 2014, however, UT allegedly lifted the suspension, following a hearing before the Assistant Vice Chancellor for Student Life. (*Id*. ¶¶236-238.) On May 6, 2015, the Dean of Student Life overturned the May 4th ruling and re-imposed the suspension, but Jane Doe VII was not told of these hearings or of the temporary lift of the suspension until a later time. (*Id*.) According to the FAC, the temporary lifting of the suspension allowed the assailant to complete his final exams for the semester and preserve his academic eligibility to play football the following semester. (*Id*. ¶¶ 239-240.) Despite the no-contact directive, the assailant's attorney allegedly hired a private investigator, who contacted multiple witnesses during the course of UT's investigation. (*Id*. ¶ 241.) On July 9, 2015, UT issued its finding that the assailant had violated UT's Standards of Conduct by engaging in sexual conduct with Jane Doe VII without her consent and, on July 22, 2015, the assailant requested a disciplinary hearing. (*Id*. ¶¶243-244.) On August 5, 2015, the Knox County District Attorney's Office announced that it would not pursue charges against the assailant and, on August 7, 2015, UT lifted the suspension and reinstated Jane Doe VII's assailant to the football team, announcing his eligibility to re-enroll at UT like any other student, without giving Jane Doe VII any notice or opportunity to participate in the decision. (*Id*. ¶¶ 245-248.) According to the FAC, Jane Doe VII's assailant was given preferential treatment to be permitted to reenroll after the deadline for readmission had passed. (*Id*. ¶ 249.)

The disciplinary hearing for Jane Doe VII's assailant was not scheduled until November of 2015. (*Id*. ¶ 250.) The FAC alleges that, due to the delay, and the assailant's reinstatement to the football team, Jane Doe VII, was "forced to leave UT." (*Id*. ¶ 251.) Jane Doe VII obtained

counsel and intended to participate in the disciplinary hearing, but the hearing was ultimately postponed until January of 2016, just weeks before her assailant's eligibility to play football would have expired. (*Id*. ¶¶ 255-256.) As a result, and because participating would have required her to travel and to take time from classes at her new school and be subject to cross examination, Jane Doe VII notified the University in January of 2016 that she would not participate. (*Id*.) UT ultimately did not proceed with the disciplinary action and the hearing did not take place. (*Id*. ¶¶257-258.) The FAC alleges that the only discipline Jane Doe VII's assailant received is that he was forced to miss one scrimmage game during his suspension in April of 2015. (*Id*.)

### G. Jane Doe VIII

According to the FAC, plaintiff Jane Doe VIII is a current UT student, enrolled in classes for the Spring 2016 semester.[6] (Docket No. 22 ¶ 264.) On February 14, 2016, she was allegedly sexually and physically assaulted by a UT football player at his apartment in Volunteer Hall. (*Id*. ¶¶ 265-270.) The FAC alleges that Jane Doe VIII reported the assault to the UT Athletic Department on the same day, and her report has subsequently been conveyed to UT's Title IX Coordinator. (*Id*. ¶271.) The FAC states that Jane Doe VII will not return to school following this incident. (*Id*. ¶ 274.) The FAC contains no allegations regarding UT's investigation and disciplinary proceedings related to this incident and, unlike the other plaintiffs who were sexually assaulted, the section of the FAC outlining Jane Doe VIII's claims includes only a

---

[6] The FAC actually states that she last enrolled in classes for the Spring *2015* semester, but this appears to be a typo since the allegations in the FAC all otherwise indicate that she was attending school at UT at the time she was assaulted in February of 2016.

"before" claim and not an "after" claim. Further, there is no reference to any basis for Title IX liability to Jane Doe VIII arising from UT's response to her assault.

### III. Allegations Related to Jane Doe V's Retaliation Claim

The FAC does not alleged that Jane Doe V was the victim of a sexual assault. She was a teammate, roommate, and friend of Jane Doe IV at the time of Jane Doe IV's assault. (Docket No. 22 ¶209 (p. 41).) According to the FAC, Jane Doe V received multiple communications from one of Jane Doe IV's assailants and from other football players, intending to discourage her and Jane Doe IV from reporting Jane Doe IV's rape. (*Id*. ¶ 210 (p. 41).) Jane Doe V allegedly reported these communications to UT coaches, but received no response. (*Id*.) Jane Doe V also allegedly spotted one of Jane Doe IV's assailants in the academic center for athletes after Jane Doe IV had been assured that her attackers would not be permitted in athletic facilities. (*Id*. ¶¶ 212, 214-215 (pp. 41-42).) Jane Doe V witnessed the attacks on Mr. Bowles, including the one that took place in the sports grill in the presence of UT coaches. (*Id*.) Jane Doe V allegedly reported all of these things to UT administrators, though no action was taken by UT in response. (*Id*.) The FAC alleges that, as a result, Jane Doe V was traumatized and "fearful of personal recrimination for her participation in the Title IX investigation of Jane Doe IV." (*Id*. ¶ 213 (p. 41).)

According to the FAC, Jane Doe V "was forced to move dorm rooms and her grades suffered" and, later, she "was forced to leave school." (*Id*. ¶¶ 216-218 (p. 42).) Jane Doe V has been diagnosed with PTSD with severe anxiety and was medically restricted from attending school during the entire Spring 2015 semester, though she has attempted to remain in contact with her coach in the hopes of returning to school when medically cleared. (*Id*.) The FAC alleges, however, that, in March or April of 2015, she was told by her coach that her "return

would be conditioned on requirements that she (Plaintiff Doe V) could not associate or socialize

with the same group of people – insinuating that the rape and events that had followed were

somehow the result of the girls' (members of the row team, including Plaintiff Doe IV's)

actions" and she was, therefore, "forced to look to other schools."  (*Id.* ¶ 218 (p. 42).)

## PROCEDURAL HISTORY

The plaintiffs initiated this action on February 9, 2016 (Docket No. 1) and, on February

22, 2016, they filed the FAC, which is the current operative pleading (Docket No. 22).  The FAC

brings the "before" and "after" Title IX claims discussed above, on behalf of Jane Does I-IV and

VI-VIII, and the Title IX retaliation claim on behalf of Jane Doe V.  In addition to seeking

compensatory damages, the FAC includes a request for injunctive relief, which is stated as

follows:

> Plaintiffs seek a mandatory injunction ordering [UT] to refrain from unlawful
> discrimination and/or retaliation, ordering UT to undertake and rectify any and all
> Title IX violations and/or inequities, ordering UT and its athletic department to
> refrain from creating and condoning a hostile sexual harassment and/or
> discrimination environment against individuals on the basis of sex by immediately
> ceasing deliberate indifference to sexual assaults; direct interference with the
> disciplinary process in favor of male athletes who were charged with rape;
> directly supporting, maintaining and controlling environments for athletes in the
> major sports of football and basketball that encouraged underage drinking, drug
> use and rape; arranging for/facilitating lawyers for athletes accused of sexual
> assault, providing or subsidizing premises known as party houses for athletes used
> for underage drinking and drugs to entice recruits to come [to] UT; unlawfully
> discriminating against victims of sexual assault and fostering a hostile sexual
> environment by the misuse of a one-sided [TUAPA] procedure.

(Docket. No. 22 ¶ 316.)  The FAC also includes a section titled "Count III: Preemption of

TUAPA by Title IX and the Campus Save Act," in which the FAC alleges that UT's "application

of the TUAPA process is preempted by federal law," specifically arguing that UT's timeline for

invoking disciplinary procedures and its allowance of cross-examination of victims by their

perpetrators are measures that comply with TUAPA but violate Title IX and the Campus Save

Act. (Docket No. 22 ¶¶ 317-330.) Relatedly, the first paragraph of the FAC states:

> Plaintiffs also sue under the Supremacy Clause, Article VI, Clause 2, of the
> United States Constitution to bar UT from application and enforcement of a state
> statute and official policy (the Tennessee Uniform Administrative Procedure Act,
> T.C.A. § 4-5-101 *et seq*.) in sexual assault cases on campus in derogation of Title
> IX and the Campus Save Act, 20 U.S.C. § 1092 (2012 (that *preempt* the TUAPA).

(Docket No. 22 ¶ 1.)

Finally, the FAC alleges that all claims are timely filed, specifically stating: "The

University of Tennessee and Plaintiffs entered into a 'Tolling Agreement,' that tolled the

applicable statute(s) of limitations such that this suit is timely filed as to Jane Does I-VI. Jane

Doe VII and Jane Doe VIII were sexually assaulted (raped) on April 24, 2015 and September 30,

2015, respectively and suit is therefore timely filed." (Docket No. 22 ¶11.)

On March 9, 2016, UT filed the pending Motion to Dismiss, raising several grounds for

dismissing various of the claims at issue under Rule 12(b)(6) and, relatedly, seeking to strike

portions of the FAC relating to some of these claims.[7]

Attached to UT's Memorandum in support of its Motion to Dismiss are a number of

documents that, combined, constitute the tolling agreement between the parties that was

referenced in (but not attached to) the FAC. (Docket No. 32-1.) It appears that, initially, UT

entered into a tolling agreement with only Jane Doe 1, which was later amended to include other

plaintiffs and to toll any applicable statutes of limitation or statutes of repose through the time

---

[7] The Motion to Dismiss (Docket No. 31) additionally sought to dismiss this entire action for lack of venue under Rule 12(b)(3), to, alternatively, transfer the action to the Eastern District of Tennessee, and to strike Paragraph 26 of the First Amended Complaint. These portions of the Motion have already been denied by the court's March 29, 2016 Order (Docket No. 37). The Memorandum accompanying that Order provides a more complete description of the procedural history in this case to date, which the court will not repeat herein. (Docket No. 36.)

period in which this action was ultimately filed.  (*Id*.)  The initial agreement with Jane Doe I is

dated May 19, 2015 and includes the following language:

> Notwithstanding anything stated herein to the contrary, any statute of limitations
> or statute of repose applicable to any Claim that has expired prior to the Effective
> Date [of the tolling agreement] shall not be resurrected or tolled by the
> Agreement, and any Claim that is governed by a statute of limitations or statue of
> repose that has expired prior to the Effective Date shall be barred and incapable of
> being asserted against [UT].  Provided, however, nothing contained in this
> Agreement shall be deemed to be a waiver of the Claimant's ability to argue that a
> Claim is timely as of the Effective Date and is not time barred.

(*Id*. at 1.)

On March 23, 2016, the plaintiffs filed a response.  (Docket No. 35.)  On March 31,

2016, UT filed a Reply.  (Docket No. 41.)

## LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court

will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff."  *Directv, Inc. v. Treesh*, 487

F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).  The

Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement

of the claim that will give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The court must

determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged.  *Swierkiewicz v. Sorema N.A.*, 534

U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the

speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To establish the

"facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## ANALYSIS

In its Motion to Dismiss, UT raises a number of arguments. Before turning to the merits of UT's requests to dismiss claims at issue in this action, the court notes that UT has also raised three requests to dismiss claims that are not currently before the court and, which, therefore do not warrant a substantive analysis.

First, UT argues that the court should dismiss any claims or defendants that were included in the initial Complaint filed in this action but were subsequently absent from the FAC, namely a 28 U.S.C. § 1983 claim against UT's Director of the Office of Student Conduct & Community Standards. (Docket No. 32, p. 24.) Because the FAC has replaced the initial Complaint in this action, and the FAC neither includes a § 1983 claim nor names anyone other than UT as a defendant, these claims are no longer before the court and the court cannot – and need not – dismiss them.

Second, UT argues that the court should dismiss the "after" claim of Jane Doe VIII. The FAC, however, does not include any such claim and, indeed, there are no allegations in the FAC relating to UT's response to Jane Doe VIII's assault, which took place just days before the FAC

was filed.  In fact, the plaintiffs concede in their briefing that they have brought no such claim.[8] (Docket No. 35, pp. 18-19.)  The court, therefore, need not address the question of dismissing this claim that is not currently pending.

Finally, UT argues that the court should dismiss the plaintiffs' claim for "preemption," referring to Count III of the FAC, which alleges that TUAPA is preempted by Title IX and the Campus Save Act.  As the plaintiffs concede (*Id*. pp.1-2, n.5), UT is correct that there is no such thing as a private cause of action for preemption, nor is there a private right of action under the Supremacy Clause, and, therefore, the court need not address whether to dismiss any such claim. The court understands Count III of the FAC not as raising its own cause of action, but rather as a part of the plaintiffs' request for injunctive relief, which includes enjoining UT to amend its application of TUAPA, based on the theory that UT's current TUAPA practices violate Title IX and the Campus Save Act.  While the parties devote a sizeable amount of their briefing to the question of whether TUAPA is, in fact, preempted by federal law, the court does not decide this question at this time.  If the plaintiffs had brought a claim against UT for violating TUAPA, UT might have sought to dismiss this claim on the grounds that TUAPA is preempted and, therefore, unenforceable.  In this case, however, the plaintiffs appear to concede that UT has complied with TUAPA and seek injunctive relief only on the ground that, as they claim, UT has, nevertheless, violated federal law.  Whether TUAPA, on the whole, is preempted is irrelevant to the fact-specific question of whether UT's specific application of TUAPA – in conjunction with its other policies – violates federal law.  The plaintiffs cannot rest their claims for injunctive relief under

---

[8] As discussed further below, *infra* pp. 37-38, Jane Doe VIII has standing, however, to bring a claim for all types of injunctive relief sought in this action, based on her allegations of sexual assault alone.

Title IX on the argument that Title IX preempts TUAPA, nor can UT seek to dismiss the plaintiffs' claim for injunctive relief on the grounds that it does not.

UT's Motion to Dismiss also raises several different grounds for dismissal of certain claims by various plaintiffs that *are* at issue in this action. Specifically, UT argues that all of the "before" claims of plaintiffs Jane Doe I-IV and VI-VIII, which seek to hold UT liable for the actual sexual assaults suffered by these plaintiffs, are categorically non-cognizable under the law and, therefore, should be dismissed and, relatedly, that all portions of the FAC related to the "before" claims (which UT identifies as ¶¶ 2, 3, 9, 10, 23-26, 27-53, 97-105, 106-118, 132-134, 148-152, 158, 219-221, 213-215 (p. 46), 259-262, 309-310, 311 a-q, 336, 345, 354, 362, 370-71, 380, 388, and 395) should be stricken from the FAC. UT also challenges the "before" claim of Jane Doe I on the alternate ground that it is barred by the applicable statute of limitations. UT also argues that Jane Doe V's claim for retaliation should be dismissed because she has failed to allege all of the necessary elements of a Title IX retaliation claim. Finally, UT argues that the plaintiffs' claim for injunctive relief should be dismissed because the plaintiffs lack standing to request an injunction in this action or, alternatively, because they have not pled their request for injunctive relief with the requisite specificity. The court will address each of these issues in turn.[9]

I.    **Enforceability of "Before" Claims For Jane Does I-IV and VI-VIII**

---

[9] The court notes that the Motion to Dismiss does not raise any argument under Rule 12(b)(6) to dismiss the "after" claims of Jane Does I-IV and VI-VII, and those claims are not discussed herein. The pending motion is styled as a Motion to Dismiss, rather than a *partial* motion to dismiss because, as mentioned *supra* n. 7, the motion also sought to dismiss the entire action for lack of venue under Rule 12(b)(3), and that request has already been denied.

In 1998, the Supreme Court addressed the question of when a Title IX funding recipient may be liable in damages for sex-based discrimination or harassment by a third party, someone other than the funding recipient itself. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998). *Gebser* involved a claim to hold a school district liable for the ongoing sexual molestation of a student by a teacher. *See id.* In attempting to "define the contours of that liability," (*id.* at 281) the *Gebser* Court held that, as in actions under 28 U.S.C. §1983, such liability could not be premised on a theory of vicarious liability or *respondeat superior. Id.* at 285. Rather, *Gebser* held that, "in cases like this one *that do not involve official policy* of the recipient entity, we hold that a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and institute corrective measures on the recipient's behalf has *actual knowledge of discrimination in the recipient's program and fails to adequately respond*." *Id.* at 290 (emphases added). This language not only defines the elements of establishing a funding recipient's liability for a third party's misconduct that does not arise from the funding recipient's policies (actual knowledge and deliberate indifference), it also appears to leave open the possibility that Title IX liability may also attach to a funding recipient where a third party's actions *are* the direct result of an official policy. [10]

---

[10] Indeed, such a holding would comport with *Gebser's* likening of Title IX funding recipient liability for third-party acts to municipal liability for third party acts under § 1983. *See Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013) (holding that, in order to show municipal liability for an officer's actions under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), a plaintiff must demonstrate one of the following: "1) the existence of an illegal official policy or legislative enactment; 2) that an official with final decision making authority ratified illegal actions; 3) the existence of a policy of inadequate training or supervision; or 4) the existence of a custom or tolerance of, or acquiescence in, federal rights violations.")

In 1999, the Supreme Court extended the holding in *Gebser* to expressly apply to Title IX cases involving student-on-student harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). In considering whether a school could be liable under Title IX for the ongoing harassment of a single student plaintiff by one particular peer, *Davis* held that liability was appropriate so long as the school had acted "with deliberate indifference to known acts of harassment" that were "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. In keeping with *Gebser's* model of premising Title IX third-party liability on the same bases that support municipal liability for third-party acts under §1983, *Davis* held:

> If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference subjects its students to harassment. That is, the deliberate indifference must, at a minimum, cause students to undergo harassment or make them vulnerable to it.

*Id.* at 644-45.

While the court is not aware of any case before the Sixth Circuit where Title IX liability for third-party acts has been premised on an *official policy* of the funding recipient, rather than on actual knowledge and deliberate indifference to known acts of harassment, the court finds that *Gebser* and *Davis* could support such a theory. The court is also swayed by the Tenth Circuit's decision in *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170 (10th Cir. 2007), which held that Title IX liability could attach to a university for the sexual assault of students by university football players and recruits, where the sexual assault is the result of an official university policy. In *Simpson*, the official policy was the university's hosting of a recruiting event for incoming athletes, in which the recruits were paired with female host students to entertain them, and the university ignored the fact that this event created an expectation of sex by the recruits, that prior

sexual assaults by recruits had occurred at similar past events, and also ignored warnings by the local District Attorney to develop policies for supervising recruits and training football players on sexual harassment.  *See Simpson*, 500 F.3d 1170.  *Simpson* cites the language of *Gebser* and *Davis* quoted above to find that an official policy theory, like that under §1983, can also support Title IX liability.  *See Id.* at 1174-79.  Contrary to UT's assertions, there is no basis to find that the Sixth Circuit would not recognize such a theory of liability.  UT argues that adopting *Simpson* would be contrary to the prior Sixth Circuit decision in *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510-11 (6th Cir. 2001).  *Klemencic*, however, actually supports the extension of Title IX liability to mirror liability under §1983.  *See Klemencic*, 263 F.3d at 510 ("In *Gebser* the Supreme Court endorsed the idea that institutional liability under § 1983 and Title IX is comparable.")

UT appears to focus on the following language from *Klemencic*: "In §1983 cases, a school would be liable only if a teacher acted pursuant to an official policy [citing *Soper*, 195 F.3d at 853], while, in Tile IX actions, a school would be liable only if it received actual notice of harassment and responded to it with 'deliberate indifference' [citing *Gebser*, at 292-93]." *Klemencic*, 263 F.3d at 511.  Taken out of context, this language could arguably be understood to mean that § 1983 liability can arise from an official policy *only* (and not from deliberate indifference to actual knowledge of prior misconduct) and that Title IX liability can arise *only* from deliberate indifference to actual knowledge of prior misconduct and not from an official policy.  Not only in this inconsistent with the established scope of liability under § 1983 (*see supra* n. 10), it is also a patent misunderstanding of the language in *Klemencic*.  *Klemenic* was simply explaining, *in dicta*, that, under the specific facts of *Gebser* (where no official policy was at issue), liability could attach only if the facts showed the requisite elements of actual

knowledge and deliberate indifference, while the *Soper* court explained that §1983 liability required some type of official policy or custom.  The true point of this language is to liken Title IX liability to § 1983 liability and supports, rather than undermines, the likelihood that the Sixth Circuit would recognize the theory of liability relied on in *Simpson*.

The Sixth Circuit has also extended the holdings in *Gebser* and *Davis* (which both involved deliberate indifference to ongoing harassment between *one* third-party perpetrator and *one* victim) to allow liability where the funding recipient was deliberately indifferent to prior acts of harassment against the same plaintiff by different third-party perpetrators.  *Patterson v. Hudson Area Schs.*, 551 F.3d 438 (6 th Cir. 2009); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000)).  *Vance* held that, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of known circumstances.  *Vance*, 231 F.3d at 261.  Several Sixth Circuit cases also suggest that liability is appropriate where the funding recipient was deliberately indifferent to known prior acts of harassment by the same perpetrator against victims other than the plaintiff, although these cases ultimately declined to find liability because the particular fact patterns did not support a finding that the defendant both had notice of these prior incidents and acted with deliberate indifference.  *See McCoy v. Board of Educ. of Columbus Cty. Schs.*, No. 12-3040, 2013 WL 538953 (6th Cir. Feb. 13, 2013); *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479 (6th Cir. 2006); *Williams ex. Rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005)[11]; *see also Lopez v. Metro Gov't*, 646 F.Supp. 2d

---

[11] In 2012, the Sixth Circuit also issued an opinion that has confusing language as to whether a plaintiff can premise a Title IX claim on the defendant's notice of prior harassment of other victims.  *See Pahssen v. Merrill Community School District*, 668 F.3d 356, 363-64 (6th Cir. 2012) (stating that "[i]ncidents involving third-party victims lack relevance unless the plaintiff

891 (M.D. Tenn. 2009) (holding that a defendant's notice of prior harassment against victims other than the plaintiff can give rise to Title IX liability, so long as the defendant "possessed enough knowledge of the harassment that it could reasonably have responded with remedial measures to address the kind of harassment upon which the plaintiff's legal claim is based.").

For these reasons, the court finds that there are two potential grounds for establishing UT's Title IX liability for the plaintiffs' "before" claims based on the allegations in the FAC. First, in line with *Davis* and *Vance*, the plaintiffs have alleged that UT had actual knowledge of prior incidents of sexual assault by UT football and basketball players that were sufficient to put UT on notice of the risk to the plaintiffs, yet UT was deliberately indifferent in failing to adequately address this risk, including failing to change its remedial measures which were not effective. Second, under the theory advanced in *Simpson*, which extends *Gebser* and *Davis* to permit Title IX liability to arise from official policies of funding recipients, the FAC has alleged a number of official policies by UT that rendered the plaintiffs vulnerable to assault.

The court is not swayed by UT's argument that, because none of the individual students who assaulted the plaintiffs are alleged to have had a known history of prior sexual misconduct, the plaintiffs did not adequately allege that UT had actual knowledge of harassment to support liability under *Davis*. UT characterizes the plaintiffs' "before" claims as attempting to attach

---

can show that the incidents deprived *her* of such access" to educational opportunities). While this language in *Pahssen* could be read to suggest that a Title IX claim must be based only on the defendant's knowledge of prior harassment of the *plaintiff*, the court finds that this is not the proper reading, as it is not in keeping with the other Sixth Circuit cases cited above and is also not consistent with *Pahssen's* own ultimate finding that liability was not appropriate because the plaintiff's school was *not deliberately indifferent* to incidents involving other victims (because these incidents occurred off school grounds and, the defendant school could not have disciplined them). *See Id*.

liability to UT based on "the general risk that some students will harass other students" and "superimposing stereotypical assumptions about sex and gender on an entire class of students." (Docket No. 32, p.7.)[12] UT overlooks, however, that the plaintiffs allege far more than UT's knowledge of general risks or stereotypical assumptions; to the contrary, the plaintiffs allege that UT was put on notice of a specific and concrete pattern of an "inordinate" number of sexual assault allegations against members of specific teams within the UT Athletic Department and also allege that such a pattern may be directly related to the culture within the Athletic Department. In fact, the entire FAC is precisely structured around the theory that liability stems from UT's failure to acknowledge and address the acute risks to female students by a certain segment of its student body that are well above and beyond the general risks of student-on-student harassment.[13] UT's reliance on *Escue v. Northern Okla. Coll.* to suggest that this notice

---

[12] UT also suggests, elsewhere in its briefing, that allowing the "before" claims to proceed may violate Title VI because African American students, who are disproportionately represented among the UT football and basketball teams, will be disparately impacted. (Docket No. 32, pp. 13-14.) This argument is an absurd distortion of the issues currently before the court. As discussed herein, the plaintiffs' "before" claims will proceed solely based on the concrete allegations in the FAC that UT has engaged in a pattern of deliberate indifference to prior sexual assaults by male UT athletes and that UT has established official policies that increase the likelihood of sexual assaults by male UT athletes. Nothing in this opinion should be read to in any way endorse any stereotypes about African American students, student athletes, or male students, at UT or more generally.

[13] In fact, *Delgado v. Stegall*, cited by UT for the proposition that liability cannot arise from the general risk of sexual harassment between students, actually supports a finding that the plaintiffs' allegations could give rise to Title IX liability for UT. *Delgado*, 367 F.3d 668, 672 (7th Cir. 2004) (Title IX liability applies "only when the funding recipient has notice of risks so great that they are almost certain to materialize if nothing is done, for it is only in such cases that recklessness regarding the consequences if the risk materializes merges with intention to bring about the consequences." (internal citations omitted)). While it may be difficult for the plaintiffs to establish facts to show that the risks of sexual assault by UT football and basketball players were "almost certain to materialize," the allegations in the FAC are sufficient to allow the

is insufficient under *Davis* is misplaced. While *Escue* held that prior instances of sexual harassment that were "too dissimilar, too infrequent, and/or too distant in time" were insufficient "to provide the [defendant] school with actual knowledge of sexual harassment in its programs," (*Escue*, 450 F.3d 1146, 1153 (10th Cir. 2006), this holding was in the context of a plaintiff's attempting to hold a school liable for her sexual harassment by a professor based on the school's notice of several inappropriate actions by this professor that took place nearly a decade prior and did not constitute sexual harassment. This is factually quite dissimilar from the instant case, where the plaintiffs allege notice of a number of recent prior sexual assaults by UT football and basketball players, under similar circumstances as their own assaults. UT also attempts to rely on *Soper v. Hoben* to show that UT's notice was insufficient, but *Soper* is, again, factually distinguishable in that it held that a defendant's notice of prior instances of minor teasing or kissing between students was not sufficient to alert the defendant to the risk of sexual assault. *Soper*, 195 F.3d 845 (6th Cir. 1999)

Finally, UT argues that the plaintiffs in this action have failed to allege an official policy like the one at issue in *Simpson* such that, even if *Simpson* liability is permitted in this Circuit, the plaintiffs have still failed to state a claim. (Docket No. 32, p. 12.) While the instant action does not involve a university policy of hosting a discrete event at which the assaults took place, as in *Simpson*, there are still several other UT practices that have been clearly alleged in the FAC, including UT's policies related to encouraging and condoning similar types of events to entertain athletes and recruits, handling athlete discipline, housing students, and lack of sexual harassment training, among others. It will ultimately be a question of fact to determine whether

plaintiffs to proceed on this theory, and this issue will ultimately be resolved as a question of fact once the record is fully developed.

any of these practices are, in fact, official policies of UT and, if so, whether they gave rise to the plaintiffs' assaults, but the FAC has clearly set forth sufficient allegations to allow the plaintiffs' "before" claims to proceed under a *Simpson* theory of liability.

For these reasons, the court will not dismiss the plaintiffs "before" claims for failure to state a claim and, as a consequence, will not strike the portions of the FAC related to these claims. The court will, however, turn next to the question of whether Jane Doe I's "before" claims in particular are time-barred.

## II. Timeliness of Jane Doe I's "Before" Claim

Title IX does not contain its own statute of limitations, but the Sixth Circuit has held that the applicable limitations period for Tile IX cases is the same as applies to state personal injury claims, which, in Tennessee, is one year. *Lilard v. Shelby Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *see also Bertrand v. Yellow Transp., Inc.*, No. 3:08-1123, 2009 WL 3169821 (M.D. Tenn. Sept. 30, 2009). The tolling agreement between Jane Doe I and UT is dated May 19, 2015, more than one year after Jane Doe I's sexual assault allegedly occurred.[14] The tolling agreement clearly states that it does not resurrect any claims that have already expired as of the date of the agreement.

---

[14] As UT points out, and the plaintiffs do not contest, the court may properly consider the tolling agreement that is attached to UT's briefing, even at the motion to dismiss phase, because it is referred to in the FAC and is central to Jane Doe I's "before" claim. *Kreipke v. Wayne State Univ.*, 807 F. 3d 768, 774 (6th Cir. 2015); *see also Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536-38 (6th Cir. 2012) (affirming the dismissal of a contract claim where the language of the attached contract itself contradicted the allegations about its terms that formed the basis of the allegations in the complaint and holding that, "[w]hen a written exhibit contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." (internal citations omitted)).

The plaintiffs do not contest that a Title IX claim arising on the date of Jane Doe I's assault was already outside of its limitations period as of the date of the tolling agreement, nor do they argue that the tolling agreement saves any such claim. Rather, the plaintiffs argue that Jane Doe I's "before" claim did not, in fact, arise on the day she was assaulted but, rather, arose on the day she learned that she was expelled from UT's nursing program and, therefore, suffered the deprivation of educational opportunity that is a requisite element of a Title IX claim. The court finds this argument untenable. Suffering a sexual assault on campus is, in and of itself, a type of harassment severe enough to constitute a deprivation of educational benefits. *See Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir.1999) (the plaintiff's assertion that she was sexually assaulted "obviously qualified as being severe, pervasive, and objectively offensive sexual harassment that could deprive [her] of access to the educational opportunities provided by her school."). Indeed, the "before" claims of Jane Does II-IV and VI-VIII may also proceed on the theory that their sexual assaults alone give rise to a Title IX claim, irrespective of whether those plaintiffs were subject to any further loss of educational opportunities at UT, or even – as Jane Doe VIII – remain currently enrolled UT students.

There is nothing in the FAC to suggest that Jane Doe I did not have all the information she needed to bring a Title IX claim against UT based on her "before" theory of liability as of the date she was assaulted. Yet, she waited until the statute of limitations had expired to even enter the tolling agreement with UT that the plaintiffs now allege renders her claim timely. The tolling agreement cannot save Jane Doe I's "before" claim, and the court must, therefore, grant UT's motion to dismiss this claim. Jane Doe I's "after" claim, however, which is premised on UT's response to notification of her assault, including the investigation and disciplinary proceedings – and perhaps encompassing UT's refusal to accommodate her so that she might stay in the

nursing program despite her falling GPA that resulted from the trauma of her assault – is not at issue in the currently pending motion and will proceed.

What this means, as a practical matter, is that Jane Doe I will not be able to recover damages from UT to compensate her for the injury of her actual assault, though she may be able to recover compensatory damages arising from UT's response to her report of the assault and actions taken in the aftermath that caused her further injury, including her expulsion from UT's nursing program. Moreover, the tolling agreement is clear that it does not preclude Jane Doe I from asserting any grounds to extend the applicable limitations period. Accordingly, while the FAC does not plead, nor have the plaintiffs argued in their briefing, any grounds for extending the one year statute of limitations period with respect to Jane Doe I's "before" claim, the court will dismiss Jane Doe I's "before" claim *without* prejudice.

## III. Jane Doe V's Retaliation Claim

The Supreme Court has recognized a retaliation claim under Title IX for individuals who are retaliated against by Title IX funding recipients for complaining of Title IX violations. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005). The Sixth Circuit has held that Title IX retaliation claims are analyzed using the same standards as Title VII retaliation claims. *Fuhr v. Hazel Park Sch. Dist.*, 710 F. 3d 668, 673 (6th Cir. 2013); *see also Nelson v. Christian Bros. Univ.*, 226 F. App'x 448, 454 (6th Cir. 2008) ("Generally, the courts have looked to Title VII as an analog for the legal standards in both Title IX discrimination and retaliation claims.") This means that, in order to establish a prima facie case of Title IX retaliation, a plaintiff must show that 1) she engaged in protected activity under Title IX by complaining about Title IX discrimination; 2) this activity was known to the defendant; 3) the defendant, thereafter, took an adverse action against her; and 4) there was a causal connection between the protected activity

and the adverse action. *See Varlesi v. Wayne State Univ.*, No. 14-1862, 2016 WL 860326 (6th Cir. March 7, 2016); *Doe v. Rutherford Cnty., Tenn. Bd. of Educ.*, No. 3:13-00328, 2014 WL 4080163 (M.D. Tenn. Aug. 18, 2014) (Trauger, J.).[15]

UT argues that Jane Doe V has failed to allege the requisite elements of a Title IX retaliation claim because 1) she has not alleged that she engaged in any protected activity; and 2) she has not alleged that any adverse action was taken against her. Specifically, UT argues that Jane Doe V cannot support her retaliation claim based on the retaliatory attacks she alleges were made on Mr. Bowles, in response to his alleged complaints about the sexual assault of Jane Doe IV. UT is correct that Jane Doe V cannot base her retaliation claim on retaliation that was inflicted on Mr. Bowles, irrespective of whether these allegations could support a claim of Title IX retaliation by Mr. Bowles. What UT overlooks, however, is that Jane Doe V is not seeking to recover for the injuries to Mr. Bowles. Rather, Jane Doe V has alleged that the retaliation she suffered was in the form of a hostile environment that caused her to fear for her physical safety and that the creation of this hostile environment was in retaliation for her own role in the investigation into Jane Doe IV's assault.

Contrary to UT's assertion, the FAC clearly alleges that Jane Doe V engaged in protected activity under Title IX. First, the FAC suggests that Jane Doe V participated in some way in the report and investigation of Jane Doe IV's assault.[16] Second, it very clearly alleges that Jane Doe

---

[15] These cases leave open the question of whether the causation element requires "but-for" causation or merely requires that the plaintiff's protected activity was a significant factor in the adverse action. This is not a question that needs to be resolved at the Motion to Dismiss phase in order to determine whether Jane Doe V has adequately pled a claim for relief.

[16] The plaintiffs also appear to argue that, even if Jane Doe V did not engage in protected activity, she may still assert a retaliation claim based on the theory that she was within the "zone-of-interest" to be protected by Title IX, as someone who was a potential witness to the assault on

V reported retaliation against Mr. Bowles, which itself may have constituted a violation of Title IX. The FAC then alleges that, as a consequence, Jane Doe V suffered harassment and a hostile environment that caused her to leave school. This theory is supported by allegations that Jane Doe V received phone calls from football players attempting to persuade her, and Jane Doe IV, not to pursue the accusations and investigation, that these phone calls made her feel physically threatened, particularly in light of the fact that she had witnessed Mr. Bowles' assault related to his support of Jane Doe IV, and that she notified UT of these events and they did not respond. While the content and volume of the phone calls Jane Doe V received from football players is not entirely clear from the allegations in the FAC, the court finds that there is enough in the pleadings to suggest that they may constitute an act of retaliation against Jane Doe V (in the form of harassment/hostile environment, which constructively forced her to leave school), to the extent that these calls were threatening (particularly where the threat was backed up by the

---

Jane Doe IV and the retaliation against Mr. Bowles. To support this argument, the plaintiffs cite *T.L. v. Sherwood*, 68 F. Supp. 3d 1295, 1314-15 (D. Or. 2014), which in turn cites to *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) and *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843 (9th Cir. 2014). As explained in *Sherwood*, however, these cases only permit zone-of-interest recovery for plaintiffs who are close enough to the person who engaged in the protected activity that the court could find that the protected activity was the plaintiff's own or that the retaliation against the plaintiff was intended to actually harm that person. *See Sherwood*, 68 F. Supp. 3d. at 1314-1315 (holding that student plaintiffs could bring retaliation claims where they were allegedly retaliated against for complaints made by their parents on their behalf, and noting that *Ollier* allowed the same and that *Thompson* allowed a retaliation claim by a plaintiff who was fired because his fiancée, who was also his coworker, engaged in protected activity and firing him was intended to harm her). The court finds that the zone-of-interest theory would not apply to save Jane Doe V's claim, had the FAC not alleged that she engaged in protected activity.

assaults on Mr. Bowles).[17]  UT's tolerance or condoning of this retaliatory behavior by the

football players, in failing to respond to Jane Doe V's complaints, may, therefore, support a

theory of retaliation by UT that is analogous to the co-worker retaliation recognized in the Title

VII context.  Indeed, the Sixth Circuit has held that coworker retaliation under Title VII can be

found where:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a
> reasonable worker from making or supporting a charge of discrimination, (2)
> supervisors or members of management have actual or constructive knowledge of
> the coworker's retaliatory behavior, and (3) supervisors or members of
> management have condoned, tolerated, or encouraged the acts of retaliation, or
> have responded to the plaintiff's complaints so inadequately that the response
> manifests indifference or unreasonableness under the circumstances.

*Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008).

UT also argues that Jane Doe V cannot base her retaliation claim on UT's "inaction,"

meaning she cannot successfully assert a retaliation claim based solely on the fact that she was

fearful of retaliation, though UT had not retaliated against her at all.  (Docket No. 41, pp. 10-11.)

The court agrees and, as the court stated above, Jane Doe V cannot base her claim on the

retaliation against Mr. Bowles alone, regardless of whether that retaliation made her reasonably

fearful that she too would be retaliated against.  However, to the extent that Jane Doe V is able to

show that UT had notice that she was suffering a hostile environment based on the threats the

football players made to *her* and did not adequately respond, this is not inaction, but rather the

---

[17] The court notes that Jane Doe V may have a steep burden to prove that she was subjected to a
hostile environment for Title IX retaliation purposes, but the court is not prepared, at this stage of
the litigation, to preclude Jane Doe V from developing the factual record in an attempt to do so.
The court also finds that such development of the record may, in any event, be relevant to Jane
Doe IV's "after" claim, which involves allegations of improper interference by UT in the
investigation into her assault.

condoning of retaliatory conduct that could form the basis for a retaliation claim against UT under *Hawkins*.

Further, the court finds that, while the plaintiffs do not advance this theory, there is another basis for Jane Doe V's retaliation claim to survive, even if the phone calls she received from football players ultimately are not found to constitute harassment that deprived her of her educational benefits. The FAC alleges that Jane Doe V was told that her return to her athletic team was conditioned on her willingness to segregate herself from other team members, a clearly punitive measure that is pled to be directly related to her alleged protected activity.

For these reasons, the court will not dismiss Jane Doe V's Title IX retaliation claim.[18]

## IV.    <u>Injunctive Relief</u>

As an initial matter, the court is not convinced, at this stage of the proceedings, that any of the plaintiffs' requests for injunctive relief – including to enjoin UT to change the ways in which it responds to allegations of sexual assault – can be tied solely to the plaintiffs' "after"

---

[18] In their response briefing, the plaintiffs also advance the argument that Jane Doe V's allegations about the phone calls she received, the attack on Mr. Bowles, and UT's failure to intervene, all of which caused her to leave school, support a separate cause of action by Jane Doe V for sexual harassment/hostile environment under Title IX. The plaintiffs argue that UT has not moved to dismiss this claim and, therefore, it should survive, even if the court grants UT's motion to dismiss Jane Doe V's retaliation claim. UT argues that it did not move to dismiss a sexual harassment claim by Jane Doe V because no such claim was properly alleged. The court agrees with UT and finds that Jane Doe V has not alleged a cause of action for Title IX sexual harassment/discrimination, because nothing in the FAC suggests that the alleged harassment she suffered was the result of her *sex*. To the contrary, the FAC clearly links the harassment Jane Doe V allegedly experienced *only* to her role as a potential witness in the investigation of Jane Doe IV's assault and supporter of Jane Doe IV. The FAC even attempts to bolster Jane Doe V's understanding of the communications she received from football players as threatening by including allegations that Mr. Bowles, who is a man, was assaulted for the same allegedly protected activity. For these reasons, the court finds that, as to Jane Doe V, the allegations in the FAC support only a claim for Title IX retaliation.

claims, the way some of the plaintiffs' requests for compensatory relief can be. The plaintiffs' requests that UT be enjoined from activities that are solely related to fostering a sexually hostile environment in which female students are more prone to assault – such as condoning underage drinking, drug use, and sex parties in order to entertain athletes and recruits; failing to discipline athletes for sexual assault and other types of misconduct; failing to provide campus training on sexual assault; and failing to separate athletes from female freshman students in residence halls – can all be said to correspond to the plaintiffs' "before" claims only, meaning that they are things that only relate to UT's liability for the plaintiffs' actual assaults. It is made clear throughout the FAC, however, that the allegations regarding the pattern with which UT has responded both to *past* sexual assaults *and* to the sexual assaults of Jane Does I-IV and VI-VII are equally relevant to the "before" claims of Jane Does II-IV and VI-VIII and the "after" claims of Jane Does I-IV and VI-VII.

Allegations that UT is biased in its investigation and disciplinary proceedings (including its application of TUAPA), fails to adequately discipline athletes, and fails to protect victims of athlete assaults – in order that athlete assailants are protected in their ability to remain at UT and be eligible to play sports, while victims who pursue accusations against athletes are shunned or even forced to leave the school altogether – supports both the theory that UT's actions fostered an environment in which the plaintiffs were more vulnerable to sexual assault as well as the theory that UT's actions contributed to additional injuries to the plaintiffs in the aftermath of reporting their assaults.

A. **The Plaintiffs' Standing to Request Injunctive Relief**

The Sixth Circuit has held that a plaintiff's standing to bring a claim for injunctive relief is established through the following elements: "(1) the plaintiff suffered an 'injury in fact' that is

'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical;' (2) the injury must be 'fairly traceable to the challenged action of the defendant;' and (3) 'it must be likely . . . that the injury will be redressed by a favorable decision.'" *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

UT argues that the plaintiffs' claim for injunctive relief should be dismissed for lack of standing because the plaintiffs are "unquestionably no longer students" at UT and, therefore, are not subject to actual or imminent future harms that can be redressed by an injunction. (Docket No. 32, p. 19.) In support of this argument, UT cites the portions of the FAC that state that Jane Does I-V and VII-VIII were students at UT in the past and that they have subsequently left UT or stopped attending classes. (*Id.*) UT acknowledges, however, that the FAC alleges nothing about whether Jane Doe VI is currently a student, though it does allege that she withdrew from classes the semester of her assault.[19] UT also overlooks the fact that the FAC refers to Jane Doe VIII as a current student enrolled in classes for the Spring 2016 semester (though the FAC also states that she has not returned to class and will not return to UT, following her assault this February). The court finds that there is simply not a sufficient factual basis to conclude that Jane Doe VI and Jane Doe VIII are not current students at UT. And, for the reasons discussed above, the fact that Jane Doe VIII has not alleged an "after" claim does not preclude her from pursuing all of the injunctive relief requested, including those portions that relate to UT's response to a report of sexual harassment. First, the way that UT responds to reports of sexual harassment is linked to its liability for creating an environment in which students are more likely to be assaulted, which

---

[19] The court notes that the plaintiffs do not argue in their briefing that Jane Doe VI is a current student at UT, though they do not expressly concede that she is not.

is the basis for Jane Doe VIII's "before" claim. Second, Jane Doe VIII – as an alleged victim whose assault has only recently been reported – has a clear interest in avoiding any injury that may occur from UT's improper response to her assault, irrespective of whether such harm has already occurred.

The plaintiffs' request for injunctive relief can go forward so long as even just one of the plaintiffs has standing to bring such a claim and, therefore, the court need not address the significance of the fact that the remaining plaintiffs, Jane Does I-V and VII, have allegedly already left UT. The court is, however, persuaded by the plaintiffs' argument that, even if *all* of the Jane Does have permanently withdrawn from UT, they may still have standing to pursue their claim for injunctive relief as relates to UT's post-assault practices, based on the fact that at least some of them are still involved in ongoing proceedings (either disciplinary proceedings against their assailants or proceedings challenging decisions about their own academic standing).[20] The plaintiffs also point out that at least some of the other Jane Does felt *forced* to leave school because their assailants have not been adequately disciplined and may remain on campus at

_____

[20] In their briefing, the plaintiffs specifically reference that Jane Does III and IV are involved in pending disciplinary proceedings. (Docket No. 35, pp. 19-20.) The court notes that the FAC explicitly alleges that disciplinary proceedings are pending against Jane Doe III's assailant, but the court is unable to locate anything in the FAC about currently pending disciplinary proceedings involving Jane Doe IV. The FAC does, however, also expressly allege that Jane Doe VI has currently pending a challenge to the loss of her scholarships and financial aid.

UT argues that, by tying the request for injunctive relief to the particular investigations and disciplinary proceedings that arose from the plaintiffs' alleged assaults, the plaintiffs are improperly asking for the court to reverse previous administrative decisions and order a specific outcome. The court finds, however, that the plaintiffs may properly request injunctive relief that could cause UT to change it procedures in a way that may impact outcomes for the plaintiffs, without the court specifically ordering a reversal of any previous decisions. At this stage of the proceedings, it is simply too early to ascertain what type of injunctive relief may be warranted, once there has been an opportunity to fully develop the facts and legal theories.

UT.[21]  Moreover, while the plaintiffs do not advance this argument, the court also notes that nothing in the FAC rules out the possibility that *any* of the plaintiffs may wish to return to UT, should the type of injunctive relief they seek be granted.  In fact, the FAC specifically alleges that Jane Doe I left school only because she was forced to do so when UT declined to extend her any leniency with respect to her GPA dropping below the requirement for her program as a result of the trauma associated with her assault.

The FAC does not allege that any of the plaintiffs has graduated from UT or completed their postsecondary studies elsewhere, and it would not be speculative, based on the allegations in the FAC, to presume that they might return to UT if certain injunctive relief were granted. Indeed, it would be an absurd result to find that any plaintiff lacks standing to seek injunctive relief that may allow her to feel she can safely return to UT, simply because she has alleged that she is not currently attending school at UT *because* of practices by UT that the injunction seeks to redress.  While the injunctive relief sought by the plaintiffs cannot redress the entire scope of injuries they have suffered, to the extent it can permit them to remain or return as UT students and access the educational opportunities they had previously enjoyed, without fear for their safety or fear of ongoing humiliation and trauma, the injunctive relief could potentially address some of the harms they allege. The plaintiffs, therefore, have standing to pursue their injunctive relief claim under *Gaylor*.

UT further argues that, with respect to Jane Doe VI, the fact that her alleged assailant no longer attends UT negates the risk of future harm to her, citing *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F. 3d 1282,1302-03 (11th Cir. 2007).  Not only does *Williams* differ from

---

[21] The plaintiffs specifically reference the allegations in the FAC that the students who assaulted Jane Does II and VII remain on campus.

Jane Doe VI's claim in that both the alleged assailant *and* the plaintiff in *Williams* were no longer students at the defendant university at the time the action was decided, *Williams* also did not involve any allegations that the school had engaged in more widespread Title IX violations than its handling of the particular incidents involving the plaintiff's assault. *Williams*, unlike the instant action, involved a Title IX claim against a university for admitting *one* particular student who the university knew had a prior history of harassing women, overlooking complaints that this student and two others had a specific history of harassing the plaintiff, and then allowing these three students to remain on campus for months after sexually assaulting the plaintiff. *See Williams*, 477 F.3d at 1282. There were no allegations, however, of any ongoing pattern by the defendant university of admitting potential offenders or inadequately responding to sexual assault allegations. *See Id*. Because the perpetrators were no longer students at the university, nor was the plaintiff, *Williams* held that the plaintiff did not have standing to seek an injunction that would force the school to implement general sexual harassment policies. *Id*. at 1302-03.

Here, on the other hand, if the plaintiffs' allegations are taken as true, the plaintiffs are at increased risk of sexual assault by *other* male UT athletes, not just the ones who already assaulted them. Further, the allegations in this action regarding UT's response to the plaintiffs' reports of sexual assault involve much more detailed *patterns* of bias in the proceedings and disregard for victims' rights, as opposed to simply failing to remove one assailant from campus. Contrary to UT's position, the fact that Jane Doe VI's assailant has allegedly graduated and left UT is not relevant to the question of whether Jane Doe VI has standing to bring a claim for injunctive relief against UT that would protect her from future sexual assault, as well as from further injury resulting from the pending proceedings regarding UT's treatment of Jane Doe VI in the aftermath of her assault.

For these reasons, the court will not dismiss the plaintiffs' claim for injunctive relief for lack of standing.

**B.  The Specificity of the Plaintiffs' Injunction Request**

UT argues, in the alternative, that the plaintiffs' request for injunctive relief should be dismissed because the plaintiffs request "the sort of 'obey the law' injunction" that "is not enforceable because it does not meet the specificity requirements of the rule and subjects a defendant to contempt proceedings if it commits some new, unrelated violations."  (Docket No. 32, p. 20, n. 9. (citing *Florida Ass'n of Rehab Facilities, Inc. v. State of Fla. Dep't of Health And Rehabilitation Servs.*, 225 F.3d 1208, 1222-23 (11th Cir. 2000)).  UT appears to be referring to the fact that the FAC's request for injunctive relief, as quoted above, contains some rather broad language about enjoining UT to refrain from, and rectify, *all* Title IX violations.  While this language will likely not be included in any injunction the court issues, this language is not the entirety of the plaintiffs' requested relief.  To the contrary, the plaintiffs' request for an injunction in the FAC also contains some very specific details about enjoining UT from tolerating underage drinking and drug use on campus, facilitating lawyers for athletes accused of sexual assault, providing premises where inappropriate parties may be hosted for athletes and recruits, and implementing biased disciplinary procedures.  Also, Count III of the FAC, which ties into the injunctive relief request insofar as the plaintiffs seek to enjoin UT's alleged misuse of TUAPA, refers specifically to enjoining UT from allowing assailants to cross-examine sexual assault victims and delaying the timeline for sexual assault investigations.  Finally, when read in conjunction with the other allegations of misconduct in the FAC, even the plaintiffs' broad requests to enjoin UT to refrain from conduct that "violates Title IX" can be understood as a request to enjoin UT from engaging in more specific patterns of alleged UT practices, such as,

among other things, failing to train athletes about sexual assaults and investigations, assigning administrative law judges with conflicts of interest to athlete disciplinary proceedings, failing to discipline contact between assailants (or their friends and teammates) and victims in the aftermath of assault allegations, housing freshman athletes in dorms with upper class athletes, hosting parties for athletes that encourage sexually hostile behavior, or allowing the Athletic Department to interfere with disciplinary decisions issued against athletes by other UT departments.

The *Florida* case cited by UT merely held that an actual injunctive order that was issued by a district court was unenforceable because it failed to comport with the specificity required by Rule 65; *Florida* does not involve the dismissal of a request for injunctive relief because its language is overly broad. *See Florida Ass'n of Rehab Facilities, Inc.*, 225 F.3d at 1222-23. Ultimately, it will be at the court's discretion to fashion the precise language of any injunctive relief that is granted in this action, and, therefore, the court will not dismiss the plaintiffs' entire claim for injunctive relief simply because it includes some overly broad language that may ultimately not provide the basis for an enforceable injunction. *See Findlay Truck Line, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 726 F.3d 738, 753 (6th Cir. 2013) (holding that injunctive relief is a form of equity, which is generally subject to the court's discretion.)

## CONCLUSION

For the foregoing reasons, UT's Motion to Dismiss will be granted in part and denied in part. Jane Doe I's "before" claim, for compensatory damages arising from her sexual assault, will be dismissed without prejudice. The "before" claims of Jane Does II-IV and VI-VIII will proceed, as will Jane Doe V's retaliation claim and the plaintiffs' claim for injunctive relief. The

44

court will not strike any portions of the FAC. The "after" claims of Jane Does I-IV and VI-VII, which were not at issue in this opinion, will also proceed.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge